UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HARPETH RIVER WATERSHED ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY DEMAND |
| CITY OF FRANKLIN, TENNESSEE, | ) ) | |
| Defendant. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF AND FOR CIVIL PENALTIES**

## I. INTRODUCTION

1.     This is a civil action brought pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("the Clean Water Act") to prevent the owner and operator of a sewage treatment plant from continuing to pollute the Harpeth River and its tributaries in violation of the Clean Water Act.

2.     Plaintiff Harpeth River Watershed Association ("Watershed Association") seeks a declaratory judgment, injunctive relief, civil penalties, and any other relief this Court deems appropriate to correct the recurring, unpermitted discharges of pollutants and permit non-compliance in violation of the Clean Water Act by Defendant City of Franklin, Tennessee ("Defendant"), which owns and operates the Franklin Sewage Treatment Plant ("Sewage Treatment Plant").

3.     Since at least 2009, Defendant has been and continues to be responsible for the unauthorized discharge into the Harpeth River and its tributaries of pollutants, including untreated sewage, ammonia, and wastewater with toxic characteristics.

4. Since 2010, Defendant has not complied and continues not to comply with the terms of its current Clean Water Act discharge permit, which requires accurate flow measurements to determine pollutant loads, the development and implementation of a plan to reduce nutrients discharged into the Harpeth River, and continuous instream monitoring.

5. Defendant's past and continuing unpermitted discharges and permit violations have a significant impact on water quality, aquatic life, and human health, and have harmed and will continue to harm the Harpeth River and the interests of the Watershed Association.

## II.    JURISDICTION AND VENUE

6. The Watershed Association brings this enforcement action under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365. This Court has subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365 and 28 U.S.C. §§ 1331, 2201 and 1355, and it has personal jurisdiction over the parties.

7. The Watershed Association has complied with the statutory notice requirements under § 505 of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.2 and 135.3. On January 13, 2014, Plaintiff provided Defendant with notice of the violations specified in this Complaint and of Plaintiff's intent to file suit after sixty days should those violations continue. This notice was effectuated by sending a letter ("60-day Notice") via email and certified mail to:

The Honorable Dr. Ken Moore          Eric S. Stuckey
Mayor                                City Administrator
City of Franklin, Tennessee          City of  Franklin, Tennessee
City Hall                            109 3rd Avenue South
109 3rd Avenue South                 Franklin, TN 37064
Franklin, TN 37064

Mark S. Hilty                           Shauna Billingsley
Director                                City Attorney
Water Management Department             City of Franklin, Tennessee
City of Franklin, Tennessee             109 3rd Avenue South
405 Hillsboro Road                      Franklin, TN 37065
Franklin, TN 37064

True and correct copies of the 60-day notice letter and return receipts are attached and incorporated in their entirety by reference as **EXHIBIT 1**.

8.     The Watershed Association also sent a copy of the 60-day Notice to the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region 4, and the Commissioner of the Tennessee Department of Environment and Conservation ("TDEC").

9.      More than sixty days have passed since the letter was served on Defendant, as well as on state and federal agencies.

10.     Upon information and belief, neither EPA nor the State of Tennessee has commenced or is diligently prosecuting any court action or administrative proceeding to redress the violations described in the 60-day Notice and alleged in this Complaint.

11.     The violations identified in the 60-day Notice that are the subject of this action are continuing at this time and are reasonably likely to continue in the future.

12.     Venue is proper in this Court pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district. The Franklin Sewage Treatment Plant is located at 135 Claude Yates Drive in the City of Franklin, Williamson County, Tennessee, which is within this judicial district. The National Pollutant Elimination System ("NPDES") permit at issue in this case, NPDES Permit No. TN0028827 (the "Permit"), authorizes the discharge of wastewater from the Franklin Sewage Treatment Plant's Outfall 001 into the Harpeth River at river mile 85.2, which is within this judicial district. The sewage

treatment plant and Outfall 001 at river mile 85.2 are where a majority of the violations identified in the 60-Day Notice and this Complaint have occurred. Violations also occurred at overflow sites (*i.e.*, where sewage was released from any portion of the wastewater collection, transmission, or treatment system other than through permitted outfalls), as more specifically described *infra*, also within this judicial district.

13. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a municipality in Williamson County, Tennessee, within this judicial district, and, pursuant to 28 U.S.C. § 1391(b)(2), because the events and omissions giving rise to the claims alleged in this complaint—that is, the Clean Water Act violations—occurred in and around the Harpeth River, within this judicial district.

## III.  PARTIES

14. Plaintiff Harpeth River Watershed Association is a "citizen" as defined in the Clean Water Act, capable of bringing a citizen suit under the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365.

15. The Watershed Association is a § 501(c)(3) non-profit public interest organization with its headquarters in Brentwood, Tennessee. The Watershed Association's mission is to restore and preserve the Harpeth River Watershed through education, research, discussion, and advocacy, and to encourage the public, including industry and government, to comply with existing laws and regulations relating to water quality. The Watershed Association and its members are concerned about contamination of the Harpeth River and about threats to wildlife and wildlife habitat posed by the pollutants in Defendant's discharge. They live, work, fish, swim, boat, view wildlife, engage in nature study and scientific study, and participate in other

forms of recreation in and around the Harpeth River. Defendant's discharges into the Harpeth River in the vicinity of these uses, impairs them.

16.     Defendant City of Franklin is a municipality in Williamson County, Tennessee and is a "person" subject to suit under the Clean Water Act. 33 U.S.C. § 1362(5). *See also* 33 U.S.C. § 1362(4).

17.     Defendant owns and operates the Franklin Sewage Treatment Plant, which receives domestic sewage, industrial sewage, and stormwater runoff from within the City of Franklin. This facility and its sewer collection system constitute the source of the violations described below.

18.     Defendant's Sewage Treatment Plant serves approximately 62,000 people and has a design flow of 12 million gallons per day ("MGD"). Defendant's Sewage Treatment Plant is the largest pollution point source discharge in the approximately 870-square-mile Harpeth River Watershed.

19.     Stream flow or discharge is often measured in terms of either cubic feet per second ("cfs") or millions of gallons per day ("MGD"). One cfs is equivalent to 0.646272 MGD; for frame of reference, a discharge of 12 MGD like that from Defendant's facility equates to approximately 18 cfs.

**IV.     BACKGROUND**

    **A. The Harpeth River**

20.     The Harpeth River flows in a generally southeast-to-northwest direction for 125 miles through middle Tennessee and is partially designated as a State Scenic River. Tenn. Code Ann. §§ 11-13-101(b); 11-13-104. The Harpeth River is a seasonably variable stream and

experiences extremely low flow conditions of less than 1 cubic foot per second during average summer months.

21. The stretch of the Harpeth River that receives Defendant's discharge is identified by TDEC using the code TN05130204016_1000. It is 6.8 miles long and begins downstream from downtown Franklin, Tennessee. This segment is currently classified for the following uses: Industrial Water Supply, Fish and Aquatic Life, Recreation, Livestock Watering and Wildlife, and Irrigation. Tenn. Comp. R. & Regs. 0400-40-04-.12 (2014). This segment appears on Tennessee's list of waterways that do not meet water quality standards under the Clean Water Act. 33 U.S.C. § 1313; 40 C.F.R. § 130.10 ("the § 303(d) list"). It has appeared on the § 303(d) list since 1998.

22. This segment of the Harpeth River is listed as impaired for its classified uses because of "low dissolved oxygen" and "phosphorus," and the sources of these impairments are identified as "Municipal Point Source" and "Discharges from MS4 [Municipal Separate Storm Sewer] area." *TDEC Final Version Year 2012 303(d) List*, p. 37 (Jan. 2014).

23. In July 2014, TDEC's *Draft Year 2014 303(d) List* was published. This list maintains that segment TN05130204016_1000 is impaired due to low dissolved oxygen and phosphorus; it also added a parameter to this segment's impairments not on the 2012 303(d) list: "loss of biological integrity due to siltation."

**B. Water Quality Standards and Total Maximum Daily Load**

24. The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Among other specific duties, states must establish minimum "water quality standards" sufficient to carry out the overall purpose of the Clean Water Act. 33 U.S.C. §1313; 40 C.F.R. § 131.2.

25.     Section 301(b)(1)(C) of the Clean Water Act and its implementing regulations require that all permits to discharge into the Nation's waters issued after 1977 include any "more stringent . . . limitation necessary to meet water quality standards . . . ." 33 U.S.C. §1311(b)(1)(C); 40 C.F.R. § 122.44(d)(1).

26.     When setting water-quality based permit limits, a state considers whether a given point source discharge "causes, has the reasonable potential to cause, or contributes to" an exceedance of the narrative or numeric criteria for various pollutants set forth in state water quality standards. 40 C.F.R. § 122.44(d)(1)(ii).

27.     Water quality standards are established for various use classifications, consistent with the purpose of the Water Quality Control Act, "to abate existing pollution of the waters of Tennessee, to reclaim polluted waters, to prevent the future pollution of the waters, and to plan for the future use of the waters so that the water resources of Tennessee might be used and enjoyed to the fullest extent consistent with the maintenance of unpolluted waters." Tenn. Code Ann. § 69-3-102. *See also* Tenn. Code Ann. § 69-3-105(a). These standards are then used to set NPDES permit limits and determine whether a stream is impaired, such that a TMDL is needed.

28.     When a waterbody like the Harpeth River is impaired or could become impaired, the state or federal agency responsible for enforcing the Clean Water Act must develop a Total Maximum Daily Load ("TMDL") for each pollutant that prevents the waterbody from attaining water quality standards. A TMDL is a plan that helps identify sources of impairment, "quantifies the amount of a pollutant that can be assimilated in a waterbody," and allocates the allowable wasteload among pollutant sources so that appropriate control actions and reductions can be made. *See* 40 C.F.R. § 130.2(h) (2002). *See also* 40 C.F.R. § 130.2(i) (2014). "Such load shall be established at a level necessary to implement the applicable water quality standards with

seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C) (2014).

29.     A TMDL for "Organic Enrichment/Low Dissolved Oxygen" for the Harpeth River was finalized a decade ago, in 2004. Despite the Clean Water Act's mandate, neither EPA nor TDEC established TMDLs in Tennessee until environmental groups sued to compel them to identify environmentally impaired waters in Tennessee and establish plans designed to bring those waters into compliance with applicable water quality standards. *Tenn. Envtl. Council et al. v. EPA*, Case No. 3:01-CV-00032 [Doc. 1] (M.D. Tenn. Jan. 1, 2001). Developing a Harpeth River TMDL was one of the terms of settlement of that litigation; when this TMDL was finalized for the Harpeth River, it set annual loads for nitrogen and dissolved oxygen in both the headwaters and the lower Harpeth River. However, it did not establish a wasteload allocation for phosphorus in the lower Harpeth River.

30.     Nutrients like nitrogen and phosphorus are pollutants because, although they "are necessary to support aquatic life . . . excess nutrients [in a waterbody] create conditions leading to eutrophication and hypoxia, in which over-enrichment causes oxygen concentrations to fall below the level necessary to sustain most within and near-bed animal life." *Definition of "Waters of the United States" Under the Clean Water Act*, 79 Fed. Reg. 22,188, 22,224 (proposed Apr. 21, 2014).

31.     The Harpeth River has excessive levels of nutrients, which causes problems at the watershed level, but the need to control local nutrient input has regional and national implications because their aggregate impact can be devastating for commercial and recreational fisheries. *See* 79 Fed. Reg. 22,228 (Apr. 21, 2014).

32.     Excess nitrogen has a different effect on water quality than excess phosphorus. A pound of phosphorus can stimulate the growth of more than 106 pounds of algae whereas one pound of nitrogen will stimulate the growth of 16 pounds. Algae take sunlight and inorganic nutrients and produce organic matter, which can be measured as Chemical Oxygen Demand ("COD"). One pound of algal biomass equals 1.24 pounds of COD. Therefore, one pound of phosphorus will support the growth of approximately 131 pounds of COD as algae, whereas one pound of nitrogen can support the growth of only approximately 19.8 pounds of COD as algae.

33.     Tennessee's water quality standard for nutrients (*e.g.*, nitrogen and phosphorus) mandates: "The waters shall not contain nutrients in concentrations that stimulate aquatic plant and/or algae growth to the extent that aquatic habitat is substantially reduced and/or the biological integrity fails to meet regional goals. Additionally, the quality of downstream waters shall not be detrimentally affected." Tenn. Comp. R. & Regs. 0400-40-03-.03(k). "Interpretation of this provision may be made using the document *Development of Regionally-based Interpretations of Tennessee's Narrative Nutrient Criterion* and/or other scientifically defensible methods." *Id.*

34.     Since 2001, the *Development of Regionally-based Interpretations of Tennessee's Narrative Nutrient Criterion* has recommended numeric interpretations of the narrative water quality standard for nutrients for each of Tennessee's "ecoregions" (*i.e.*, areas with similar ecosystems and types, qualities, and quantities of environmental resources). Defendant's Sewage Treatment Plant is located in an area designated Level IV Ecoregion 71h, in which the recommended numeric interpretation of the narrative criterion for Total Phosphorus is 0.18 milligrams per liter ("mg/l"). Tennessee's water quality standards also allow for "scientifically defensible methods" to interpret the narrative standard for nutrients, and ten years ago, EPA's

scientifically defensible method for the appropriate numeric interpretation of Tennessee's narrative criteria for Total Phosphorus in Ecoregion 71h was 0.060 mg/l. *Harpeth TMDL*, p. 20.

35. More recently, Tennessee's draft nutrient reduction strategy establishes a tiered approach and provides that sewage treatment plants with a high impact may only discharge 0.3 mg/l of phosphorus into phosphorus-impaired waters.

36. Tennessee's water quality standard for dissolved oxygen provides, "There shall be sufficient dissolved oxygen present to prevent odors of decomposition and other offensive conditions" and "dissolved oxygen shall not be less than 5.0 mg/l." Tenn. Comp. R. & Regs. 0400-40-03-.03(2)(a), (3)(a).

37. Tennessee's water quality standard for biological integrity provides, "The waters shall not be modified through the addition of pollutants or through physical alteration to the extent that the diversity and/or productivity of aquatic biota within the receiving waters are substantially decreased or, in the case of wadeable streams, substantially different from conditions in reference streams in the same ecoregion." Tenn. Comp. R. & Regs. 0400-40-03-.03(m).

### C. Defendant's Uses of the Harpeth River and its NPDES Permit

38. Upstream from Defendant's sewage treatment plant, Defendant withdraws up to 20% of the Harpeth River's flow to provide a portion of its drinking water supply. Defendant's drinking water plant is not allowed to operate when the instream flow in the Harpeth River is below 10 cfs (approximately 6.5 MGD). When Defendant's drinking water plant is operating, Defendant's upstream withdrawal lessens the capacity of the Harpeth River to assimilate Defendant's discharge from its Sewage Treatment Plant downstream. While Defendant's

currently-operating drinking water plant has a 2 MGD capacity, Defendant has explored plans to expand this plant's capacity to 2.6 or 4 MGD.

39.     Under authority of the Tennessee Water Quality Control Act and the authority delegated to the State of Tennessee from EPA, TDEC has issued and renewed a National Pollutant Discharge Elimination System ("NPDES") permit to Defendant for its Sewage Treatment Plant, NPDES permit number TN0028827 ("the Permit"). *See* 33 U.S.C. § 1342(b); Tenn. Code Ann. § 69-3-101 *et seq*.

40.     The Permit authorizes the discharge of wastewater from Outfall 001 into the Harpeth River at approximately river mile 85.2. *State of Tennessee NPDES Permit No. TN0028827* (Issued Sept. 30, 2010, Modified Feb. 2, 2011) (hereafter "*Permit*") (a true and accurate copy of this permit is attached as **EXHIBIT 2**).

41.     The current version of the Permit became effective on November 1, 2010, pursuant to the permitting requirements of the Clean Water Act, 33 U.S.C. § 1342, and expired on November 30, 2011. It has been administratively extended by TDEC pending the issuance of a new permit for which Defendant has applied.

42.     Effluent limitations in the Permit that relate to nutrient enrichment and oxygen demand include $CBOD_5$ (five day carbonaceous biochemical oxygen demand), phosphorus, nitrogen, and ammonia.

43.     Despite 40 C.F.R. § 122.4(i) and the state and federal interpretations of Tennessee's water quality standard for nutrients, the Permit provides that Defendant can discharge up to 5.0 mg/l of Total Phosphorus (monthly average concentration) in the summer (May through October). There is no limit on how much phosphorus Defendant may discharge

during the winter (November through April). Defendant has no daily limits on its phosphorus discharge.

44.     In 2009, during the NPDES permit renewal process, TDEC proposed reducing Defendant's Total Phosphorus effluent limit to 3.0 mg/l (monthly average concentration), but—as reflected in the permit rationale addendum—Defendant responded that the limit should be raised to 5.0 mg/l and that "one of the targeted goals to be included in the [plant-specific] Nutrient Management Plan and the [Defendant's city-specific] IWMP ["Integrated Water Management Plan"] is to achieve a total phosphorus concentration limit of not more than 3 mg/l." (**EXHIBIT 2**, pp. 55-56). According to the permit rationale, TDEC agreed to raise the limit to 5.0 mg/l, specifically citing the Nutrient Management Plan and its lower phosphorus target goal as reasons for keeping the phosphorus limit at the higher level during the current permit cycle. *Id.* at p. 56.

45.     In 2013, TDEC again proposed limiting Defendant to discharging no more than 3.0 mg/l of phosphorus (monthly average concentration); in November 2013, Defendant submitted comments to TDEC about the proposed renewed NPDES permit, including a request "that the requirement for 3.0 mg/l total phosphorus be dropped from the permit" because, in part, "there is no phosphorus wasteload allocation established in the TMDL." Moreover, Defendant requested that the permit's Nutrient Management Plan requirement, which requires Defendant to maximize nutrient removal of its discharge, be "dropped completely from the [new version of the NPDES] permit." As of August 2013, TDEC has not issued a new permit to Defendant.

**V.     CLAIMS FOR RELIEF: VIOLATIONS OF THE CLEAN WATER ACT, TENNESSEE WATER QUALITY CONTROL ACT AND IMPLEMENTING REGULATIONS**

**ALLEGATIONS COMMON TO ALL CLAIMS**

46.     Paragraphs 1-45 are hereby incorporated by reference as if rewritten in their entirety.

47.     As owner and operator of the Franklin Sewage Treatment Plant, Defendant is responsible for the violations of the Clean Water Act alleged herein.

48.     At all times relevant hereto, Defendant was and is responsible for complying with all applicable requirements of the Rules of TDEC, the Tennessee Water Quality Control Act, and the Clean Water Act concerning the discharge of pollutants into the Harpeth River and its tributaries. 33 U.S.C. § 1317(a); *Permit*, § 3.10 (2010).

49.     Prior to filing this lawsuit, the Watershed Association notified Defendant that Defendant's pollutant discharges and permit non-compliance violate the Clean Water Act and interfere with the Watershed Association's rights.

50.     The purpose of providing defendants with notice of intent to sue is to provide an opportunity to come into compliance without the need for litigation.

51.     Defendant has asserted that it corrected some of the deficiencies identified by the Watershed Association after receiving the Notice. These changes included re-submitting Discharge Monitoring Reports ("DMRs") and Monthly Operating Reports ("MORs") to TDEC. Both DMRs and MORs are reports about Defendant's operations, including the amounts of pollutants it has been discharging into the Harpeth River. These reports must be submitted to TDEC each month, signed and certified under penalty of perjury. In total, Defendant re-submitted approximately 339 pages of records to TDEC as a result of the Notice. The new DMRs and MORs show that Defendant amended some entries and added others, including using what it called the "rule of rounding" to round down certain entries from levels at which it was in violation to levels at which it was not.

52.     However, Defendant failed to correct other violations cited by the Watershed Association. As a result, Plaintiff and its members continue to suffer irreparable injury as a result of the discharges of Defendant's pollutants into the Harpeth River and Defendant's permit non-compliance.

53.     The Harpeth River and its tributaries are waters of the United States or have a significant nexus to waters of the United States and thus are navigable waters as defined by the Clean Water Act and controlling authority. 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

54.     To accomplish the objective of the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" Congress set the national goal that "the discharge of pollutants into the navigable waters be eliminated . . . ." 33 U.S.C. § 1251(a).

55.     One way in which this goal was to be accomplished required states to establish water quality standards. The purpose of a water quality standard, as defined in the Clean Water Act, is to ensure that, wherever attainable, water quality will be suitable for public water supplies, propagation of fish and wildlife, and recreational purposes, among other uses. 33 U.S.C. §§ 1313(c)(2)(A), 1251(a)(2). Tennessee water quality standards provide that, "Waters have many uses which in the public interest are reasonable and necessary. Such uses include: sources of water supply for domestic and industrial purposes; propagation and maintenance of fish and other aquatic life; recreation in and on the waters including the safe consumption of fish and shellfish; livestock watering and irrigation; navigation; generation of power; propagation and maintenance of wildlife; and the enjoyment of scenic and aesthetic qualities of waters." Tenn. Comp. R. & Regs. 0400-40-03.02(2) (2014).

56.     Section 301 of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from any point source to waters of the United States, except for discharges in compliance with an NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

57.     The Clean Water Act gives regulators the authority to require permit holders to undertake tasks to further the Act's objectives, "including but not limited to . . . developing or assisting in the development of any effluent limitation, or other limitation, prohibition, or effluent standard, pretreatment standard, or standard of performance under this chapter . . . ." 33 U.S.C. § 1318.

58.     Because an NPDES permit provides a limited exception to the prohibition on discharging pollutants, a permit holder must strictly comply with the terms of its permit.

59.     The issuance of an NPDES permit "does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of federal, state, or local laws or regulations." *Permit* § 2.1.6 (2010).

60.     Each violation of an NPDES permit—and each "discharge of any pollutant" that is not authorized by a permit—constitute a separate violation of the Clean Water Act. *See, e.g.*, 33 U.S.C. § 1319(d) ("penalty . . . per day for each violation"); 33 U.S.C. §§ 1311(a), 1342(a), 1365(f). *See also* 40 C.F.R. § 122.41(a). *Accord* Tenn. Comp. R. & Regs. 1200-04-05-.07(2)(a).

61.     The "discharge of any pollutant" means "any addition of any pollutant to navigable waters from any point source . . . ." 33 U.S.C. § 1362(12). The term "pollutant" includes sewage, garbage, sewage sludge, chemical wastes, biological materials, heat, and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The

term "point source" includes "any discernible, confined and discrete conveyance" from which pollutants may be discharged, including "any pipe, ditch, channel, tunnel, conduit, well [and] discrete fissure." *Id.* § 1362(14). The term "effluent limitation" means "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

62.     Nothing precludes a state from adopting or enforcing requirements which are more stringent or more extensive than those required under the Clean Water Act and its implementing regulations. 40 C.F.R. § 123.1(i)(1).

63.     Defendant's NPDES permit contains water quality-based effluent limitations, monitoring requirements, and reporting requirements.

64.      Water quality-based effluent limitations are incorporated into NPDES permits if technology-based limitations alone are not sufficient to ensure compliance with applicable water quality standards. 33 U.S.C. §§ 1311(b)(1)(C), 1312(a), 1313(e)(3)(A); 40 C.F.R. § 122.44(d). Each NPDES permit must include requirements necessary to achieve water quality standards under the Clean Water Act, including state narrative criteria for water quality. 40 C.F.R. § 122.44(d)(1).

65.     Defendant's NPDES permit provides, "The wastewater discharge shall not contain pollutants in quantities that will be hazardous or otherwise detrimental to humans, livestock, wildlife, plant life, or fish and aquatic life in the receiving stream." *Permit* § 1.1 (2010). It also informs that, "notwithstanding this Permit, it shall be the responsibility of the

permittee to conduct its wastewater treatment and/or discharge activities in a manner such that public or private nuisances of health hazards will not be created." *Permit* § 2.4.1 (2010).

66.     Defendant's NPDES permit incorporates Tennessee's "Antidegradation Statement" into Defendant's obligations for permit compliance. *Permit* § 3.10 (2010). *See* 40 C.F.R. § 131.12 (2014). *See* Tenn. Comp. R. & Regs. 0400-40-03-.06 (2014). The antidegradation statement is designed to maintain and protect water quality.

67.     Defendant's NPDES permit provides, "Any permit noncompliance constitutes a violation of applicable state and federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance." *Permit* § 2.3.1 (2010).

68.     Defendant's NPDES permit further provides, "The filing of a request by the permittee for a modification, revocation, reissuance, termination, or notification of planned changes or anticipated noncompliance does not halt any permit condition." *Permit* § 2.2.2(d) (2010).

69.     "In the case of any noncompliance which could cause a threat to public drinking supplies, or any other discharge which could constitute a threat to human health or the environment," the permittee must notify TDEC within twenty-four hours of becoming aware of the circumstances. *Permit* § 2.3.2(a) (2010). *See also id.* § 2.3.6 (2010) (report unanticipated bypass within 24-hours).

70.     The NPDES permitting program relies primarily on self-reporting by permittees to determine compliance. As such, Defendant is required to record and submit Discharge Monitoring Reports ("DMRs") and Monthly Operating Reports ("MORs") to show it is in compliance with the permit. *Permit* §§ 1.3.1, 1.3.4 (2010).

71.     Defendant's NPDES permit further provides that Defendant's DMRs and MORs must be signed and certified. *Permit* § 1.3.1 (2010). *See also* 40 C.F.R. § 122.22(d) (requiring certification by authorized agent of permittee that information submitted with DMR is "true, accurate, and complete"); Tenn. Comp. R. & Regs. 1200-04-10-.03(e)(4) (2013); Tenn. Comp. R. & Regs. 0400-40-05-.07(f) (2014).

72.     Defendant's NPDES permit further provides that Defendant must report any permit non-compliance on its DMRs. *Permit* § 2.3.2 (2010).

73.     The Clean Water Act allows enforcement of a state's water quality provisions. *See* 33 U.S.C. §§ 1365(a)(1), 1365(f), 1342(b).

74.     Section 505 of the Clean Water Act authorizes any citizen to commence a civil action "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation . . . ." 33 U.S.C. § 1365(a)(1).

75.     Such enforcement action under Clean Water Act § 505, 33 U.S.C. § 1365, includes an action seeking remedies for violation of "a permit or condition thereof issued under section 1342 of this title," that is, under section 402 of the Clean Water Act. 33 U.S.C. § 1365(f).

76.     Section 505(a) of the Clean Water Act authorizes an action for injunctive relief. 33 U.S.C. § 1365(a).

77.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505(a) of the Clean Water Act. 33 U.S.C. § 1319(d) (Availability of Civil Monetary Penalties); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

78.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorney fees and expert witness fees.

79.     Based on Defendant's own public reports to TDEC, Defendant has a long-standing and continuing history of unauthorized discharges from the Sewage Treatment Plant and its sewage collection system into the Harpeth River and other waters of the United States, such as unpermitted discharge of untreated sewage, discharges of excess pollutants, wet and dry weather overflows, and bypasses. Based on Defendant's own public reports to TDEC, Defendant has a long-standing and continuing history of non-compliance with its NPDES permit, including failure to develop or implement a nutrient management plan, failure to perform continuous instream monitoring, failure to operate its plant in accordance with its permit, and failure to accurately measure its influent. It is therefore reasonably likely that Defendant's illegal discharges and permit non-compliance will continue to occur in the absence of a remedy provided by this Court.

80.     Defendant's violations are exacerbated by Defendant's withdrawal of water upstream from its discharge outfall, lessening the Harpeth River's assimilative capacity.

81.     Continuing commission of the acts and omissions alleged herein irreparably harms the identified waters, as well as Harpeth River Watershed Association and its members, for which they have no adequate remedy at law

82.     These identified types of continued violations have a significant impact on water quality, aquatic life, and human health.

## COUNT 1: DEFENDANT'S SEWAGE OVERFLOWS AND TREATMENT PLANT BYPASSES VIOLATE THE CLEAN WATER ACT

83.     Paragraphs 1-82 are hereby incorporated by reference as if rewritten in their entirety.

84.     Defendant's wastewater collection and transmission system is supposed to convey domestic, commercial, and industrial wastewater, plus limited amounts of infiltrated ground water and stormwater, to its sewage plant for treatment.

85.     Defendant's NPDES permit provides that "any release of sewage from any portion of the collection, transmission, or treatment system other than through permitted outfalls" is an "overflow." Overflows are prohibited. *Permit*, § 2.3.3(a), (b) (2010).

86.     Microbial pathogens, toxics, and other pollutants present in overflows can cause or contribute to water quality impairment, contamination of drinking water supplies, and other environmental and human health problems.

87.     Defendant's permit also prohibits bypasses, except under limited and specified circumstances. A "bypass" is the intentional diversion of waste streams from any portion of a treatment facility. *Permit*, § 2.3.6(a), (b) (2010). In other words, bypasses mean that untreated or partially treated sewage is discharged into the Harpeth River.

88.     Defendant must submit monthly reports to TDEC with a "summary report of known or suspected instances of overflows in the collection system or bypass of wastewater treatment facilities." *Permit* § 1.3.5.1 (2010).

89.     "The [overflow] report must contain the date and duration of the instances of overflow and/or bypassing and the estimated quantity of wastewater released and/or bypassed." *Permit* § 1.3.5.1 (2010).

90.    Defendant's own records submitted under oath to TDEC and EPA show that Defendant violated its NPDES permit's prohibition on overflows and reporting requirements for overflows, as reflected in the following chart:

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2009-01-22* | Overflow | 301 Avondale Drive | unknown | § 308[3] Report (p. 6): Unreported overflow event in customer call database[4] |
| 2009-02-26 | Dry Weather Overflow | Ivy Glen Pump Station | "unknown" | |
| 2009-03-20 | Dry Weather Overflow | Ladd Park Subdivision | "unknown" | |
| 2009-05-07* | Overflow | 209 Walnut Drive | unknown | § 308 Report (p. 6): Unreported overflow event in customer call database |
| 2009-05-13 | Dry Weather Overflow | 3453 Carothers Parkway | "unknown" | |

--------------------

[1] "*" signifies that the overflow was not included in the Notice; the source of information about these overflows or bypasses is indicated in the "notes" column.

[2] When quoted, the description of overflow volume comes from Defendant's reports; when not quoted, the description indicates an absence of information in Defendant's reports.

[3] In October 2012, EPA sent Defendant an "Information Request Letter" pursuant to Section 308 of the Clean Water Act, 33 U.S.C. § 1318, requesting Defendant provide certain information about the Franklin STP and its associated sanitary sewer collection system. Defendant provided information in a "§ 308 Response" and "Attachment A-2" to the response. Thereafter, EPA conducted a Compliance Evaluation Inspection in June 2013. In December 2013, EPA sent Defendant a report detailing the results of EPA's Compliance Evaluation Inspection of Defendant's wastewater collection and transmission system ("§ 308 Report").

[4] EPA's December 2013 letter to Defendant is the source of information about some of the unreported overflow events that were not reported to TDEC or EPA. EPA's information appears to have been limited to overflow events occurring before August 2013.

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2009-05* | Overflow | | unknown | Noted on Re-submitted May 2009 DMR which references two overflows, perhaps referring to 3465 Carothers Parkway |
| 2009-09-09* | Overflow | 317 Main Street | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"][5] "sewer back up – grease buildup" |
| 2009-12-28 | Overflow | 207 Davidson Drive | unknown | EPA § 308 Report (p. 6): Unreported overflow event in customer call database |
| 2010-01-16* | Overflow | 707 Hillsboro Road | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – run sewer main (grease, grit)" |
| 2010-01-17* [or 01-19] | Overflow | 1302 Chickering Drive/Sharp Branch | "N/A" | Noted on Re-submitted January 2010 DMR; EPA § 308 Report (p. 6): Unreported overflow event in customer call database |
| 2010-02-05* | Overflow | 130 9th Avenue South / Sharp Branch | "N/A" | Noted on Re-submitted February 2010 DMR

EPA § 308 Report (p. 6): Unreported overflow event in customer call database |

---

[5] The latest information available to Plaintiff about overflows on "private property" that were not reported to TDEC is December 2012. No similar information is available for 2013 and 2014, as of the filing of this Complaint.

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2010-02-25* | Overflow | 443 Cool Springs Blvd Suite 105 | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – grease buildup" |
| 2010-02-28 | Dry Weather Overflow | 624 Westminster Drive | "unknown" | |
| 2010-03-04 | Weather Overflow | Carlisle Ln. and Old Charlotte Pike | unknown | |
| 2010-04-06* | Overflow | 314 Bel Aire Drive | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – blockage in sewer main" |
| 2010-04-28* | Overflow | 209 Cherry Drive | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – blockage of grease and rags" |
| 2010-05-16* | Overflow | 717 Riverview Drive | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – main line blocked due to roots" |
| 2010-06-04 | Dry Weather Overflow | Lewisburg Pike & Sullivan Farms Subdivision / Donelson Creek | "unknown" | |
| 2010-07-12* | "Chronic Overflows" | Fowles Street & Natchez Street | unknown | Complaint to Defendant |
| 2010-07-16* | Overflow | 300 Saddlebridge Lane | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – blockage between home and main sewer line" |

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2010-09-08 | Overflow | 1343 Carnton Lane | "unknown" | |
| 2010-11-16* | Overflow | 320 Main Street | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – issue w/ City sewer lines" |
| 2010-12-15* | Overflow | 313 11th Avenue South | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – blockage at "T" where line meets City line" |
| 2010-12-18 | Dry Weather Overflow | 720 West Main Street | unknown | |
| 2011-02-15 | Dry Weather Overflow | 720 West Main Street | "n/a" | |
| 2011-02-21 | Dry Weather Overflow | 198 Edmond Court / Harpeth River | "n/a" | |
| 2011-03-30* | Overflow | 332 Natchez Street | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – flushing lines" |
| 2011-04-12* | Overflow | 151 Acton Street | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – cleaning sewer main, raw sewage backflowed" |
| 2011-04-12* | Overflow | 1558 or 155B Acton Street | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – cleaning sewer main, raw sewage backflowed" |

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2011-04-25<br><br>Or 04-26] | Dry Weather Overflow | 4040 Murfreesboro Road / Watson Branch | "n/a" | |
| 2011-06-14 [or 06-15 | Dry Weather Overflow | 713 Murfreesboro Road / North Ewingville Creek | "unknown" | |
| 2011-06-23* | Overflow | 203 Avondale Drive | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – cleaning sewer main, raw sewage backflowed" |
| 2011-10-07 [or 10-10] | Dry Weather Overflow | 112 Tamara Circle | "unknown" | |
| 2011-12-14 | Dry Weather Overflow | 401 Sugartree Lane / Watson Branch | "unknown" | |
| 2011-12-14* | Dry Weather Overflow | 1010 Murfreesboro | unknown | Related to Sugartree Lane<br><br>EPA § 308 Report (p. 6): Unreported overflow event in customer call database |
| 2011-12-18 | Dry Weather Overflow | 528 Hopewood Court / Robinson Lake | "unknown" | |
| 2011-12-29 | Dry Weather Overflow | 700 West Main Street / Sharp Branch | "unknown" | |
| 2012-01-03* | Overflow | 720 W. Main Street | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – west main street" |
| 2012-01-20 | Dry Weather Overflow | 1014 Columbia Avenue / Sharp Branch | "unknown" | |

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2012-02-13 | Dry Weather Overflow | 2000 Mallory Lane / Spencer Creek | "unknown" | |
| 2012-03-13* | Overflow | 112 Seaboard Lane | unknown | EPA § 308 Report (p. 6): Unreported overflow event in customer call database |
| 2012-04-24 | Dry Weather Overflow | 707 Hillsboro Road / Harpeth River | "unknown" | |
| 2012-05-07 | Dry Weather Overflow | Jordan Road / North Ewingville Creek | "unknown" | |
| 2012-06-29* | Overflow | Unknown | unknown | EPA § 308 Report (p. 6): Unreported overflow event in customer call database |
| 2012-07-25* | Overflow | 502 N. Petway | unknown | § 308 Response, Attachment A-2(b) ["SSOs on private property"] "sewer back up – grease buildup" |
| 2012-08-07 | Dry Weather Overflow | 1137 West Main Street / Quarry Branch | "unknown" | |
| 2012-08-08 | Dry Weather Overflow | 363 Stonegate Drive / Donelson Creek | "N/A" | |
| 2012-11-17 | Dry Weather Overflow | 510 New Highway 96 D-1 | "unknown" | |
| 2012-12-03 | Dry Weather Overflow | 605 Chickasaw Place / Sharp Branch | "unknown" | |
| 2013-01-08 | Dry Weather Overflow | 910 Brentwood Pointe / North Prong Spencer Creek | "unknown" | |
| 2013-01-14 | Wet Weather Overflow | 325 4th Avenue North | "N/A" | |
| 2013-03-03 | Dry Weather Overflow | 1247 West Main Street / West Main Branch | "unknown" | |

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2013-04-28 | Wet Weather Overflow | Alicia Drive / Quarry Branch | "N/A" | |
| 2013-04-28 | Wet Weather Overflow | 4th Avenue North / Sharp Branch | "N/A" | |
| 2013-04-28 | Wet Weather Overflow | 712 West Main Street / Sharp Branch | "N/A" | |
| 2013-04-28 | Wet Weather Overflow | Mount Hope Street / Sharp Branch | "N/A" | |
| 2013-04-28 | Wet Weather Overflow | 5th Avenue South / Sharp Branch | "N/A" | |
| 2013-04-29 | Wet Weather Overflow | Franklin Road / Harpeth River | "N/A" | |
| 2013-05-02 | Wet Weather Overflow | 410 Luna Court / Watson Branch | "N/A" | |
| 2013-05-06 | Dry Weather Overflow | 407 Church Street / Sharp Branch | "N/A" | |
| 2013-06-13 | Dry Weather Overflow | 515 Cairnview Drive | Est. 200 gallons | |
| 2013-07-23 | Dry Weather Overflow | 624 Westminster Drive / Watson Branch | "N/A" | |
| 2013-08-26 | Dry Weather Overflow | McEwen Drive & Resource Parkway / South Prong Spencer Creek | Est. 1,000 gallons | |
| 2013-10-19 | Dry Weather Overflow | 2040 Fieldstone Parkway / Stramble Creek | Est. 200 gallons | |
| 2013-10-28 | Dry Weather Overflow | 821 Murfreesboro Road (HWY 96) / North Ewingville Creek | "N/A" | |

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2013-11-08 | Dry Weather Overflow | South Royal Oaks Blvd. & Creekstone Blvd. / Watson Branch | "N/A" | |
| 2013-12-12* | Dry Weather Overflow | 707 Hillsboro Road | Est. 700 gallons | |
| 2013-12-18* | Dry Weather Overflow | 508 Tywater Crossing Boulevard | Est. 40 gallons | |
| 2014-01-10* | Dry Weather Overflow | 1770 Galleria Boulevard | Est. 1,000 gallons | |
| 2014-01-13* | Wet Weather Overflow | 121 Holiday Court | Est. 100 gallons | |
| 2014-02-01* | Dry Weather Overflow | 302 Stable Rd. | Est. 200 gallons | |
| 2014-02-06* | Wet Weather Overflow | 135 Claude Yates Drive | Est. 300,000 gallons | |
| 2014-02-06* | Wet Bypass Overflow | 135 Claude Yates Drive | Est. 348,000 gallons | |
| 2014-02-25* | Dry Weather Overflow | 2000 Shadow Green Dr. | Est. 875 gallons | |
| 2014-04-04* | Overflow | 1010 Murfreesboro Road | Est. 325 gallons | |
| 2014-04-05* | Overflow | McKay's Mill 1 Pump Station, 4121 Clovercroft Rd. | Est. 375 gallons | |
| 2014-04-16* | Overflow | 526 Franklin Road | Est. 3,100 gallons | |
| 2014-04-23* | Overflow | 105 Ornesby Place | Est. 240 gallons | |
| 2014-04-24* | Overflow [disputed] | 424 Old Peytonsville Road | Est. 2,500 gallons | |
| 2014-04-29* | Wet Weather Overflow | 109 South Margin Street | Est. 65,250 gallons | |
| 2014-05-06* | Overflow | 936 Riverview Drive/Harpeth River | Est. 390 gallons | |
| 2014-05-25* | Overflow | 102 Stable Road / Lynnwood Branch | Est. 250 gallons | |

| Date of Violation(s)[1] | Permit Parameter Violated | Location | Volume[2] | Notes |
|---|---|---|---|---|
| 2014-07-02* | Overflow | 108 East Fowlkes Street | Est. 30 gallons | |
| 2014-07-03* | Overflow | 4108 Murfreesboro Road | Est. 485 gallons | |
| 2014-07-26* | Overflow | 1800 Galleria Blvd. | Est. 500 gallons | |

91.     Each overflow and bypass listed above constitutes a violation of the NPDES permit and the Clean Water Act.

92.     Each failure to report the volume of overflows listed above is a violation of the NPDES permit and the Clean Water Act.

93.     It is not known whether reports of these overflows were made within twenty-four hours, but letters from Defendant to TDEC are sometimes dated more than twenty-four hours after the overflow and often marked as received more than twenty-four hours after the overflow. *Permit* § 2.3.2(a) (2010). Failure to report within twenty-four hours in a violation of the NPDES permit

94.     The primary trigger for Defendant's awareness of overflow events in its sanitary sewer collection system is reports from members of the community to Defendant.

95.     According to EPA, Defendant has failed to report all overflows to TDEC.

96.     The seasonally-variable and low-flow nature of the Harpeth River exacerbates the harm caused by Defendant's overflows.

97.     In December 2013, EPA sent Defendant a "Compliance Evaluation Inspection Report" detailing the results of its evaluation of Defendant's wastewater collection and transmission system. EPA's report stated, in part: "[Defendant's] neglect in reporting any volume estimates for SSOs [sanitary sewer overflows] and building back-ups is consistent with a

lack of proper guidance. An examination of [Defendant's] SORP [Sewer Overflow Response Plan] shows that this document is severely inadequate to guide proper recording and reporting procedures."

98.     In the same report, EPA recommended Defendant undertake improvements, including: Mapping; Grease Control, Capacity Assurance; Preventive Maintenance and Inspection Programs; Gravity Line Preventive Maintenance Program; Continuing Sewer System Assessment Program; Infrastructure Rehabilitation Program; Pump Station Operations and Preventive Maintenance Program; and a comprehensive Sewer Overflow Response Plan ("SORP").

99.     Due to Defendant's apparent reporting and monitoring problems, it is not presently possible to determine with complete accuracy whether it violated the overflow and bypass prohibitions on dates in addition to those listed in the table.

100.     Each and every one of the foregoing unpermitted discharges, overflows, and bypasses constitutes a separate and distinct violation of the permit and Section 301(a), 33 U.S.C. §1311(a), and Section 402, 33 U.S.C. § 1342, of the Clean Water Act, and each and every failure to report such unpermitted discharges, overflows, and bypasses in compliance with Defendant's permit violated Defendant's permit and the Clean Water Act. As of the filing of this Complaint, Defendant's efforts have been inadequate to prevent recurrent illegal discharges. These discharges are therefore likely to continue.

101.     Plaintiff and its members have suffered irreparable damage and continue to suffer damage as a result of Defendant's actions and/or omissions described in this count. These actual and potential injuries have been, are being, and will continue to be caused by the illegal discharges from Defendant's Sewage Treatment Plant and sewage collection system into waters

of the United States. The relief sought herein will redress the harms to the Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to stop the illegal discharges of pollutants and to comply with such other relief as this Court deems necessary.

## COUNT 2: FAILURE TO DEVELOP OR IMPLEMENT
## A NUTRIENT MANAGEMENT PLAN VIOLATES THE CLEAN WATER ACT

102.    Paragraphs 1-101 are hereby incorporated by reference as if rewritten in their entirety.

103.    Defendant has failed to develop or implement a plan to decrease the total nitrogen and phosphorus in its treated wastewater through operational changes, without major capital upgrades ("Nutrient Management Plan"). *Permit* § 3.8 & Attachment 2.

104.    Prior to issuing Defendant's current NPDES permit to discharge wastewater into the Harpeth River, TDEC noted that the Harpeth River's designated use for fish and aquatic life was not being fully supported and that Defendant's discharge contained contaminants that contribute to the impairment. More specifically, the Harpeth River is impaired for dissolved oxygen and phosphorus and Defendant's discharge contains contaminants associated with decreased receiving stream dissolved oxygen and increased phosphorus.

105.    Accordingly, TDEC included permit terms requiring Defendant to develop a Nutrient Management Plan and requiring "investigational/increased wastewater control provisions to improve the instream water quality" because "it needs to get additional treatment plant effluent characterization data/instream information, and correspondingly have the permittee investigate/implement wastewater treatment plant operational performance enhancements." *Permit (Rationale)*, Page R-2, § R4(e)); Page R-13, § R7.21 (2010).

106.     Prior to issuance of the current permit, Defendant objected to the requirement to prepare a Nutrient Management Plan, and asked that the requirement be deferred, stating that it would incorporate some of the terms of the Nutrient Management Plan into its Integrated Water Resources Plan ("IWRP"). *See* Addendum to Rationale, Page AD-8 (2010).

107.     TDEC declined to remove the requirement for a Nutrient Management Plan.

108.     Section 3.8 of Defendant's permit provides: "Pursuant to the requirements delineated in Attachment 2, the permittee shall develop/implement a Nutrient Management Plan (NMP) with appropriate reporting for its wastewater treatment plant. The Permittee can request proposed changes to the Attachment 2 provisions within three months from the permit's effective date. If the division agrees in writing with the proposed changes, no permit modification will be necessary."

109.     Defendant's permit describes the Nutrient Management Plan, in part, as follows: "The NMP shall be oriented toward identifying the use of its existing facilities (without major capital expenditures) such that changing operations/usages may result in decreases in the discharged treated wastewater total nitrogen and phosphorus." *Permit*, Attachment 2 (2010). Further, Defendant has been required to address seven elements to maximize removal of nitrogen and phosphorus.

110.     By contrast, the "Scope of Work, Schedule, and Cost Proposal" for Defendant's IWRP framed its purpose as screening "alternatives for capital improvements and resource management opportunities ['such as water conservation, water recycling, *etc.*'] across the spectrum of water-related utilities [*e.g.* 'stormwater, water supply, wastewater, and water reuse']," and described its goal as "present[ing] a long-term program to meet water resource

needs for the next 20 years by identifying the alternatives, their recommended timing, effects, and estimated costs . . . ."

111.   Defendant's Nutrient Management Plan was supposed to have been submitted within nine months of the permit's effective date. Defendant has also been required to update the report each year by February 15.

112.   Defendant did not appeal Permit § 3.8 or Attachment 2 after the permit was issued in 2010.

113.   In July 2011, Defendant "submit[ted] [to TDEC] that the Integrated Water Resources Plan is inclusive of the requirements of the Nutrient Management Plan," which was to be implemented "in the coming years."

114.   TDEC never agreed in writing to proposed changes to Defendant's Permit § 3.8 or Attachment 2.

115.   Defendant's permit was never amended or modified to remove the duty to develop and implement a Nutrient Management Plan according to Permit § 3.8 and Attachment 2.

116.   Defendant did not prepare or implement a Nutrient Management Plan pursuant to Permit § 3.8 and Attachment 2, nor did it submit reports related to the Nutrient Management Plan to TDEC in February 2012, February 2013, or February 2014.

117.   Defendant's subsequently-developed IWRP alternatives (that is, potential project options for Defendant's wastewater system) show increased discharge of nutrients like Total Nitrogen, as well as BOD and Ammonia, into the Harpeth River.

118.   None of Defendant's IWRP alternative plans have been implemented.

119. Each day Defendant has operated without a Nutrient Management Plan is a separate violation of the permit and of the Clean Water Act, and each failure to report on its Nutrient Management Plan to TDEC is a separate violation of the Clean Water Act.

120. This violation is likely to continue. Since 2010, Defendant has submitted no plan oriented toward identifying the use of its existing facilities (without major capital expenditures) such that changing operations/usages may result in decreases in total nitrogen and phosphorus discharged in Defendant's treated wastewater. In fact, in 2013, Defendant requested that the Nutrient Management Plan requirement be "dropped completely from the [new version of the NPDES] permit," because Defendant "sees no rationale for a NMP." In July 2014, Defendant again requested that TDEC accept the IWRP as meeting the NMP requirements and revise the draft NPDES permit to "remove any additional NMP requirement."

121. Plaintiff and its members have suffered irreparable damage and continue to suffer damage as a result of Defendant's failure to develop and implement a plan to reduce nutrients in Defendant's discharge. These actual and potential injuries have been, are being, and will continue to be caused by discharges from the Defendant's Sewage Treatment Plant into nutrient-impaired waters without having developed or implemented a plan to reduce the nutrient loading. The relief sought herein will redress the harms to the Harpeth River Watershed Association and its members caused by Defendant's discharges and permit non-compliance. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to develop and implement a plan to reduce the nutrients discharged into the Harpeth River and to comply with such other relief as this Court deems necessary.

## COUNT 3: FAILURE TO CONDUCT CONTINUOUS
## INSTREAM MONITORING AND RECEIVING STREAM INVESTIGATIONS
## VIOLATES THE CLEAN WATER ACT

122.    Paragraphs 1-121 are hereby incorporated by reference as if rewritten in their entirety.

123.    Section 3.7 and Attachment 1 of Defendant's permit contain receiving stream monitoring and reporting requirements, which Defendant continues to violate. *Permit* § 3.7, Attachment 1 (2010).

124.    Prior to 2013, Defendant also failed to take appropriate grab samples, as required by § 3.7 and Attachment 1.

125.    Instream monitoring and reporting have been required by TDEC to better understand the nature of the Harpeth River's impairments and more clearly determine the impact of Defendant's treated wastewater on the Harpeth River. Defendant's 2010 permit term was less than five years because TDEC needed additional treatment plant effluent characterization data and instream information to set future permit limits consistent with upgrading the Harpeth River's water quality.

126.    During the draft permit stage, Defendant requested that the receiving stream monitoring and reporting provisions contained in Attachment 1 ("particularly those related to the diurnal investigations and the implementation of advanced methods for improving receiving stream water quality") be deleted. *See Addendum to Rationale*, Page AD-7 (2010).

127.    TDEC denied this request and issued Defendant's permit with the following provision: "[A]s defined in Attachment 1, the permittee shall complete supplemental instream monitoring – diurnal investigations and identify enhancements for improving its receiving stream water quality."

128.     Attachment 1 to Defendant's permit states: "[T]he permittee must expand its receiving stream evaluations/reporting to include instream diurnal monitoring stations (one upstream and two downstream of the Outfall 001 discharge) . . . ."

129.     The Permit calls for two downstream and one upstream monitoring stations because the impact of Defendant's wastewater includes both downstream impacts, such as dissolved oxygen sag points created miles downstream by some of the pollutants in Defendant's treated wastewater, and near-outfall impacts.

130.     Within three months from the permit's effective date, Defendant could "request proposed changes to the Attachment 1 requirements." *Permit* § 3.7 (2010).

131.     Defendant's permit indicates that, "Following written approval from the division, the permittee shall proceed with the diurnal testing," and informed that, "[s]hould the division agree in writing with the request, no permit modification will be required." *Id.*

132.     Defendant never appealed the permit requirements contained in Section 3.7 and Attachment 1 of its NPDES permit.

133.     In December 2010, Defendant requested changes to Attachment 1. Rather than one upstream and two downstream monitoring sites, Defendant proposed monitoring water quality at one site three miles upstream from its discharge point and at one site 0.9 miles downstream of its discharge point.

134.     TDEC never provided written approval of Defendant's proposal. Nor has TDEC modified this permit provision or otherwise relieved Defendant of § 3.7's requirement.

135.     To date, Defendant has not conducted the continuous instream monitoring required by the 2010 permit.

136.    In July 2014, Defendant informed TDEC that it has "installed several permanent monitors in the Harpeth River and its tributaries," but no additional information is available about the location and nature of these monitors and the data collected. Whatever monitors have been installed are not being operated in cooperation with the U.S. Geological Survey, as proposed by Defendant in 2010. To date, Defendant has not conducted the modified instream monitoring it proposed in 2010. Plaintiff has no knowledge that TDEC approved a permit modification in 2014.

137.    Each day that Defendant has operated without conducting the instream monitoring is a violation of its permit and the Clean Water Act.

138.    Defendant is likely to continue to violate this provision because, three years after Defendant was supposed to conduct instream monitoring, Defendant again "request[ed] that the Division drop this requirement" in its future NPDES permit.

139.    Defendant also continues to violate § 3.7 and Attachment 1 because it has not submitted annual reports to TDEC about its options for improving receiving stream quality in February 2012, February 2013, or February 2014.

140.    Plaintiff and its members have suffered irreparable damage and continue to suffer damage as a result of Defendant's failure to conduct timely and appropriate instream monitoring investigations in order to aid TDEC set appropriate effluent limitations in Defendant's future NPDES permit and improve Harpeth River water quality. These actual and potential injuries have been, are being, and will continue to be caused by Defendant's failure to comply with its NPDES permit and the illegal discharges from the Defendant's Sewage Treatment Plant operating out of compliance with Section 3.7 and Attachment 1. The relief sought herein will redress the harms to the Harpeth River Watershed Association and its members caused by

Defendant's operation and the failure to investigate its impact on the Harpeth River. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to establish a comprehensive monitoring system to determine the impact of years of its discharge on the Harpeth River and to comply with such other relief as this Court deems necessary.

## COUNT 4: DEFENDANT'S FAILED WHOLE EFFLUENT TOXICITY TESTING VIOLATES THE CLEAN WATER ACT

141.    Paragraphs 1-140 are hereby incorporated by reference as if rewritten in their entirety.

142.    Defendant has violated and is likely to continue to violate Section 1.1 ("Numeric and Narrative Effluent Limitations") and Section 3.4 ("Biomonitoring Requirements, Chronic") of its Permit, which set limits and requirements for testing endpoint toxicity. These permit sections relate to the concentration of Defendant's wastewater that inhibits test organisms ("$IC_{25}$"), according to whole effluent toxicity ("WET") testing. *Permit* §§ 1.1; 3.4 (2010).

143.    To determine the chronic toxicity of Defendant's treated wastewater, organisms are exposed to composite samples of effluent from Defendant's sewage treatment plant. Toxic conditions can be caused by either particular pollutants or by aggregate and synergistic toxic effects when the mixture of pollutants enters receiving waters like the Harpeth River.

144.    Toxicity is demonstrated if the $IC_{25}$ value is less than 100%. "$IC_{25}$" refers to the inhibition concentration causing 25% reduction in survival, reproduction, and growth of test organisms (*i.e.*, water fleas and flathead minnows) when exposed to treated wastewater.

145.    Defendant must only conduct this test four times a year, once per quarter.

146.     Defendant's permit provides that, "In the event of a test failure, the permittee must start a follow-up test within 2 weeks and submit results from a follow-up test within 30

days from obtaining initial WET testing results," and that "the follow-up test will not negate an initial failed test." *Permit* § 3.4 (2010).

147.    The Permit further provides that, "in the event of 2 consecutive test failures or 3 test failures within a 12-month period for the same outfall, the permittee must initiate a Toxicity Identification Evaluation/Toxicity Reduction Evaluation (TIE/TRE) study within 30 days and so notify the division by letter." *Permit* § 3.4 (2010). The TIE/TRE study may be terminated at any time upon the completion and submission of 2 consecutive tests (for the same outfall) demonstrating compliance." *Permit* § 3.4 (2010).

148.    Defendant's first failed whole effluent toxicity test in 2013 occurred in January 2013 (water flea: 18.14%). This failed test for effluent toxicity was for the first quarter of 2013: January 1 to March 30, 2014. This test was conducted by Empirical Laboratories, LLC. A successful follow-up test was conducted in March 2013, more than two weeks after Defendant learned of the test failure. The second test was conducted by a second laboratory, ESC Lab Sciences.

149.    Defendant's second failed whole effluent toxicity test occurred in September 2013 (water flea: 44.5%). This failed test for effluent toxicity was for the third quarter of 2013: July 1 to September 30, 2013. This test was performed by ESC Lab Sciences. ESC Lab Sciences conducted a follow-up test for Defendant in October 2013, which was successful.

150.    Defendant's third failed toxicity test occurred in early December 2013 and was excused due to a testing error or insufficient data due to lab error.

151.    Defendant's fourth failed toxicity test occurred in mid-December 2013 (water flea: 2.02%). This failed test for effluent toxicity was for the fourth quarter of 2013: October 1 to December 31, 2013. The test was conducted by ESC Lab Sciences.

152. Despite having failed at least three toxicity tests in 2013, in March 2014, Defendant admitted only "two toxicity test failures" and asserted that the TIE/TRE has "never been triggered."

153. Defendant's fifth failed toxicity test occurred in April 2014 (water flea: 46.2%). This failed test for effluent toxicity was for the second quarter of 2014: April 1 through June 30, 2014, which was part of Defendant's TIE/TRE. The test was conducted by ESC Lab Sciences.

154. On May 1, 2014, Defendant requested to be released from the Toxicity Identification Evaluation/Toxicity Reduction Evaluation investigation based on test results from a third laboratory, TEC Environmental Laboratories, Inc.

155. Upon information and belief, Defendant has not identified the source of its biomonitoring, whole effluent toxicity test ($IC_{25}$) violations.

156. Without having identified the source of the whole effluent toxicity, Defendant cannot prevent future effluent toxicity violations, and thus these violations are likely to continue.

157. Defendant's failures to conduct each follow-up test within two weeks are also violations of its permit and of the Clean Water Act.

158. Each day of the quarterly period during which Defendant failed a toxicity test is a violation of its permit and of the Clean Water Act.

159. Plaintiff and its members have suffered irreparable damage and continue to suffer damage as a result of Defendant's discharge of wastewater that fails toxicity tests. These actual and potential injuries have been, are being, and will continue to be caused by the illegal discharges from the Defendant's Sewage Treatment Plant into waters of the United States. The relief sought herein will redress the harms to the Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this

Court requiring Defendant to take immediate and substantial action to more fully investigate and stop the illegal discharges of effluent with toxic characteristics into the Harpeth River and to comply with such other relief as this Court deems necessary.

**COUNT 5: DEFNDANTS DISCHAGES OF EXCESS AMMONIA (AS NITROGEN) VIOLATE THE CLEAN WATER ACT**

160.    Paragraphs 1-159 are hereby incorporated by reference as if rewritten in their entirety.

161.    Section 1.1 of Defendant's permit contains a water quality-based effluent limitation which sets numeric effluent limitations for discharge of Ammonia as Nitrogen ("NH$_3$-N" or "Ammonia") into the Harpeth River.

162.    "Ammonia is a constituent of nitrogen pollution. Unlike other forms of nitrogen, which can cause eutrophication of a water body at elevated concentrations, the primary concern with ammonia is its direct toxic effects on aquatic life, which are exacerbated by elevated pH and temperature." *Final Aquatic Life Ambient Water Quality Criteria for Ammonia—Freshwater 2013*, 78 Fed. Reg. 52,192 (Aug. 22, 2013).

163.    According to EPA, "When ammonia is present in water at high enough levels, it is difficult for aquatic organisms to sufficiently excrete the toxicant, leading to toxic buildup in internal tissues and blood, and potentially death." *Fact Sheet on Aquatic Life Ambient Water Quality Criteria for Ammonia—Freshwater (Aug. 2013)*.

164.    Defendant's DMRs and MORs submitted under oath to TDEC reveal the following violations of Defendant's ammonia permit limitation:

| Date of Violation(s) | Permit Parameter Violated | Permit Limit | Reported on DMR (or MOR) | % Exceedance | Fine or Penalty Imposed by TDEC |
|---|---|---|---|---|---|
| June 22, 2010 | Daily Ammonia as Nitrogen mg/L max. | 0.8 | (1.9) | 137.5% | No |
| June 23, 2010 | Daily Ammonia as Nitrogen mg/L max. | 0.8 | (1.5) | 87.5% | No |
| June 24, 2010 | Daily Ammonia as Nitrogen mg/L max. | 0.8 | (1.5) | 87.5% | No |
| June 25, 2010 | Daily Ammonia as Nitrogen mg/L max. | 0.8 | (2.0) | 150% | No |
| June 26, 2010 | Daily Ammonia as Nitrogen mg/L max. | 0.8 | 2.2 | 175% | No |
| June 27, 2010 | Daily Ammonia as Nitrogen mg/L max. | 0.8 | (0.95) | 18.75% | No |
| June 20 – June 26, 2010 | Weekly Ammonia as Nitrogen mg/L avg. | 0.6 | 1.41 | 135% | No |
| June 1 – June 30, 2010 | Monthly Ammonia as Nitrogen mg/L avg. | 0.4 | 0.41 | 2.5% | No |
| January 8, 2012 | Daily Ammonia as Nitrogen mg/L max | 3.0 | 4.8 | 60% | No |
| January 9, 2012 | Daily Ammonia as Nitrogen mg/L max. | 3.0 | 4.0 | 33.33% | No |
| October 14 - October 20, 2012 | Weekly Ammonia as Nitrogen mg/L avg. | 0.60 | 0.63[6] | 5% | No |
| June 12, 2013 | Daily Ammonia as Nitrogen mg/L max. | 0.80 | (0.90) | 12.5% | No |
| June 13, 2013 | Daily Ammonia as Nitrogen mg/L max. | 0.80 | 7.10 | 787.5% | No |
| June 14, 2013 | Daily Ammonia as Nitrogen mg/L max. | 0.80 | (7.00) | 775% | No |
| June 15, 2013 | Daily Ammonia as Nitrogen mg/L max. | 0.80 | (6.90) | 762% | No |
| June 9 – June 15, 2013 | Weekly Ammonia as Nitrogen mg/L avg. | 0.60 | 3.26 | 443.33% | No |
| June 9 – June 15, 2013 | Weekly Ammonia as Nitrogen lb/day avg. | 60 | 183.0 | 205% | No |

---

[6] After receiving the Notice from the Watershed Association, in 2014, Defendant re-submitted its October 2012 DMR to TDEC changing this entry from "0.63" to "0.6" based on its position that it should have rounded down the results.

| Date of Violation(s) | Permit Parameter Violated | Permit Limit | Reported on DMR (or MOR) | % Exceedance | Fine or Penalty Imposed by TDEC |
|---|---|---|---|---|---|
| June 16, 2013 | Daily Ammonia as Nitrogen mg/L max. | 0.80 | (5.10) | 537.5% | No |
| June 17, 2013 | Daily Ammonia as Nitrogen mg/L max. | 0.80 | (1.30) | 111.25% | No |
| June 16 – June 2,2 2013 | Weekly Ammonia as Nitrogen mg/L avg. | 0.60 | (1.20) | 100% | No |
| June 16 – June 22, 2013 | Weekly Ammonia as Nitrogen lb/day avg. | 60 | (66.0) | 10% | No |
| June 1 – June 30, 2013 | Monthly Ammonia as Nitrogen lb/day avg. | 40 | 60.3 | 50.75% | No |
| June 1 – June 30, 2013 | Monthly Ammonia as Nitrogen mg/L avg. | 0.4 | 1.08 | 170% | No |

165.    Each day of the period (daily, weekly, or monthly) of violations for excess ammonia constitutes a separate violation of the permit and of the Clean Water Act.

166.    Defendant's investigation into the June 2013 ammonia violations is complete, but Defendant did not discover the cause of the violations. A true and correct copy of the memorandum detailing Defendant's investigation is attached as **EXHIBIT 3**. The periodic nature of the violations of ammonia and Defendant's inability to determine the cause of the most recent violations indicates that these violations are likely to continue.

167.    Plaintiff and its members have suffered irreparable damage and continue to suffer damage as a result of Defendant's recurrent discharges of ammonia in excess of its permit limits. These actual and potential injuries have been, are being, and will continue to be caused by the illegal discharges from the Defendant's Sewage Treatment Plant into waters of the United States. The relief sought herein will redress the harms to the Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to investigate and stop

the illegal discharges of ammonia into the Harpeth River and to comply with such other relief as this Court deems necessary.

### COUNT 6: DEFENDANT'S INACCURATE FLOW MEASUREMENT AND MONITORING VIOLATE ITS PERMIT AND THE CLEAN WATER ACT

168. Paragraphs 1-167 are hereby incorporated by reference as if rewritten in their entirety.

169. Defendant must accurately monitor its influent raw wastewater and treated effluent flows, and it must do so continuously seven days per week. *Permit* § 1.1 (2010). *See also Rationale* § R7.1 (Flow).

170. Discharge flow is a quantifiable effluent characteristic which is used to calculate compliance with pollutant effluent limitations and ensure that dilution is not a substitute for the treatment and removal of pollutants. 40 C.F.R. §§ 122.44, 122.45.

171. Defendant's permit states, "Appropriate flow measurement devices and methods consistent with accepted scientific practices shall be selected and used to insure the accuracy and reliability of measurements of the volume of monitored discharges. The devices shall be installed, calibrated and maintained to insure that the accuracy of the measurements is consistent with accepted capability of that type of device. Devices selected shall be capable of measuring flows with a maximum deviation of less than plus or minus 10% from the true discharge rates throughout the range of expected discharge volumes." *Permit* § 1.2.1 (2010).

172. Defendant's permit also provides that "[t]he permittee shall at all times properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit. Proper operation and maintenance also includes adequate laboratory

and process controls and appropriate quality assurance procedures." *Permit* § 2.1.4(a) (2010). *Accord* Tenn. R. & Regs. 400-40-05-.07(2)(c) (2014); *Permit* § 1.3.6 (2010).

173.   Flow is monitored and used to calculate contaminant mass loading rates. *Rationale* § R7.1 (Flow).

174.   Mass loading rates provide distinct effluent limitations than concentration-based limits; some pollutants have both limitations.

175.   According to a July 2013 letter from TDEC to Defendant, inaccurate flow measurements and/or un-representative influent sampling affects plant hydraulic loading data, pounds per day loading and percent removal calculation, and influent parameter sample concentrations.

176.   Since at least 2012, Defendant's daily influent sampling data have been inaccurate.

177.   In March 2014, Defendant informed Plaintiff and others that it "recognizes the current flow monitoring scheme has certain deficiencies" which it plans to address when the potential expansion of the facility occurs rather than "waste[]" "capital monies." In April 2014, Defendant responded that "no such document exists" when asked for a cost estimate for replacing the flow meter. In July 2014, Defendant requested guidance from TDEC about methodology being considered during expansion and upgrades.

178.   Due to Defendant's inaccurate flow measuring capacity, it is not presently possible to accurately determine the amounts of pollutants discharged into the Harpeth River by Defendant, nor has it been possible to do so for years.

179.     Each day that Defendant operates its plant without an accurate flow measurement mechanism is a separate violation of NPDES Permit § 1.1 and of the Clean Water Act. Such violations are likely to continue.

180.     Each day that Defendant operates its plant without an accurate flow measurement mechanism is a separate violation of NPDES Permit § 1.2.1 and of the Clean Water Act. Such violations are likely to continue.

181.     Each day that Defendant operates its plant without an accurate flow measurement mechanism is a separate violation of NPDES Permit § 2.1.4(a) and of the Clean Water. Such violations are likely to continue.

182.     Plaintiff and its members have suffered irreparable damage and continue to suffer damage as a result of Defendant's failure to operate its plant with an accurate flow meter and thereby accurately self-report data to TDEC and the public concerning plant hydraulic loading data, pounds per day loading and percent removal calculation, and influent parameter sample concentrations. These actual and potential injuries have been, are being, and will continue to be caused by the potentially illegal discharges from the Defendant's Sewage Treatment Plant into waters of the United States. The relief sought herein will redress the harms to the Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to ensure accurate calculation of pollutant discharges and to comply with such other relief as this Court deems necessary.

**COUNT 7: DEFENDANT'S DISCHARGE OF POLLUTANTS THAT CAUSE OR CONTRIBUTE TO THE HARPETH RIVER'S WATER QUALITY IMPAIRMENT VIOLATE THE CLEAN WATER ACT**

183.    Paragraphs 1-182 are hereby incorporated by reference as if rewritten in their entirety.

184.    When Defendant discharges pollutants from Outfall 001 into the Harpeth River that prevent the Harpeth River from achieving water quality standards for its classified uses, such discharges violate the Clean Water Act. 33 U.S.C. §§ 1342(b)(1)(A), 1312(a). *See also* Tenn. Comp. R. & Regs. 0400-40-05.04(1)(f). *Cf.* 33 U.S.C. § 1341(a).

185.    In general, when discharges of pollutants from a point source would interfere with attainment of water quality, effluent limitations must be established that can reasonably be expected to contribute to the attainment. 33 U.S.C. § 1312(a). In fact, all permits issued after 1977 must include any "more stringent . . . limitation" necessary to meet water quality standards. 33 U.S.C. §1311(b)(1)(C); 40 C.F.R. § 122.44(d)(1).

186.    EPA regulations require permitting authorities to include conditions in NPDES permits that "control all pollutants or pollutant parameters . . . [that] are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(1)(i).

187.    Further, the federal "antidegradation policy" requires that standards must be "sufficient to maintain existing beneficial uses of navigable waters, preventing their further

degradation." *PUD No. 1 of Jefferson Cnty. v. Washington Dep't of Ecology*, 511 U.S. 700, 705 (1994).[7] Water quantity may be regulated under antidegradation regulations.

188.    Achieving water quality standards is one of the Clean Water Act's central objectives. Defendant's permit does not provide an impermeable shield from liability, because its permit requires compliance with all state and federal water quality laws. *See Permit* § 3.10; *Permit* § 2.4.2 ("Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable state law or the Federal Water Pollution Control Act, as amended.").

189.    Under current water quality conditions, Defendant cannot demonstrate that its discharges of oxygen-depleting pollutants and pollutants that contribute to nutrient enrichment— including $CBOD_5$, Ammonia as Nitrogen, Total Nitrogen, Insoluble Total Kjeldahl Nitrogen, Total Phosphorus, and Suspended Solids—do not have the reasonable potential to cause or contribute excursions above the applicable water quality standards.

190.    To the extent that TDEC has relied on the 2004 Harpeth River "Organic Enrichment/Low Dissolved Oxygen" TMDL to set the limits in Defendant's NPDES permit, Defendant is not relieved from the duty to discharge in accordance with water quality-based limitations. Reliance on a TMDL alone is insufficient to comply with the Clean Water Act's water quality-based permitting requirements. Moreover, there is no indication that existing controls on other point and nonpoint sources are resulting in needed reductions and that the Harpeth River has remaining loading capacity when it reaches Outfall 001.

---

[7] Tennessee's Antidegradation Statement contains a *de minimis* exception that is inconsistent with the federal antidegradation policy. *See* 40 C.F.R. § 131.12(a).

191.    Because Defendant's permit does not protect water quality and instead treats the Harpeth River as a component of its wastewater treatment system, the NPDES permit does not and cannot validly authorize Defendant's discharges to this water of the United States.

192.    The purpose of the "permit shield" provision is to protect permittees from changes *during* the period of the permit, but since at least 2001, TDEC has interpreted the water quality narrative criteria for phosphorus as 0.18 mg/l where Defendant discharges. Since at least 2004, Defendant has known that the nutrient concentration goal for its ecoregion is at least as low as 0.060 mg/l for Total Phosphorus. However, in both 2009 and 2013, Defendant sought to maintain its 5.0 mg/l monthly average concentration discharge limit for the summer, which is the equivalent of adding 500 pounds of this pollutant to the river per day when the STP is operating at its design capacity, even when the river could be running at less than 1 cubic foot per second.

193.    Where the permitting authority "has failed to fulfill its duties under the Act by issuing NPDES permits that do not comply with the Clean Water Act and its implementing regulations," the permit is not valid. *Miccosukee Tribe of Indians of Fla. v. United States*, 706 F. Supp. 2d 1296, 1302 (S.D. Fla. 2010), *aff'd* 498 Fed. App'x 899 (11th Cir. 2012) (per curiam).

194.    To allow otherwise would directly contradict the Clean Water Act's objective of restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters and the NPDES permitting program's goal of eliminating discharges of pollutants into navigable waters. 33 U.S.C. § 1251(a).

195.    Plaintiff and its members have suffered irreparable damage and continue to suffer damage as a result of Defendant's actions described in this count. These actual and potential injuries have been, are being, and will continue to be caused by the illegal discharges from the Defendant's Sewage Treatment Plant into waters of the United States. The relief sought herein

will redress the harms to the Watershed Association and its members caused by Defendant's discharges. Their injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial action to stop the illegal discharges of pollutants into the Harpeth River and to comply with such other relief as this Court deems necessary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

196.    Issue service of process as authorized by law;

197.    Issue a declaratory judgment stating that Defendant has violated and is continuing to violate the Clean Water Act with its recurring illegal discharges into the Harpeth River;

198.    Order injunctive relief that temporarily and permanently enjoins Defendant from committing any further violations of the Clean Water Act or other applicable laws, requires Defendant to remove or otherwise remedy the discharges and damage to waters of the United States, and ensures that Defendant will come into compliance and remain in compliance with applicable laws and regulations, by ordering that Defendant:

a. Develop and implement a Nutrient Management Plan, as required by its NPDES permit;

b. Conduct continuous instream monitoring, as required by its NPDES permit;

c. Establish a compliance schedule for limiting overflows, adopt a proactive approach to identifying overflow, and establish a public awareness mechanism for overflows, such as reporting them on Defendant's website;

d. Install new flow meter(s) so as to have an accurate measure of influent flow;

e. Continue to investigate the source of toxicity that caused Defendant to fail three of four tests in 2013 and one in 2014;

f.   Establish a uniform protocol for monitoring and sampling of both their system and, as applicable, the river;

g.   Establish programs to ensure future compliance, such as a Capacity, Management, Operation and Maintenance (CMOM) Programs, like those listed in EPA's § 308 Evaluation: Mapping Program, Grease Control Program, Capacity Assurance Program, Preventative Maintenance and Inspection Programs, Standard operating procedures (SORP) (*e.g.*, Sewage Overflow Response Plan);

h.   Conduct additional monitoring to remedy, reduce, or offset the harm caused by its failure to conduct monitoring or implement a nutrient management plan for the last four years, leaving the State of Tennessee and the public without years of data to understand the impact of Defendant's conduct on the Harpeth River;

i.   Allow third-party inspection of the operation and testing of the STP facility; and

j.   Require Defendant to design and install adequate control technology to abate the continuing discharges of pollutants;

k.   Require Defendant to participate in a stakeholder group;

199.   Assess civil penalties against Defendant of up to $37,500 per violation per day pursuant to 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. § 19.4, as the Court deems necessary;

200.   Order an award of litigation costs, including reasonable attorneys' fees and expert witness fees, to Plaintiff pursuant to 33 U.S.C. § 1365(d);

201.   Order such other and further relief as this Court deems just and equitable.

Respectfully submitted this 25TH day of August 2014,

_____

DELTA ANNE DAVIS
BPR No. 010211
Managing Attorney
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
adavis@selctn.org
(615) 921-9470
(615) 921-8011 [Facsimile]

_____

ANNE E. PASSINO
BPR No. 027456
Staff Attorney
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
apassino@selctn.org
(615) 921-9470
(615) 921-8011 [Facsimile]

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this Complaint has been served via electronic mail and certified first class U.S. mail to:

> Shauna R. Billingsly
> City of Franklin
> Law Department
> 109 Third Avenue South
> P.O. Box 305
> Franklin, Tennessee 37065-0305
> Phone: (615) 550-6603
> Fax: (615) 550-6998
> shauna.billingsley@franklintn.gov
>
> Gary B. Cohen
> Hall & Associates
> 1620 I Street, NW, Suite 701
> Washington, DC 20006
> Phone: 202-463-1166
> Fax: 202-463-4207
> E-Mail: gcohen@hall-associates.com

_____
DELTA ANNE DAVIS