**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| HARPETH RIVER WATERSHED ASSOCIATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 3:14-1743 ) Judge Sharp/Bryant |
| CITY OF FRANKLIN, TENNESSEE | ) Jury Demand ) |
| Defendant. | ) ) ) |
| | ) |
| CITY OF FRANKLIN, TENNESSEE | ) ) |
| Counter Plaintiff, | ) ) |
| v. | ) ) |
| HARPETH RIVER WATERSHED ASSOCIATION, | ) ) ) |
| Counter Defendant. | ) ) |

**DEFENDANT CITY OF FRANKLIN ANSWER AND COUNTERCLAIM**

Defendant and Counter Plaintiff City of Franklin ("City"), by and through its undersigned

counsel, by way of Answer to the Complaint states as follows:

**I.  INTRODUCTION**

1.    Deny.

2.    Deny.

3.    Deny.

4.    Deny.

1

5.      Deny.

## II.  JURISDICTION AND VENUE

6.      The City admits that this Court has personal jurisdiction over the parties.  The City denies the remainder of paragraph 6.

7.      The City admits that a true and correct copy of a letter sent by the Harpeth River Watershed Association ("HRWA") is set forth in Pl. Exhibit 1.  The City denies the remainder of paragraph 7.

8.      Admit.

9.      Admit.

10.     Deny.

11.     Deny.

12.     The City denies that there were violations or that violations continue, as alleged in paragraph 12. The City admits that venue is proper in this Court pursuant to 33 U.S.C. § 1365(c)(1) and that an NPDES permit authorizes the discharge from the City's sewage treatment plant ("STP").

13.     The City denies that there were violations as alleged in paragraph 13. The City admits that venue is proper in this Court.

## III.  PARTIES

14.     The City admits that Plaintiff Harpeth River Watershed Association is a "citizen" as defined in the Clean Water Act.  The City denies the remainder of paragraph 14.

15.     The City admits that the Plaintiff is a § 501(c)(3) non-profit located in Brentwood, Tennessee. The City denies the remainder of paragraph 15.

2

16. Admit.

17. The City admits that it owns and operates the Franklin STP. The City denies that the STP receives stormwater runoff except to the extent that infiltration and/or inflow that enters the sewer system is deemed to be stormwater runoff. The City further denies that the STP constitutes the source of any violations.

18. The City denies that its STP is the largest pollution point source discharge. The City avers that it is a permitted point source discharge. The City further avers that it is in compliance with its permit and the Total Maximum Daily Load ("TMDL"), both of which limit the discharge of pollutants into the Harpeth River. The TMDL was established after extensive modeling from TDEC and EPA to determine what water quality limits the river can withstand without degrading water quality. The City denies that the Harpeth River is polluted. The City admits the remainder of paragraph 18.

19. Admit.

## IV. BACKGROUND

### A. The Harpeth River

20. The City denies that the Harpeth River experiences flow conditions of less than 1 cfs during average summer months. The City admits the remainder of paragraph 20.

21. The City denies that the only classified uses for the 6.8 mile segment are Industrial Water Supply, Fish and Aquatic Life, Recreation, Livestock Water and Wildlife, and Irrigation. The City avers that TN0513020401_1000 is

3

classified also for Domestic Water. Tenn. Comp. R. & Regs. 0400-40-04-.12 (2013). The City admits the remainder of paragraph 21.

22.     The City admits the allegations in paragraph 22, but avers that the comments set forth on page 37 of the document entitled "TDEC Final Version Year 2012 303(d) List" (Jan. 2014) state that "EPA approved DO and nutrient TMDLs for the known pollutants." The City further avers that TDEC's TMDL Priority is NA, which for category "4a" is defined as "A TMDL has already been completed, submitted to EPA and approved by EPA."

23.     The City admits that TDEC's Draft Year 2014 303(d) list was published in 2014. The City admits that the draft report states that there is loss of biological integrity due to siltation. The City avers that the comment states that "EPA approved DO and nutrient TMDLs for the known pollutants." The City further avers that TDEC's TMDL Priority for low dissolved oxygen and total phosphorus is "NA", which for category "4a" is defined as "A TMDL has already been completed, submitted to EPA and approved by EPA." The TMDL Priority for the loss of biological integrity due to siltation is "L," which is defined as "Tools are not available to produce the TMDL, and the stream is not in the watershed being studied in the next two years. TMDL will be produced in the next twelve years."

        **B. Water Quality Standards and Total Maximum Daily Load**

24.     The allegations in paragraph 24 purport to characterize the Clean Water Act and 40 C.F.R. § 131.2. The Clean Water Act and 40 C.F.R. §131.2 speak for themselves, and the City denies any allegations contrary to their plain meaning.

4

25. The allegations in paragraph 25 purport to characterize the Clean Water Act and are vague in that they generally refer to "implementing regulations" without identifying those regulations. The Clean Water Act and any implementing regulations speak for themselves, and the City denies any allegations contrary to their plain meaning.

26. Deny. 40 C.F.R § 122.44(d) (1)(ii) states in its entirety: "When determining whether a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative or numeric criteria within a State water quality standard, the permitting authority shall use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water."

27. The allegations in paragraph 27 purport to characterize the Water Quality Control Act. The Water Quality Control Act speaks for itself, and the City denies any allegations contrary to its plain meaning.

28. The allegations in paragraph 28 purport to characterize the Clean Water Act and 40 C.F.R. § 130.2. The Clean Water Act and 40 C.F.R. §130.2 speak for themselves, and the City denies any allegations contrary to their plain meaning. In further answer, the City avers that a TMDL is not required for a waterbody that "could become impaired."

5

29. The City lacks knowledge or information necessary to either admit or deny the allegations relative to *Tenn. Envtl. Council et al. v. EPA*, Case No. 3:01-CV-00032 as that case has not been provided to the City, and therefore such allegations are denied.

30. Deny.

31. Deny.

32. Deny.

33. The allegations in paragraph 33 purport to characterize Chapter 0400-40-03 of the Rules and Regulations of the State of Tennessee. Chapter 0400-40-03 speaks for itself, and the City denies any allegations contrary to its plain meaning.

34. The allegations in paragraph 34 purport to characterize the *Development of Regionally-based Interpretations of Tennessee's Narrative Nutrient Criterion*, provide vague references to Tennessee's water quality standards without providing a specific citation, and further characterize the Harpeth TMDL. These documents speak for themselves, and the City denies any allegations contrary to their plain meaning.

35. Deny.

36. The allegations in paragraph 36 purport to characterize Chapter 0400-40-03 of the Rules and Regulations of the State of Tennessee. Chapter 0400-40-03 speaks for itself, and the City denies any allegations contrary to its plain meaning.

37. The allegations in paragraph 37 purport to characterize Chapter 0400-40-03 of the Rules and Regulations of the State of Tennessee. Chapter 0400-40-03 speaks for itself, and the City denies any allegations contrary to its plain meaning.

   **C. Defendant's Uses of the Harpeth River and its NPDES Permit**

38. The City admits that its ARAP permit allows it to withdraw 20% of the water from the Harpeth River when the Harpeth River has a flow of 10 cfs or greater. The City admits that it has studied expanding the water plant from 2.6 MGD to 4.0 MGD. The City denies the remainder of paragraph 38.

39. Admit.

40. The City admits that Pl. Exhibit 2 contains a true and accurate copy of the "Permit" as well as additional documents that are part of the permitting record. The City admits the remainder of paragraph 40.

41. The City admits that the current version of the permit became effective November 1, 2010; expired on November 30, 2011; and has been administratively extended pending issuance of a new permit by TDEC. The City denies that the current version of the permit was "pursuant to the permitting requirements of the Clean Water Act, 33 U.S.C. § 1342." The City denies the remainder of paragraph 41.

42. The City denies that all the listed pollutants relate both to nutrient enrichment and oxygen demand.

43. The City admits that it is authorized to discharge up to 5.0 mg/l of total phosphorus in the summer. The City denies that the Permit was issued

"despite 40 C.F. R. § 122.4(i) and the state and federal interpretations of Tennessee's water quality standards for nutrients."   The City admits the remainder of paragraph 43 and further provides that the State determined that winter phosphorus and daily phosphorus limits were unnecessary.

44.   Deny.

45.   The City admits that it has requested the 3.0 mg/l total phosphorus be dropped from the Permit. The City admits that TDEC has not yet issued a new permit; however, the City avers that TDEC's delay has nothing to do with the total phosphorus issue. The City denies the remainder of paragraph 45.

## V.   CLAIMS FOR RELIEF: VIOLATIONS OF THE CLEAN WATER ACT, TENNESSEE WATER QUALITY CONTROL ACT, AND IMPLEMENTING REGULATIONS

### ALLEGATIONS COMMON TO ALL CLAIMS

46.   Answers to paragraphs 1-45 are incorporated by reference as if rewritten in their entirety.

47.   The City admits that it is the owner and operator of the Franklin STP.  The City denies that the Complaint sets forth violations for which the City is liable under the Clean Water Act.

48.   The allegations in paragraph 55 purport to characterize the Clean Water Act and the NPDES permit.  The Clean Water Act and the NPDES permit speak for themselves, and the City denies any allegations contrary to their plain meaning.

49.   *See* Motion to Dismiss.

8

50.　Admit.  In further answer, the City avers that the purpose of the notice of intent to sue is clearly not to coerce or extort the permittee to undertake actions that Plaintiff was unable to convince TDEC to include in the NPDES permit.

51.　*See* Motion to Dismiss. To the extent not addressed in the Motion to Dismiss, the City admits that it re-submitted DMRs and MORs, but the City avers that it was to show that the City was not in violation, based on the "rule of rounding" as directed by Mike Thornton of TDEC. To the extent not addressed in the Motion to Dismiss, the City denies the remainder of paragraph 51.  In further answer, the City avers that NPDES permit condition 2.1.8 (2010) recognizes that a discharger may inadvertently have submitted incorrect information and would require the submission of the corrected information.  The City further avers that effluent limitation violations alleged by Plaintiff do not accurately reflect the applicable permit limits.

52.　Deny.

53.　Paragraph 53 calls for a legal conclusion to which no response is required. To the extent that paragraph 53 is construed to contain allegations against the City, the City denies them.

54.　The allegations in paragraph 54 purport to characterize the Clean Water Act. The Clean Water Act speaks for itself, and the City denies any allegations contrary to its plain meaning.

55.　The allegations in paragraph 55 purport to characterize the Clean Water Act and Chapter 0400-40-03 of the Rules and Regulations of the State of Tennessee.  The Clean Water Act and Chapter 0400-40-03 speak for themselves, and the City denies any allegations contrary to their plain meaning.

9

56. The allegations in paragraph 56 purport to characterize the Clean Water Act. The Clean Water Act speaks for itself, and the City denies any allegations contrary to its plain meaning.

57. Paragraph 57 calls for a legal conclusion to which no response is required. To the extent that paragraph 57 is construed to contain allegations against the City, the City denies them. In further answer, the Clean Water Act and the cited provision of CWA 308, 33 U.S.C. § 1318, only provide legal authority to the federal Environmental Protection Agency ("EPA"). Other regulators, such as states, must have their own legal authority pursuant to state law. 40 C.F.R. Part 123.

58. The City admits that it is required to comply with the terms of its permit under State law, subject to applicable defenses. The City further admits that it is required to comply with some terms of its permit under the CWA, subject to applicable defenses. *See* Motion to Dismiss. The City denies the remainder of paragraph 58.

59. The City admits that the cited language is from the cited permit condition.

60. The allegations in paragraph 60 purport to characterize the Clean Water Act, 40 C.F.R. § 122.41 and Chapter 1200-04-05 of Rules and Regulations of the State of Tennessee. The Clean Water Act, 40 C.F.R. §122.41, and Chapter 1200-04-05 speak for themselves, and the City denies any allegations contrary to their plain meaning. In further answer, the City avers that Tenn. Comp. R. & Regs. 1200-04-05-.07(2)(a) and the current standard as set forth in 0400-40-05-.07(2)(a) provide that "[a]ny permit noncompliance constitutes a violation of the Water Quality Control Act," not the Clean Water Act.

10

61. Admit.

62. The City admits that the CWA and 40 C.F.R. § 123.1 do not preclude states from adopting or enforcing requirements that are more stringent; however, the City avers that the State of Tennessee is required to follow procedures when it seeks to change the requirements. *See*, e.g., 40 C.F.R. § 123.62. The City further avers that the State may include permit conditions that are beyond the scope of the CWA and that such permit conditions are not enforceable under the CWA. 40 C.F.R. § 123.1(i)(2).

63. The City admits that water quality-based effluent limitations, monitoring requirements, and reporting requirements are some of the conditions included in the NPDES permit, among other requirements.

64. The allegations in paragraph 64 purport to characterize the Clean Water Act and 40 C.F.R. § 122.44. The Clean Water Act and 40 C.F.R. §122.44 speak for themselves, and the City denies any allegations contrary to their plain meaning.

65. Admit.

66. Deny.

67. Admit.

68. Admit. In further answer, the City avers that such permit condition does not trigger an obligation under the NPDES permit where a condition precedent, such as action by TDEC, is required.

69. The City admits that the quoted language is part of the language set forth in Permit § 2.3.2(a) (2010). In further answer, the allegations in paragraph 69

purport to characterize Permit § 2.3.2(a), which speaks for itself. The City denies any allegations contrary to its plain meaning. The City denies the remainder of paragraph 69 and further avers that Permit § 2.3.2(a) refers to the "required notice of noncompliance" but fails to identify any such "required notice of noncompliance."

70.    The City admits that self-reporting is one of the means that the NPDES permitting program uses to evaluate compliance. The City denies the characterization of the second sentence in that it purports to shift the burden of proof to the NPDES permittee to demonstrate compliance.

71.    Admit. In further answer, the City avers that the NPDES permit condition 2.1.8 (2010) recognizes that a discharger may inadvertently have submitted incorrect information and would require the submission of the corrected information.

72.    The allegations in paragraph 72 purport to characterize Permit § 2.3.2 (2010). Such permit condition speaks for itself, and the City denies any allegations contrary to its plain meaning.

73.    *See* Motion to Dismiss. To the extent not addressed in the Motion to Dismiss, deny.

74.    The allegations in paragraph 74 purport to characterize Section 505 of the CWA, 33 U.S.C. § 1365. CWA Section 505 speaks for itself, and the City denies any allegations contrary to its plain meaning. In further answer, the City provides that the citizen must have standing. *See* Motion to Dismiss.

12

75. The allegations in paragraph 75 purport to characterize Section 505 of the CWA, 33 U.S.C. § 1365. CWA Section 505 speaks for itself, and the City denies any allegations contrary to its plain meaning. The City also denies that Plaintiff is entitled to a remedy under the Clean Water Act. *See* Motion to Dismiss. The City further denies that the alleged permit violations involve a permit or permit conditions issued under 42 U.S.C. § 1342.

76. Deny.

77. The City denies that a penalty of up to $37,500 per day per violation for each separate violation of the Clean Water Act occurring after January 12, 2009, is provided for by Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a). The City admits that 40 C.F.R. § 19.4 sets forth an adjustment of civil monetary penalties for inflation.

78. The allegations in paragraph 78 purport to characterize Section 505(d) of the CWA, 33 U.S.C. § 1365(d). CWA Section 505(d) speaks for itself, and the City denies any allegations contrary to its plain meaning.

79. Deny.

80. Deny.

81. Deny.

82. Deny.

**COUNT 1: DEFENDANT'S SEWAGE OVERFLOWS AND TREATMENT PLANT BYPASSES VIOLATE THE CLEAN WATER ACT**

83. Answers to paragraphs 1-82 are incorporated by reference as if written in their entirety.

13

84. To the extent the words "is supposed" are intended to reflect a legal obligation, such allegation is denied. Otherwise, the allegation in paragraph 84 is admitted.

85. *See* Motion to Dismiss.

86. The City admits that it is theoretically possible for microbial pathogens, toxics, and other pollutants present in overflows to cause or contribute to water quality impairment, contamination of drinking water supplies, and other environmental and human health problems. The City avers that whether such impacts arise to a level of concern will be based upon the specific underlying facts. The City further avers that there is no liability under the CWA for "causing or contributing" to a water quality standard exceedance. The CWA §303(d), 33 U.S.C. §1313(d), program addresses these issues.

87. The City admits that Plaintiff correctly stated the definition to a "bypass" but denies that bypasses are discharged into the Harpeth River. Furthermore, the NPDES permit provides a defense for bypasses, and the City denies the allegations to the extent it fails to recognize such defense. The City denies the remainder of paragraph 87.

88. The allegations in paragraph 88 purport to characterize Permit § 1.3.5.1 (2010). Such permit condition speaks for itself, and the City denies any allegations contrary to its plain meaning.

89. The City admits that the cited language is one sentence from the cited permit condition.

90. *See* Motion to Dismiss. The City admits that the overflows identified by an "*" signify HRWA's admission that the overflow was not included in the HRWA's

notice of suit.  *See* footnote 1 to paragraph 90.  To the extent not otherwise addressed in the Motion to Dismiss and the preceding sentence, deny.

91.  Deny.

92.  Deny.

93.  Deny.

94.  It is admitted that one of the primary triggers for becoming aware of an overflow event is from members of the community.

95.  Deny.

96.  Deny.

97.  The City admits that such statement was made in the December 2013 EPA "Compliance Evaluation Inspection Report."  In further answer, the City avers that neither the federal nor state regulations require a Sewer Overflow Response Plan ("SORP").  On or about January 4, 2001, the EPA Administrator signed a proposed rule that, among other things, if finalized, would have required a SORP, but the decision was made not to proceed with such rulemaking.  The City further avers that the December 2013 EPA "Compliance Evaluation Inspection Report" concluded that (i) the number of overflows from the City's system "is well below the typical SSO [sanitary sewer overflow] count found in other comparable cities," (ii) the City's overflows are "quite low compared to other comparable cities in Region 4," and (iii) the "City's personnel appear to be maintaining the system effectively."

98.  Deny.  The City avers that EPA "noted several preventative maintenance procedures that the City is utilizing that are in keeping with best management

15

practices to operate and maintain the system; however, the EPA recommends

that the City develop formal written programs for these preventative

maintenance procedures and programs.  Developing formal written programs

will aid the City in refining these programs, which should increase efficiency of

the programs and provide guidance for the implementation of these programs

that can be passed down to the next maintenance generation."  In further

answer, the City avers that neither the federal nor state regulations require such

formal written programs.  On or about January 4, 2001, the EPA Administrator

signed a proposed rule that, among other things, if finalized, would have

required formal written programs, but the decision was made not to proceed

with such rulemaking.

99.   Deny.

100.  Deny.

101.  Deny.

## COUNT 2: FAILURE TO DEVELOP OR IMPLEMENT A NUTRIENT MANAGEMENT PLAN VIOLATES THE CLEAN WATER ACT

102.   Answers to paragraphs 1-101 are hereby incorporated by reference as if

rewritten in their entirety.

103.   *See* Motion to Dismiss. To the extent not addressed in the Motion to Dismiss,

deny.

104.   The City admits that parts of the Harpeth River were listed on the State's

§ 303(d) list as being impaired for dissolved oxygen and phosphorus.  The City

further answers and avers that inasmuch as impairment is also upstream of the

City's discharge, the City's discharge does not cause the impairment. The City

16

denies the remainder of paragraph 104 and avers that the City, in fact, adds dissolved oxygen to the Harpeth River. The City further avers that there are no contaminants in the City's effluent and the City is in compliance with its phosphorus permit limit.

105. *See* Motion to Dismiss. To the extent not addressed in the Motion to Dismiss, deny.

106. Admit.

107. Admit.

108. Admit.

109. The City admits that the cited language is from Permit, Attachment 2 (2010). The remainder of the allegations in paragraph 79 purports to characterize the requirements of an unidentified section of the Permit. The Permit speaks for itself, and the City denies any allegations contrary to its plain meaning.

110. Admit. In further answer, the City avers that TDEC's response to comments on the NPDES permit specifically noted that "[t]he division considers the development/implementation of the permittee's IWMP to provide for significant nutrient control."

111. *See* Motion to Dismiss. To the extent not addressed in the Motion to Dismiss, deny.

112. Admit.

113. Admit.

114. The City admits that TDEC failed to communicate regarding the proposed changes.

115. The City admits that the permit has not been amended or modified as the City is still awaiting a response from TDEC regarding the proposed changes discussed in paragraph 113 above.

116. The City denies that it never prepared a NMP, as the NMP submission was part of the Integrated Water Resources Plan prepared by the City. In further answer, the City avers that TDEC's response to comments on the NPDES permit specifically noted that "[t]he division considers the development/implementation of the permittee's IWMP to provide for significant nutrient control." The City admits that it has not implemented a NMP as the City is awaiting a response from TDEC regarding the proposed changes discussed in paragraph 113 above.

117. Deny.

118. Deny.

119. Deny. *See also* Motion to Dismiss.

120. The City admits that it requested that the NMP be dropped from the new NPDES permit and that it requested that TDEC accept the IWRP as meeting the NMP requirements. The City denies the remainder of paragraph 120.

121. Deny.

**COUNT 3: FAILURE TO CONDUCT CONTINUOUS INSTREAM MONITORING AND RECEIVING STREAM INVESTIGATIONS VIOLATES THE CLEAN WATER ACT**

122. Answers to paragraphs 1-121 are hereby incorporated by reference as if rewritten in their entirety.

18

123. The City admits Section 3.7 and Attachment 1 of the permit contain receiving-stream monitoring and reporting requirements. The City denies that it is in violation of Section 3.7 or Attachment 1.

124. Deny.

125. The City admits that its permit term was less than five years. The City denies the Plaintiff's allegation as to TDEC's reasoning for a permit term less than five years. The City denies the remainder of paragraph 125. *See also* Motion to Dismiss.

126. Admit.

127. The City admits that the cited language is part of a permit condition.

128. The City admits that the cited language is a sentence contained in the permit. In further answer, the City avers that the permit provides for the submission of a monitoring program subject to TDEC approval.

129. The allegations in paragraph 129 purport to characterize an unidentified condition of the permit. The permit speaks for itself, and the City denies any allegations contrary to its plain meaning. The City further avers that it has proposed one upstream and one downstream monitoring station to monitor year-round instead of the diurnal monitoring and is awaiting a response from TDEC. Whereas the NPDES permit merely provided for four to five days of continuous monitoring during May through October, the City's submission to TDEC went well beyond such approach. The City proposed 24-hour and 365-day continuous monitoring throughout the year to provide more accurate information regarding the river.

130. Admit that the cited language is a sentence in the permit.

131. Admit that such cited language is contained in the NPDES permit. In further answer, the City avers that such language specifically recognizes that the City is not required to undertake such instream monitoring until "[f]ollowing written approval from the division." As the City is still awaiting division response on the City's monitoring proposal, the obligation to undertake such monitoring has not yet been triggered. *See also* Motion to Dismiss.

132. Admit. However, the City avers that it has submitted revisions to TDEC and is awaiting responses.

133. Admit. The City avers that it has proposed to continuously monitor year-round, not just 4-5 days during the summer months.

134. The City admits TDEC never provided written approval of the City's proposal and that TDEC did not modify the permit provision. The City avers that it is awaiting a response from TDEC and that, subject to the cited permit condition, the City's legal obligation to monitor has not been triggered. To that extent, TDEC's inaction has, in effect, "relieved Defendant of § 3.7's requirement" and therefore, such allegation is denied.

135. Deny.

136. The City admits that it has submitted a plan for instream monitoring to TDEC and is currently awaiting a response from TDEC. The City denies the remainder of paragraph 136.

137. Deny. *See also* Motion to Dismiss.

138. Deny.

20

139. The City admits that it has not submitted annual reports to TDEC, but the City denies that it is in violation of § 3.7 as the City is currently awaiting a response from TDEC regarding the City's instream monitoring plan.

140. Deny. *See also* Motion to Dismiss.

## COUNT 4: DEFENDANT'S FAILED WHOLE EFFLUENT TOXICITY TESTING VIOLATES THE CLEAN WATER ACT

141. Answers to paragraphs 1-140 are hereby incorporated by reference as if written in their entirety.

142. Deny.

143. The City admits that to determine the potential for chronic toxicity of Defendant's treated wastewater, organisms are exposed to composite samples of effluent from Defendant's STP. The City further admits the rest of the allegations in paragraph 143 and avers that the WET test is sensitive to non-toxic pollutants, hardness, pH, dissolved solids, bacteria, and other stresses that are not "toxics" and may produce a false positive indication of potential toxicity. The City further avers that, as a biological test, the WET test is subject to uncontrollable and unforeseen variation, which is why retesting is required by the NPDES permit.

144. The City denies that toxicity is simply demonstrated if the $IC_{25}$ value is less than 100% as other test validation criteria apply to interpreting the test and ensuring its validity. The City avers that the WET test is sensitive to non-toxic pollutants, hardness, pH, dissolved solids, bacteria, and other stresses that may result in a false positive indication of potential toxicity. The City admits the remainder of paragraph 144 regarding what an $IC_{25}$ refers to.

145. Admit.

146. Admit.

147. Admit.

148. *See* Motion to Dismiss. To the extent not addressed by the Motion to Dismiss, admit.

149. *See* Motion to Dismiss. To the extent not addressed by the Motion to Dismiss, admit.

150. *See* Motion to Dismiss. To the extent not addressed by the Motion to Dismiss, admit. The City avers that the lab lost the data, and the City was forced to retest.

151. *See* Motion to Dismiss. To the extent not addressed by the Motion to Dismiss, admit.

152. *See* Motion to Dismiss. To the extent not addressed by the Motion to Dismiss, deny.

153. *See* Motion to Dismiss. To the extent not addressed by the Motion to Dismiss, deny. The City avers that the two samples were split between two labs to rule out testing discrepancies. One lab passed the sample, and the other failed the sample. TDEC was contacted for guidance, and the City was directed to retest. That test passed.

154. Deny.

155. Admit.

156. Deny.

157. Deny.

158. Deny.  In further answer, the City avers that the allegation in paragraph 158 confuses the permit averaging period with the testing frequency.  Toxicity testing is not a quarterly permit limit.  While the permit only requires quarterly testing, such testing frequency does not make a single test failure a violation for each day in the quarter.  Section 3.4 of the permit states that "[t]oxicity demonstrated by the test specified herein constitutes a violation of this permit." It uses the singular "violation" and nowhere indicates any intent to deem the permittee to be in violation for each day of the quarter.

159. Deny.

## COUNT 5: DEF[E]NDANT[']S DISCHA[R]GES OF EXCESS AMMONIA (AS NITROGEN) VIOLATE THE CLEAN WATER ACT

160. Answers to paragraphs 1-159 are hereby incorporated by reference as if rewritten in their entirety.

161. Admit.

162. The allegations in paragraph 162 purport to characterize the statement in the Federal Register.  The statement in the Federal Register speaks for itself, and the City denies any allegations contrary to its plain meaning.  The City avers that nitrogen is not pollution.

163. The City admits that such sentence was included in the cited fact sheet.  In further answer, the City avers that such statement is based upon the presence at "high enough levels" and that there has been no determination that the City's discharge results in such condition.

164. *See* Motion to Dismiss. In further answer, the City avers that effluent limitation violations alleged by Plaintiff set forth inaccurate permit limits.  The City

23

further avers that it estimates that based on data from November 1, 2010, through August 2014, the City discharged a mere fraction, i.e., under 6%, of the loadings of ammonia that it was authorized to discharge under its NPDES permit. To the extent not addressed in the Motion to Dismiss, deny.

165. *See* Motion to Dismiss. To the extent not addressed in the Motion to Dismiss, deny.

166. *See* Motion to Dismiss. The City admits that Pl. Exhibit 3 is a true and correct copy of its document. To the extent not addressed in the Motion to Dismiss and the preceding sentence, the City denies the remainder of paragraph 166.

167. Deny.

## COUNT 6: DEFENDANT'S INACCURATE FLOW MEASUREMENT AND MONITORING VIOLATE ITS PERMIT AND THE CLEAN WATER ACT

168. Answers to paragraphs 1-167 are hereby incorporated by reference as if rewritten in their entirety.

169. The allegations in paragraph 169 purport to characterize the Permit § 1.1. Such permit condition speaks for itself, and the City denies any allegations contrary to its plain meaning. *See also* Motion to Dismiss.

170. Deny.

171. Admit.

172. Admit.

173. Admit.

174. Deny. Mass limits are often redundant with concentration-based limits factoring in the permitted flow.

24

175. The allegations in paragraph 175 purport to characterize a TDEC letter. Such letter speaks for itself, and the City denies any allegations contrary to its plain meaning.

176. Deny.

177. Admit.

178. Deny.

179. Deny.

180. Deny.

181. Deny.

182. Deny.

## COUNT 7: DEFENDANT'S DISCHARGE OF POLLUTANTS THAT CAUSE OR CONTRIBUTE TO THE HARPETH RIVER'S WATER QUALITY IMPAIRMENT VIOLATE THE CLEAN WATER ACT

183. Answers to paragraphs 1-182 are hereby incorporated by reference as if rewritten in their entirety.

184. Deny. *See also* Motion to Dismiss.

185. Deny.

186. *See* Motion to Dismiss. To the extent not addressed by the Motion to Dismiss, deny.

187. The allegations in paragraph 187 purport to characterize a court case. Such case speaks for itself, and the City denies any allegations contrary to its plain meaning.

188. Denied.  Section 101(a) of the CWA, 33 U.S.C. §1251(a), specifically identifies the objective of the CWA, and it does not identify "achieving water quality standards" as the objective.  The City denies the remainder of paragraph 188.

189. Deny.

190. Deny.  *See* CWA § 402(k), 33 U.S.C. § 1342(k), and Motion to Dismiss.

191. Deny.  *See* CWA § 402(k), 33 U.S.C. § 1342(k), and Motion to Dismiss.

192. *See* Motion to Dismiss. To the extent not address by the Motion to Dismiss, deny.

193. Deny.

194. Deny.

195. Deny.

## VI. DEFENSES

Defendant and Counter Plaintiff City of Franklin sets forth the following Defenses to the Complaint:

## FIRST DEFENSE
(General Denial)

The City denies any and all allegations of the Complaint, express or implied, that are not specifically admitted herein.

## SECOND DEFENSE
(Failure to State a Claim)

The Complaint fails to state a claim upon which relief can be granted.

## THIRD DEFENSE
(Subject Matter Jurisdiction)

The Court lacks subject matter jurisdiction over the claims, in whole or in part, set forth in the Complaint.

## FOURTH DEFENSE
(Beyond the Scope of the Clean Water Act)

The Clean Water Act ("CWA") assigns primary authority to issue National Pollutant Discharge Elimination System ("NPDES") permits to the EPA and allows EPA to authorize a state to supplant the federal permit with one of its own under specified circumstances. EPA regulations at 40 C.F.R. Part 123 set forth standards applicable to EPA approval, modification, and withdrawal of states' NPDES permitting programs. These regulations provide that "[i]f an approved State program has greater scope of coverage than required by Federal law the additional coverage is not part of the Federally approved program." 40 C.F.R. § 123.1(i)(2). NPDES permit conditions issued by a State that are beyond the scope of the CWA are not enforceable in an action filed under CWA §505, 33 U.S.C. §1365. *See e.g., Atlantic States Legal Found. v. Eastman Kodak Co.*, 12 F.3d 353, 359 (2d Cir. 1997) ("[N]PDES permits, which mandate 'a greater scope of coverage than that required' by the federal CWA and its implementing regulations are not enforceable through a citizen suit under 33 U.S.C. § 1365.").

## FIFTH DEFENSE
(Permit Conditions Based Upon State Regulations Which Were Never Approved by EPA After 1977 Are Not Enforceable Under the Federal Clean Water Act)

Federal regulations govern the state adoption of modifications based upon changes to the CWA and federal NPDES regulations. Subpart D of 40 C.F.R. Part 123 addresses NPDES state program approval, revision, and withdrawals. 40 C.F.R. § 123.62(e) requires a state, after authorization of its NPDES program, to adopt amendments that are made to the Federal program

within one year of the promulgation of the federal regulation, unless the state must adopt or amend a statute, in which case the revision of the state program must take place within two years. Until a state adopts the federal amendments, the state program does not include such requirements, and those requirements are not enforceable, whether included in a permit or not.

The State of Tennessee's NPDES permit program was approved on December 28, 1977. Upon information and belief, the only amendments to the State's approved program have been to address the pretreatment program in 1983, approval to regulate federal facilities in 1986, and approval to issue general permits in 1991, issues not germane to this lawsuit. Upon information and belief, there have been no other approved amendments to the State of Tennessee's NPDES permit program since 1977. *See* EPA website at http://water.epa.gov/polwaste/npdes/basics/ State-Program-Status.cfm.

Since 1977, EPA has made numerous changes to its NPDES permitting regulations. Upon information and belief, the State of Tennessee never sought modification of its NPDES permitting program to provide for State implementation of such requirements. Since 1977, the State of Tennessee has made numerous changes to its NPDES permitting regulations. Upon information and belief, these changes were never approved by EPA as part of the State of Tennessee approved NPDES permitting program. EPA regulation at 40 C.F.R. §123.62(a)(4) provides that notice of the approval of any substantial revision shall be published in the Federal Register. Upon information and belief, there has been no publication in the Federal Register other than those approvals noted above. In the absence of an approved State undertaking the actions necessary to maintain an approved NPDES permit program, 40 C.F.R. § 123.64 sets forth the process for withdrawal of an approved State NPDES permitting program.

Absent EPA approval of the State regulations upon which the NPDES permit is based, an NPDES permit condition based on such State regulation is not federally enforceable under CWA § 505.

## SIXTH DEFENSE
(Statute of Limitations)

Plaintiff's claims are barred in whole or in part by the statute of limitations.

## SEVENTH DEFENSE
(Failure to Provide an Adequate Sixty-Day Notice)

By letter dated January 13, 2014, Plaintiff provided Defendant notice of its intent to file a CWA citizen suit action. Plaintiff has failed to provide an adequate sixty-day notice as required by CWA § 505(b), 33 U.S.C. §1365(b), and 40 C.F.R. Part 135, identifying the alleged violations. The Complaint sets forth specific violations that were not identified in the January 13, 2014, notice of suit. This includes, but is not limited to, alleged overflows wherein the table set forth in Count 1, ¶90 of the Complaint identifies those overflows that Plaintiff admits were "not included in the Notice" with an "*". The Complaint further sets forth allegations of violations of specific sections of the NPDES permit as well as other alleged violations that were not identified in the January 13, 2014, notice of suit.

## EIGHTH DEFENSE
(Alleged Violations of Permit Requirements That Are Not Effluent Standards or Limitations)

A citizen suit is not authorized under CWA §505(b)(1), 33 U.S.C. § 1365(b)(1), for alleged violations of an NPDES permit wherein the underlying condition is not an effluent standard or limitation under Title 33, Chapter 26, of the United States Code.

29

**NINTH DEFENSE**
(Overflows Caused and Located on Private Property)

The Complaint alleges CWA violations for overflows from portions of the collection system that are privately owned (*e.g*., private laterals) and caused by actions of person(s) other than the City. As the City did not cause such overflows and the overflows were not from any part of the City owned sewer system, the City cannot be liable for such events.

**TENTH DEFENSE**
(Overflows on Private Property)

The Complaint alleges CWA violations for overflows that occurred on private property where the overflows remained in a building and/or are not known to have entered "navigable waters" as defined in CWA § 502(7), 33 U.S.C. §1362(7). Except as otherwise authorized or subject to a defense, liability under the Clean Water Act only applies to "discharges of pollutants" from "point sources" to "navigable waters," not to "overflows" on private property.

**ELEVENTH DEFENSE**
(Backups on Private Property)

The Complaint alleges CWA violations for backups that occurred on private property fixtures where there was no overflow. As the City did not cause an overflow, the City cannot be liable for such events.

**TWELFTH DEFENSE**
(Overflows Not Resulting in a "Discharge" to Waters of the U.S.)

The Complaint alleges Clean Water Act violations for overflows that did not result in a "discharge" (as defined in CWA § 502(16), 33 U.S.C. § 1362(16)) from a "point source" (as defined in CWA §502(14), 33 U.S.C. § 1362(14)) to "navigable waters" (as defined in CWA §502(7), 33 U.S.C. §1362(7)). Liability under the CWA does not apply to overflows that do not result in a "discharge of pollutants" from a "point source" to "navigable waters."

30

## THIRTEENTH DEFENSE
### (Permit Does Not Prohibit Overflows Not Resulting in a "Discharge of a Pollutant" to "Navigable Waters")

The Complaint alleges Clean Water Act violations for overflows that did not result in a "discharge" (as defined in CWA § 502(16), 33 U.S.C. §1362(16)) from a point source (as defined in CWA §502(14), 33 U.S.C. § 1362(14)) to "navigable waters" (as defined in CWA §502(7), 33 U.S.C. §1362(7)). Section II.C.3.a of the City of Franklin's NPDES permit issued May 24, 2004, and continued as a matter of law until November 1, 2010 (*i.e.,* the effective date of the reissued NPDES permit), limits liability to a "discharge" and defines an "overflow" as "the discharge of wastes . . . ."

## FOURTEENTH DEFENSE
### (No Feasible Alternatives to the Overflow)

Overflows were unavoidable to prevent loss of life, personal injury, or severe property damage. There were no feasible alternatives to the overflow, and the City submitted timely notice. Section II.C.3.b of the City of Franklin's NPDES permit issued May 24, 2004, and continued as a matter of law until the effective date of the reissued NPDES permit, provides an affirmative defense against the prohibition of overflows.

## FIFTEENTH DEFENSE
### (Alleged Noncompliance Caused by Others)

Actions involving the alleged noncompliance were caused by person(s) other than the City. Section 309(d) of the CWA, 33 U.S.C. § 1319(d), imposes potential civil liability upon "any person" who causes a violation, not the permittee.

## SIXTEENTH DEFENSE
(Commendable City Performance)

The City has been operating its wastewater treatment plant and collection system in a commendable manner and has been able to limit overflows to a level well below that achieved by similarly-situated municipalities. EPA specifically recognized the achievements of the City in limiting overflows. The December 2013 EPA Compliance Inspection Report ("EPA Inspection Report") cited in the Complaint (*see, e.g.*, ¶97 of the Complaint) sets forth EPA's determination that the number of overflows from the City's system "is well below the typical SSO [sanitary sewer overflow] count found in other comparable cities." EPA Inspection Report, at 3. Furthermore, in the "Findings and Recommendations" section, EPA described the City's overflows as "quite low compared to other comparable cities in Region 4," *id.* at 6, and in the "Conclusions" section, EPA determined that the "City's personnel appear to be maintaining the system effectively." *Id.* at 9.

In written comments to TDEC, HRWA has described the Franklin STP as a highly functioning STP. In its June 27, 2013, letter to TDEC, HRWA stated that "as seen in the DMRs, the City is currently discharging less than half of its permitted BOD5 load [and] very little of its permitted ammonia. . . ." This letter also states that "[a]s noted in prior comments, the city of Franklin is currently producing highly treated effluent and not discharging all of its effluent in the summer because of effluent reuse program. * * * The city has the ability to continue to add to its current facility more flow and still hold to its current total pollutant load through more effluent reuse and other means." HRWA's June 27, 2013, letter further states:

> A review of the DMRs in each permit provides some insight into operations. While Franklin is meeting its permit limits, Cartwright Creek is struggling with high Inflow ad Infiltration (I and I) problems.

32

Ex. 1, at 6.  In a February 10, 2013 letter to TDEC, HRWA states that "[t]he City of Franklin's plant is treating its effluent to a very high standard and currently discharges effluent discharge significantly below its permit requirements that are set at the TMDL limits.  Ex. 1**,** at 22.  In a December 1, 2009, letter to TDEC (attached to HRWA's June 27, 2013, letter), HRWA states:

> [T]he city of Franklin's plant is discharging at less than half of its permitted design capacity with a very highly treated effluent that is well within the permit limits.  (Underlining in original.)

and

> Franklin . . . has a highly functioning STP that can meet tight effluent limits cost effectively and has already put integrated water management schemes into play, such as effluent reuse.

Ex. 1, at 26, 28; Pl. Ex. 2, at 148, 149.  Furthermore, HRWA's website states that "[t]he city's current levels are less than HALF of what the permit currently allows. . . ." ttp://www.harpethriver.org/programs/waterquality/stps/2013/11/01/tdec-draft-sewer-permits-need-to-be-tightened.878529 (last visited on October 17, 2014).

One of the counts set forth in HRWA's January 13, 2014, notice of suit pertained to alleged system bypasses.  Plaintiff Exhibit 1, ¶G at 70.  The alleged noncompliance involved action by the City that resulted in the City being presented with the Tennessee Water and Wastewater Energy Efficiency Partnership award on October 11, 2012, associated with the City's efforts to conserve energy at its wastewater plant. This award, signed by Gwendolyn Keyes Fleming, EPA Region IV Regional Administrator, and Robert J. Martineau, Jr., Commissioner, TDEC, was in recognition and appreciation of the City of Franklin's "outstanding leadership and successful organizational achievements benefiting its customers, Tennessee citizens and the state's environment as a result of its membership and work in the Tennessee Water and Wastewater Energy Efficiency partnership."

33

## SEVENTEENTH DEFENSE
(Plaintiffs Cannot Challenge the Permit or Total Maximum Daily Load ("TMDL") in an
Enforcement Action)

Plaintiff's cause of action is based upon its dissatisfaction with the underlying TMDL and the City's NPDES permit limits. *See, e.g.*, Complaint, ¶¶190-91 at 48-49. Neither a TMDL nor an NPDES permit can be challenged in the context of a CWA enforcement action. *See General Motors Corp.*, 168 F.3d 1377, 1381-83 (D.C. Cir. 1999), 33 U.S.C. § 1369(b).

## EIGHTEENTH DEFENSE
(Exhaustion of Administrative Remedies)

Plaintiff has failed to exhaust administrative remedies. Plaintiff was required to appeal the NPDES permit to the extent that Plaintiff did not believe the NPDES permit complies with applicable law.

## NINETEENTH DEFENSE
(Permit as a Shield)

Pursuant to CWA Section 402(k), 33 U.S.C. § 1342(k), compliance with the NPDES permit is deemed compliance with the CWA for purposes of, among other things, enforcement under CWA Section 309, 33 U.S.C. § 1319.

## TWENTIETH DEFENSE
(NPDES Permit Identifies When Overflows Are to Be Rectified)

Part 2.3.3 of the Franklin NPDES Permit (2010) identifies when corrective action is required to address overflows. Part 2.3.3.c of the Franklin NPDES permit provides that "[n]o new or additional flows shall be added upstream of any point in the collection system which experiences chronic overflows (greater than 5 events per year) or would otherwise overload any portion of the system." Part 2.3.3.d of the Franklin NPDES permit relieves the permittee of the requirement where, among other things, "correction work is underway." Inasmuch as Franklin

does not experience "chronic overflows" and its sewer system is not otherwise overloaded, the NPDES permit reflects that correction work is not required to address overflows.

### TWENTY-FIRST DEFENSE
(Rounding and Corrected Reports)

An effluent violation does not exist to the extent that the City reported testing results to more decimal points than the NPDES permit standard and where rounding to the number of decimal points of the NPDES permit limit results in compliance with the NPDES permit limit. The City submitted corrected monitoring reports reflecting compliance under such circumstance(s).

### TWENTY-SECOND DEFENSE
(NPDES Permitting Regulations Pertaining to a Nutrient Management Plan Do Not Apply to Municipal Treatment Plants)

The only discharger required by federal regulations to develop a nutrient management plan is a concentrated animal feeding operation ("CAFO"). *See* 40 C.F.R. § 122.42(e)(1). A CAFO is defined in 40 C.F.R. § 122.42(b)(2) and involves animal feeding operations where a specified large number of animals (*e.g.,* 125,000 chickens) are stabled or confined and fed or maintained for a certain period of time. The City's wastewater treatment plant is not a CAFO and is not subject to nutrient management requirements. Any State NPDES permit requirement pertaining to a nutrient management plan for a municipal wastewater treatment plant is not enforceable under the CWA.

### TWENTY-THIRD DEFENSE
(The City Discharged a Mere Fraction of the Level of Ammonia and Other Pollutants Authorized by the NPDES Permit)

The City's wastewater treatment plant discharges an extremely high quality effluent that is typically well below the level that it is authorized to discharge. Whereas the City's NPDES

35

permit effective as of November 1, 2010, authorizes the discharge of 40 lbs/day of ammonia on a monthly average basis during the summer months and 150 lbs/day of ammonia on a monthly average basis during the winter months, the City's historical values have been significantly below such levels. It is estimated that, based on data from November 1, 2010, through August 2014, the City discharged a mere fraction, *i.e.,* under 6%, of the loadings that it was authorized to discharge under its NPDES permit.

### TWENTY-FOURTH DEFENSE
(Permit Obligations Not Triggered Due to Failure of State to Act)

Pursuant to the terms of the Franklin NPDES permit, the City submitted documents to TDEC for their review and approval. Wherein TDEC did not respond to the City's submissions, legal obligations under the NPDES permit were not triggered.

### TWENTY-FIFTH DEFENSE
(Upset)

Alleged violations were due to upset events.

### TWENTY-SIXTH DEFENSE
(Standing)

Plaintiff is without standing to enforce permit provisions that do not pertain to the actual discharge from the Franklin STP. This includes, but is not limited to, permit conditions pertaining to ambient monitoring, overflows that do not reach waters of the U.S., and influent monitoring.

### TWENTY-SEVENTH DEFENSE
(Impossibility)

Alleged violations were due to causes that were impossible to prevent. As the City's wastewater collection system is subject to the potential illegal actions of others (*e.g.,* a person emptying oil and grease or other problematic waste into a manhole) and acts of nature (*e.g.,* tree

36

roots growing and causing a sewage overflow), the City cannot be required to meet an impossible standard. EPA recognizes, for example, that "[e]ven municipal collection systems that are operated in an exemplary fashion may experience unauthorized discharges under exceptional circumstances." 75 Fed. Reg. 30,395, 30,400 (June 1, 2010).

### TWENTY-EIGHTH DEFENSE
(Single Operational Upset)

Alleged violations were due to a single operational upset. CWA Section 309(d), 33 U.S.C, § 1319(d), provides that "a single operational upset that leads to simultaneous violations or more than one pollutant parameters shall be treated as a single violation."

### TWENTY-NINTH DEFENSE
(NPDES Permit Sets Forth Process for Determining Whether Further Action Is Required to Address Whole Effluent Toxicity Failure and Whether It Is Reasonably Expected to Recur)

Part 3.4 of the Franklin NPDES Permit (2010) specifically identifies when further action is required to address Whole Effluent Toxicity (WET) test failure and whether WET test failure is reasonably expected to recur. Part 3.4 provides that, in the event of two consecutive test failures (or three test failures within a twelve-month period), the permittee must initiate a Toxicity Identification Evaluation/Toxicity Reduction Evaluation (TIE/TRE). Part 3.4 further provides that the TIE/TRE study may be terminated at any time upon the completion and submission of two consecutive tests demonstrating compliance. Upon demonstrating compliance, no further action is required by the permittee other than periodic testing under the terms of the permit as WET test failure is not reasonably expected to reoccur. The June 20, 2014, letter from the City of Franklin to TDEC confirmed that the City passed two WET tests and no longer needed to undertake a TIE/TRE.

37

## THIRTIETH DEFENSE
### (Inappropriate Enforcement/Abuse of Process)

The filing of this action by Plaintiff is an "abuse" of the Clean Water Act enforcement authority and has been undertaken to extort and coerce the City to waive rights regarding future permit obligations, agree to requirements not otherwise required by applicable law, agree to the need for a revision to the duly adopted TMDL, or to otherwise preclude the City from objecting to or disagreeing with HRWA positions.

## THIRTY-FIRST DEFENSE
### (Failure to Add Indispensable Parties)

Plaintiff has failed to add indispensable parties.

## THIRTY-SECOND DEFENSE
### (Alleged Permit Violations Are Not Reasonably Expected to Reoccur)

Alleged violations are not reasonably expected to reoccur. Among other things, Counts 4 and 5 address alleged failed Whole Effluent Toxicity tests and "Dischages [sic] of Excess Ammonia," respectively. There is no reasonable likelihood that such alleged exceedances will reoccur.

## THIRTY-THIRD DEFENSE
### (Reservation of Rights)

The City reserves all defenses not stated here but which it may later discover.

## VII. COUNTERCLAIM

COMES NOW, Defendant and Counter Plaintiff, City of Franklin, and hereby counterclaims against Plaintiff and Counter Defendant, Harpeth River Watershed Association and states, upon information and belief:

1.     The responses to the pleadings and allegations of the Complaint, as responded to by Defendant (including all Defenses), are hereby incorporated by this reference and restated as if set forth in full.

## I.     INTRODUCTION

2.     The City of Franklin is an incorporated municipality in Williamson County, Tennessee, organized under the laws of the State of Tennessee.

3.     The Harpeth River Watershed Association ("HRWA") is a § 501(c)(3) non-profit organization with its headquarters in Brentwood, Tennessee.

4.     This action arises out of a civil action brought by Cross-Defendant HRWA pursuant to the CWA citizen suit provision.  33 U.S.C. §1365.

## II.     JURISDICTION AND VENUE

5.     Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 33 U.S.C. § 1365 and pursuant to 28 U.S.C. § 1367 for ancillary and pendent state law claims.

6.     This Counterclaim arises from a common nucleus of facts.   Judicial economy necessitates that the Court hear this counterclaim.

## III.     COUNTERCLAIM

7.     Cross Plaintiff, City of Franklin, seeks a declaratory judgment, damages, injunctive relief, and any other relief this Court deems appropriate pertaining to HRWA having utilized the CWA citizen suit authority in an inappropriate manner to extort and coerce the City of Franklin into agreeing to new permit conditions, waiving its rights to object to HRWA positions, and seeking to superimpose additional requirements upon the City not otherwise required by applicable law.

8.      Cross Defendant HRWA has engaged in the abuse of process so as to extort and

coerce the City of Franklin into (a) undertaking actions the City is not legally required to

undertake and (b) forgoing to take actions that the City has the legal right to undertake.

## IV.    BACKGROUND

9.      A TMDL is defined in 40 C.F.R.  § 130.2(i) as:

> The sum of the individual WLAs [wasteload allocations] for point sources
> and LAs [load allocations] for nonpoint sources and natural background. If
> a receiving water has only one point source discharger, the TMDL is the
> sum of that point source WLA plus the LAs for any nonpoint sources of
> pollution and natural background sources, tributaries, or adjacent
> segments. TMDLs can be expressed in terms of either mass per time,
> toxicity, or other appropriate measure. If Best Management Practices
> (BMPs) or other nonpoint source pollution controls make more stringent
> load allocations practicable, then wasteload allocations can be made less
> stringent. Thus, the TMDL process provides for nonpoint source control
> tradeoffs.

10.     A wasteload allocation ["WLA"] is defined in 40 C.F.R. § 130.2(h) as:

> The portion of a receiving water's loading capacity that is allocated to one
> of its existing or future point sources of pollution. WLAs constitute a type
> of water quality-based effluent limitation.

11.     EPA regulation at 40 C.F.R. §130.7(c)(1) provides that:

> TMDLs shall be established at levels necessary to attain and maintain the
> applicable narrative and numerical WQS [water quality standards] with
> seasonal variations and a margin of safety which takes into account any
> lack of knowledge concerning the relationship between effluent limitations
> and water quality. Determinations of TMDLs shall take into account
> critical conditions for stream flow, loading, and water quality parameters.

12.     A development of a TMDL by EPA or TDEC reflects that agency's scientific

determination that compliance with the TMDL will achieve applicable water quality standards.

13.     On or about September 2004, the United States Environmental Protection Agency

duly adopted a TMDL for the Harpeth River.  This TMDL titled "Final Organic Enrichment/Low

Dissolved Oxygen Total Maximum Daily Load (TMDL) for Waters in the Harpeth River

40

Watershed (HUC 05130204)" (hereinafter "Harpeth River TMDL"), sets forth a WLA for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek LLC – Grassland STP (hereinafter "Cartwright Creek STP") identifying the number of pounds of CBOD5 (carbonaceous biochemical oxygen demand), ammonia, and total nitrogen that EPA determined could be discharged and protective of the Harpeth River.

14.     On or about September 2010, Lynwood Utility Corporation changed its name to Berry's Chapel Utility, Inc. (hereinafter "Berry's Chapel").

15.     Upon information and belief, HRWA never commented on the proposed Harpeth River TMDL.

16.     The Harpeth River TMDL contains a response to commenters and identifies only three commenters: (i) Black & Veatch Corporation, Nashville, TN; (ii) Lee Barclay, US Fish & Wildlife Service, Cookeville, TN, and (iii) Barry Sulkin.

17.     Once the Harpeth River TMDL was established, upon information and belief, HRWA never appealed the TMDL.

18.     The Harpeth River TMDL sets forth WLAs for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek STP as follows:

| Facility | Design Flow MGD | Summer CBOD5 lbs/day | Summer Ammonia lbs/day | Winter CBOD5 lbs/day | Winter Ammonia lbs/day | Annual Total N lbs/day |
|---|---|---|---|---|---|---|
| Franklin STP | 12.0 | 400 (4.0mg/l) | 40 (0.4 mg/l) | 1001 (10.0 mg/l) | 150 (1.5 mg/l) | 290 (2.9 mg/l) |
| Lynnwood STP | 0. 4 | 17 (5.0 mg/l) | 7 (2.0mg/l) | 33 (10.0 mg/l) | 17 (5.0mg/l) | 22 (6.6 mg/l) |
| Cartwright Creek STP | 0.25 | 10 (5.0 mg/l) | 4 (2.0 mg/l) | 21 (10.0 mg/l) | 10 (5.0 mg/l) | 15 (7.0 mg/l) |

19.     On or about August 31, 2009, the Tennessee Department of Environment and Conservation ("TDEC") issued a draft NPDES permit (TN0028827) for the City of Franklin Sewage Treatment Plant ("STP").

41

20.     On or about August 31, 2009, TDEC also issued draft NPDES permits for Lynwood Utilities STP (TN0029718) and Cartwright Creek STP (TN0027278).

21.     The City of Franklin STP, Berry's Chapel STP, and Cartwright Creek STP all discharge treated wastewater into the Harpeth River.  The discharges from these three wastewater plants are within an approximately 17-mile stretch of one another in the upper third of the Harpeth River watershed.

22.     By letter dated December 1, 2009, HRWA submitted comments on the three draft NPDES permits for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek STP.

23.     Due to the interrelationship of the three wastewater plant discharges, in its December 1, 2009, letter, HRWA reiterated its request for a joint hearing on the three proposed NPDES permits for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek STP.

24.     HRWA's December 1, 2009, letter "applauds the department in working on a watershed basis in these permit renewals" (Pl. Ex. 2, at 149), since coordination of these permits can provide a process for addressing HRWA's concerns regarding the Harpeth River.

25.     In response to the April 2013 draft NPDES permits for the Franklin STP, Berry's Chapel STP, and Cartwright Creek STP, by letter dated June 27, 2013, the Southern Environmental Law Center ("SELC") submitted a letter to TDEC on behalf of HRWA and requested a combined hearing for the three draft permits stating that "the drafts present interrelated issues."   Ex. 1, at 1.  A true and correct copy of the June 27, 2013, letter from SELC to TDEC, including the attached letters, are attached hereto as Exhibit 1.

42

26.     Since at least 2009, HRWA has been seeking to have TDEC issue an amended or new TMDL for the Harpeth River to provide for more stringent requirements to be imposed upon the discharges from the City of Franklin STP, Lynwood Utilities STP (or Berry's Chapel STP after the name change), and Cartwright Creek STP.

27.     Since at least 2009, HRWA has been seeking to have EPA amend or otherwise issue a new TMDL for the Harpeth River to provide for more stringent requirements to be imposed upon the discharges from City of Franklin STP, Lynwood Utilities STP (or Berry's Chapel STP after the name change), and Cartwright Creek STP.

28.     EPA regulation at 40 C.F.R. §122.44(d) identifies how NPDES permit water quality-based effluent limits are developed.

29.     EPA regulation at 40 C.F.R. § 122.44(d)(1)(vii)(B) provides that:

(vii) When developing water quality-based effluent limits under this paragraph the permitting authority shall ensure that:
. . . .

(B) Effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7 [i.e.,. TMDL].

30.     Preamble to EPA regulations states that "when WLAs are available, they must be used to translate water quality standards into NPDES permit limits."  54 Fed. Reg. 23879 (June 2, 1989).

31.     Courts have recognized the binding effect of TMDLs on the NPDES permitting process.  For example, in 2006 the federal Court of Appeals for the D.C. Circuit stated in *Friends of Earth, Inc. v. Environmental Protection Agency*, 446 F.3d 140, 143 (D.C. Cir. 2006):

Once approved by EPA, TMDLs must be incorporated into permits allocating effluent discharges among all pollution sources, including point sources (like factories) and non-point sources (like storm-water run-off).  . . . *see also* 40

C.F.R. § 122.44(d)(1)(vii)(B) (requiring permitting authority to set effluent limits "consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA").

32.     The Harpeth River TMDL sets forth EPA's conclusion that "the nutrient reductions [set forth in the TMDL] are sufficient to enable the lower Harpeth River to attain water quality standards." Harpeth River TMDL at v.

33.     The WLA in a TMDL has a controlling effect on the NPDES permit for those pollutant parameters addressed by the wasteload allocation.

34.     In its February 10, 2013, letter to TDEC regarding the draft NPDES permits for the Franklin STP, Berry's Chapel STP, and Cartwright Creek STP that TDEC was preparing, HRWA acknowledged that the Franklin STP NPDES permit limits are consistent with the TMDL.

35.     In its February 10, 2013, letter to TDEC, HRWA states that "[t]he City of Franklin's plant is treating its effluent to a very high standard and currently discharges effluent discharge significantly below its permit requirements that are set at the TMDL limits." Ex. 1, at 22.

36.     A comparison of Franklin's current NPDES permit (2010) limits for the Franklin STP with the Harpeth River TMDL reflects that permit loading limits for summer CBOD5, summer ammonia, winter CBOD5, winter ammonia, and annual total nitrogen are the same. The TMDL WLA for the Franklin STP and the Franklin NPDES permit issued on or about September 30, 2010, contain the following values:

| Facility | Summer CBOD5 lbs/day | Summer Ammonia lbs/day | Winter CBOD5 lbs/day | Winter Ammonia lbs/day | Annual Total N lbs/day |
|---|---|---|---|---|---|
| TMDL: Franklin STP | 400 lbs. | 40 lbs. | 1001 lbs. | 150 lbs. | 290 lbs. |
| Franklin 2010 NPDES Permit | 400 lbs. | 40 lbs. | 1001 lbs. | 150 lbs. | 290 lbs. |

44

37.     TDEC's "Rationale" accompanying the City of Franklin 2010 NPDES permit reissuance sets forth TDEC's conclusion that "[t]he new permit's terms and conditions are consistent with the TMDL's required wasteload allocations."  Pl. Ex. 2, at 177.

38.     Notwithstanding the binding effect of the WLA's upon the NPDES permits, HRWA's December 1, 2009, letter on the draft NPDES permit contained comments regarding the TMDL for the Harpeth River and HRWA's belief that a new TMDL was necessary.

39.     HRWA submitted field data with its December 1, 2009, letter and set forth its belief that "[t]hese field data findings essentially point to issues with key assumptions in the TMDL, and that it is time for investment in a new TMDL model."  Pl. Ex. 2, at 148.

40.     The HRWA December 1, 2009, letter set forth HRWA's belief that the existing TMDL is insufficient and that the "waste load allocation and TMDL needs to be redone for the Harpeth."  *Id.* at 149.

41.     The December 1, 2009, HRWA letter sets forth HRWA's opinion that the permit should require Franklin, through its Integrated Water Management Plan, "to establish a new waster [sic] load allocation for the Harpeth" and that "Lynwood and Cartwright Creek [should be required to] participate and bring some funding to the effort."  *Id.* at 150, *see also id.* at 151. The NPDES permit issued to Franklin STP (issued on or about September 30, 2010, modified February 2, 2011) did not impose such requirements upon the City of Franklin.

42.     The NPDES permit issued to Berry's Chapel STP in 2010, on or after September 30, 2010, also did not impose such requirements.  The NPDES permit issued to Cartwright Creek STP on or about October 22, 2010, did not impose such requirements.

43.     On or about August 31, 2010, Ms. Dorie Bolze testified at a public hearing on behalf of HRWA pertaining to draft NPDES permits for the Franklin STP, Lynwood Utility Corp. STP, and Cartwright Creek STP.

44.     Notwithstanding the binding effect of the Harpeth TMDL on the NPDES permits, at the August 31, 2010, hearing, Ms. Dorie Bolze testified that the NPDES permits for Franklin STP, Lynwood Utility Corp. STP, and Cartwright Creek STP need to be more stringent than what is in the TMDL.

45.     HRWA's website titled "TDEC DRAFT SEWER PERMITS NEED TO BE TIGHTENED" (Capitalization in original) encourages citizens to "ASK the state to. . . 2. Require all 3 sewer permittees to participate in funding the needed river studies to set a new required pollution reduction plan."   http://www.harpethriver.org.sitemason.com/programs/ waterquality/stps/2013/11/01/tdec-draft-sewer-permits-need-to-be-tightened.878529 (last visited on November 17, 2014).  The currently effective NPDES permits for Franklin STP, Berry's Chapel STP and Cartwright Creek STP do not require such funding.

46.     The April 23, 2013, draft NPDES permit for the Franklin STP would not require such funding.

47.     The April 23, 2013, draft NPDES permits for Berry's Chapel STP and Cartwright Creek STP also would not require such funding.

48.     Since at least 2009, HRWA has been trying to persuade or otherwise get EPA to establish a new or amended TMDL for the Harpeth River to change the WLAs for CBOD5, ammonia, and total nitrogen for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek STP.

46

49.     Since at least 2009, HRWA has been trying to persuade or otherwise get TDEC to establish a new or amended TMDL for the Harpeth River to change the WLAs for CBOD5, ammonia, and total nitrogen for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek STP.

50.     The City of Franklin does not agree with HRWA that an amendment or new TMDL should be undertaken to impose more stringent requirements.  Such disagreement is within the legal right of the City of Franklin as there is no law or regulation that would require the City to defer to HRWA's opinion.

51.     Since establishment of the EPA Harpeth River TMDL in September 2004, EPA has never amended the Harpeth River TMDL to establish a new TMDL and WLA for CBOD5, ammonia, and total nitrogen for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek STP.

52.     Since establishment of the EPA Harpeth River TMDL in September 2004, TDEC has never established an alternative TMDL and new WLAs for CBOD5, ammonia, and total nitrogen for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek STP.

53.     On or about April 2013, TDEC proposed to reissue NPDES permits to the City of Franklin STP, Berry's Chapel STP, and Cartwright Creek STP.

54.     In its June 27, 2013, comments to TDEC on the draft NPDES permits for Franklin STP, Berry's Chapel STP, and Cartwright Creek STP, HRWA set forth proposed permit conditions that would provide for HRWA to be a member of a technical advisory committee ("TAC") conceived by HRWA.

55.     In its June 27, 2013, comments to TDEC on the draft NPDES permits, HRWA set forth a suggested compliance schedule providing for the TAC to "coordinate and oversee the development of a draft TMDL" for nutrient enrichment/low dissolved oxygen.  Ex. 1, at 19.

56.     By letter dated November 13, 2013, HRWA submitted additional comments to TDEC on the draft NPDES permits for Franklin STP, Berry's Chapel STP, and Cartwright Creek STP.  In its comments, HRWA argues that "a new TMDL for the Harpeth River for low dissolved oxygen and nutrient enrichment is required."   Ex. 2, at 33 (in title), 35.  A true and correct copy of the November 13, 2013, letter from HRWA to TDEC is attached hereto as Exhibit 2.

57.     By letter dated November 13, 2013, to TDEC, HRWA sets forth its belief that the City and other utilities should be required to gather the data HRWA wants for determining a new TMDL and that the City and the other two utilities should be required to participate on a technical advisory committee ("TAC") conceived by HRWA.  *Id.* at 35.

58.     HRWA's November 13, 2013, letter to TDEC states:

However, HRWA strongly believes that all permittees need to be responsible for gathering the needed water quality studies and regular monitoring data. It should not be the responsibility of one of the permittees. However, it will be much more efficient and would generate high quality data if the monitoring is designed and managed by the TAC [Technical Advisory Committee]. The permittees would contribute financially based on their pollutant load, and staff of the permittees can be trained to take on aspects of monitoring in order to reduce costs. The TAC would finalize and revise the monitoring plan, which would be allocated to each permittee and others who participate.

*Id.* at 37.

59.     Item "D" to the HRWA November 13, 2013, letter to TDEC states that:

The permits need to require that each provide funding to launch the continuous water quality monitoring program with 4 - 6 USGS gauging stations so they are operational by May 2014.

*Id.* (underlining in original).

60.     To date, the NPDES permits for Franklin STP, Berry's Chapel STP, and Cartwright Creek STP do not require the permittees to fund this monitoring program that HRWA believes should be undertaken.

61.     The City of Franklin and HRWA, within their respective rights, disagree as to what requirements should be imposed in the Franklin STP NPDES permit to be reissued.

62.     The City of Franklin and HRWA, within their respective rights, disagree as to whether the TMDL should be amended to impose more stringent requirements upon the City of Franklin STP.

63.     By letter dated January13, 2014, SELC sent a notice of intent to file suit on behalf of HRWA to Cartwright Creek, LLC, for alleged violations of its NPDES permit as the first step in commencing a citizen lawsuit under the Clean Water Act.

64.     Through the CWA citizen suit process, HRWA has sought to impose conditions upon Cartwright Creek, LLC, that are not required by the Cartwright Creek STP's current NPDES permit.

65.     Through the CWA citizen suit process, HRWA has sought to impose conditions upon Cartwright Creek, LLC, that HRWA has tried but, to date, been unsuccessful in having included in the Cartwright Creek STP NPDES permit.

66.     By letter dated January 13, 2014, SELC sent a notice of intent to file suit on behalf of HRWA to Berry's Chapel for alleged violations of its NPDES permit as the first step in commencing a citizen lawsuit under the Clean Water Act.

67.     Through the CWA citizen suit process, HRWA has sought to impose conditions upon Berry's Chapel Utility that are not required by its current NPDES permit.

49

68.     Through the CWA citizen suit process, HRWA has sought to impose conditions upon Berry's Chapel that HRWA has tried but, to date, been unsuccessful in having included in the Berry's Chapel STP NPDES permit.

69.     By letter dated January13, 2014, SELC sent a notice of intent to file suit on behalf of HRWA to the City of Franklin for alleged violations of its NPDES permit as the first step in commencing a citizen lawsuit under the Clean Water Act.

70.     Through the CWA citizen suit process, HRWA has sought to impose conditions upon the City of Franklin that are not required by the City's current NPDES permit.

71.     Through the CWA citizen suit process, HRWA has sought to impose conditions upon the City of Franklin that HRWA has tried but, to date, been unsuccessful in having included in the City's NPDES permit.

72.     A court does not have jurisdiction of a CWA citizen suit unless a CWA Section 505(b), 33 U.S.C. §1365(b), notice has been provided to the alleged violator sixty days in advance of the filing of an action.

73.     On or about August 28, 2014, HRWA filed, among other things, a Complaint and proposed Consent Decree with the United States District Court, Middle District of Tennessee, associated with alleged CWA noncompliance by Cartwright Creek, LLC.

74.     The proposed Consent Decree with Cartwright Creek, LLC, filed with the Court on or about August 28, 2014 (hereinafter "Cartwright Creek Consent Decree") provides for Cartwright Creek, LLC, to provide funding for water quality monitoring that HRWA, to date, has been unable to get TDEC to impose in the Cartwright Creek STP NPDES permit.

75.     Paragraph 13 of the Cartwright Creek Consent Decree provides for Cartwright Creek, LLC, to pay $40,000.00 in undertaking in-stream monitoring and water quality investigations.

76.     The Cartwright Creek Consent Decree provides for Cartwright Creek, LLC, to participate in a stakeholder group that HRWA, to date, has been unable to convince TDEC to include in the Cartwright Creek STP NPDES permit.  Paragraph 12 of the Cartwright Creek Consent Decree sets forth a requirement for Cartwright Creek, LLC, to participate in the stakeholder group.

77.     The Cartwright Creek Consent Decree provides for Cartwright Creek, LLC, to waive its rights regarding future disagreement with activities undertaken by the stakeholder group.

78.     Paragraph 12.a of the Cartwright Creek Consent Decree provides that Cartwright Creek, LLC, "agrees to take no action that would unreasonably delay the Stakeholder Group's progress or completion of the Stakeholder Group's mission and projects."  This requires Cartwright Creek, LLC, to agree to the development of a new TMDL for the Harpeth River even if Cartwright Creek, LLC, has good faith objections to such approach.

79.     TDEC Rule 0400-40-05-12 provides that:

Permittees, applicants for permits, and aggrieved persons meeting the criteria of paragraph (3) of this rule who disagree with the denial, terms, or conditions of a permit are entitled to review of the Commissioner's decision by the Board of Water Quality, Oil and Gas (the Board) pursuant to T.C.A. § 69-3-105(i) and § 69-3-110.

80.     The Cartwright Creek Consent Decree provides for Cartwright Creek, LLC, to waive its rights to appeal provisions of the NPDES permit, once issued, pertaining to the nutrient management plan.

51

81.     Applicable law does not otherwise preclude Cartwright Creek, LLC, from objecting to and appealing any permit condition it disagrees with or otherwise believes to be unreasonable or not otherwise supported by law.

82.     Paragraph 11(b) of the Cartwright Creek Consent Decree provides for Cartwright's Creek, LLC's waiver of its right to appeal the pending NPDES permit for the Cartwright Creek STP.

83.     The Cartwright Creek Consent Decree requires Cartwright Creek, LLC, to pursue the agenda items that HRWA has been advocating for years although such actions are not required by the current NPDES permit issued to the Cartwright Creek STP on or about October 22, 2010.

84.     The Cartwright Creek Consent Decree requires Cartwright Creek, LLC, to fund water quality monitoring, agree to future terms of an NPDES permit, agree to participate in a stakeholder group, and to waive its right to taking any action that would unreasonably delay the stakeholder group's progress or completion of the group's mission and projects, although these actions are not required by the Cartwright Creek STP current NPDES permit (issued on or about October 22, 2010) nor are contained in the April 23, 2013, draft NPDES for the Cartwright Creek STP.

85.     Other than these actions, the Cartwright Creek Consent Decree does not provide for any penalty.  Upon information and belief, Cartwright Creek, LLC, was threatened with a CWA citizen suit, significant penalties, and costs associated with achieving compliance with its NPDES permit unless it agreed to HRWA's demand that Cartwright Creek agree to the above mentioned terms, although such actions are not set forth in the Cartwright Creek STP current NPDES permit issued on or about October 22, 2010.

52

86. On or about August 28, 2014, HRWA filed, among other things, a Complaint and proposed Consent Decree with the United States District Court, Middle District of Tennessee, pertaining to alleged CWA violations by Berry's Chapel.

87. The August 28, 2014, proposed Consent Decree with Berry's Chapel (hereinafter "Berry's Chapel Consent Decree") provides for Berry's Chapel to provide funding for water quality monitoring that HRWA, to date, has been unable to get TDEC to include in the Berry's Chapel NPDES permit.

88. Paragraph 13 of the Berry's Chapel Consent Decree provides for Berry's Chapel to pay $40,000.00 in undertaking in-stream monitoring and water quality investigations.

89. The Berry's Chapel Consent Decree provides for Berry's Chapel to participate in a stakeholder group that HRWA, to date, has been unable to convince TDEC to include in the Berry's Chapel NPDES permit. Paragraph 12 of the Berry's Chapel Consent Decree sets forth the requirement for Berry's Chapel to participate in the stakeholder group.

90. The Berry's Chapel Consent Decree provides for Berry's Chapel to waive its rights regarding future disagreement with activities undertaken by the stakeholder group.

91. Paragraph 12.a of the Berry's Chapel Consent Decree provides that Berry's Chapel "agrees to take no action that would unreasonably delay the Stakeholder Group's progress or completion of the Stakeholder Group's mission and projects." This requires Berry's Chapel to agree to the development of a new TMDL for the Harpeth River even if Berry's Chapel has good faith objections to such approach.

92. The Berry's Chapel Consent Decree provides for Berry's Chapel to waive its rights to appeal provisions of the NPDES permit, once issued, pertaining to the nutrient management plan. Applicable law does not otherwise preclude Berry's Chapel from objecting to

53

and appealing any permit condition it disagrees with or otherwise believes to be unreasonable or not otherwise supported by law.

93. Paragraph 11(b) of the Berry's Chapel Consent Decree sets forth provisions pertaining to Berry's Chapel's waiver of its right to appeal the pending NPDES permit.

94. The Berry's Chapel Consent Decree requires Berry's Chapel to pursue the agenda items that HRWA has been advocating for years although such actions are not required by Berry's Chapel's current NPDES permit issued in 2010, on or after September 30, 2010.

95. The Berry's Chapel Consent Decree requires Berry's Chapel to fund water quality monitoring, agree to future terms of an NPDES permit, agree to participate in a stakeholder group, and to waive its right to taking any action that would unreasonably delay the stakeholder group's progress or completion of the group's mission and projects although these actions are not required by Berry's Chapel's current NPDES permit (issued in 2010, on or after September 30, 2010). Other than these actions, the Berry's Chapel Consent Decree does not provide for any penalty.

96. Upon information and belief, Berry's Chapel was threatened with a CWA citizen suit, significant penalties, and costs associated with achieving compliance with its NPDES permit unless it agreed to HRWA's demand that Berry's Chapel agree to the above mentioned terms although such actions are not set forth in the Berry's Chapel STP current NPDES permit (issued in 2010, on or after September 30, 2010), nor are contained in the April 23, 2013, draft NPDES for the Berry's Chapel STP.

97. The purpose of the CWA citizen suit provision is to allow a "citizen" (as defined in the CWA) to bring an enforcement suit on behalf of the government against a permittee that is in violation of its NPDES permit. The purpose of such suits is to allow private parties affected by

54

permit violations to assist the state or federal government in enforcing the CWA to achieve NPDES permit compliance.

98.  The purpose of a CWA citizen suit provision is not for a "citizen" (as defined in the CWA) to superimpose its objectives upon a permittee when such provisions are not set forth in the NPDES permit.

99.  The purpose of a CWA citizen suit is not for a "citizen," who through the NPDES permitting process has been unable to get certain conditions in an NPDES permit, to then force the permittee to agree to such additional requirements under threat of suit.

100.  By letter dated May 6, 2014, SELC provided the City a "formal demand" on behalf of HRWA and indicated that HRWA would only settle the pending lawsuit if, among other things, (a) the City waived its rights as a permittee to object and challenge permit conditions, and (b) the City agreed not to raise and pursue any objections it may have to HRWA's contention that a new or amended TMDL should be developed.  Ex. 3.

101.  A true and correct copy of the May 6, 2014, HRWA formal demand is attached hereto as Exhibit 3.

102.  HRWA's May 6, 2014, formal demand indicated that the City must agree to the identified ten terms "among other terms to be negotiated by the parties" in order to resolve the Clean Water Act citizen suit.  *Id.* at 56.

103.  HRWA's May 6, 2014, formal demand was hand delivered by HRWA to the City of Franklin at a meeting on May 6, 2014.

104.  Paragraph 3 of the HRWA's May 6, 2014, formal demand would prevent the City of Franklin from seeking less stringent requirements in its pending NPDES permit to be reissued. To the extent that the City disagrees with a permit condition or otherwise believes permit

55

conditions to be inappropriate, *ultra vires*, or otherwise not supported by applicable law, paragraph 3 of the formal demand would require the City to waive such arguments. *Id.* at 57.

105.    Paragraphs 3.A of HRWA's May 6, 2014, formal demand would require the City of Franklin to comply with mere recommendations of EPA whether or not such recommendations are based upon current federal or State regulatory requirements or required by the City's NPDES permit. *Id.*

106.    Paragraph 3.B of HRWA's May 6, 2014, formal demand would require the City of Franklin to follow the recommendations of a third party whether or not such recommendations are based upon current federal or State regulatory requirements or required by the City's NPDES permit. *Id*.

107.    Paragraph 3.B.d of HRWA's May 6, 2014, formal demand would require the City of Franklin to impose a sewer ban on all portions of the City's collection system although such provision is inconsistent with the City's current NPDES permit issued September 30, 2010, as to when a sewer ban can be imposed on a small part of the collection system. *Id*.

108.    Section 2.3.3.c of the City's current NPDES permit issued on or about September 30, 2010, provides that "[n]o new or additional flows shall be added upstream of any point in the collection system, which experiences chronic overflows (greater than 5 events per year) or would otherwise overload any portion of the system. Sections 2.3.3.d and 2.3.3.e of the City's current NPDES permit relieve a permittee from any Section 2.3.3.c sewer ban.

109.    The EPA Inspection Report of the City's treatment facility and collection system identifies that "there are no specific clusters or problem areas with regards to causation of SSOs." EPA Inspection Report at 4 of 15.

110.     Notwithstanding the inapplicability of a sewer ban to the City's circumstances under the NPDES permit standard, HRWA inappropriately seeks to extort or coerce the City into agreeing to a sewer ban under threat of a lawsuit.

111.     By letter dated December 1, 2009, wherein HRWA submitted comments on the three draft NPDES permits for the City of Franklin STP, Lynwood Utilities STP, and Cartwright Creek STP, HRWA stated that it "signs onto the comments provided by the Tennessee Clean Water Network." Pl. Ex. 2, at 146.

112.     One of the comments of the Tennessee Clean Water Network, as set forth in its November 30, 2009, letter titled "Moratorium on Connections," requests that "[t]here should be language in each of these permits placing a moratorium on any new connections . . . ." Pl. Ex. 2, at 139.

113.     In 2013, HRWA requested that TDEC impose a sewer moratorium on the City of Franklin.

114.     By letter dated November 13, 2013, HRWA submitted additional comments to TDEC on the draft NPDES permits for Franklin STP, Berry's Chapel STP, and Cartwright Creek STP. Comment number III.G pertaining to the Franklin STP is titled "Place moratorium on city approval of new sewer capacity by prohibiting approval of new development for which the city proposes to provide sewer via the sewer plant." HRWA was requesting that the NPDES permit impose a sewer moratorium upon the City of Franklin. Ex. 2, at 43.

115.     HRWA was not successful in getting TDEC to include a sewer moratorium in the City of Franklin NPDES permit. Neither the City's current NPDES permit issued on or about September 30, 2010, nor the April 23, 2013, proposed draft permit would impose a moratorium on all new connections.

57

116.    Paragraph 4 of HRWA's May 6, 2014, formal demand would require the City of Franklin to submit a nutrient management plan "to HRWA for approval."  Ex. 3, at 58.

117.    HRWA is not the NPDES permitting authority.

118.    HRWA seeks to impose itself as the regulatory body.  Neither the City's existing NPDES permit issued on or about September 30, 2010, nor the April 23, 2013, draft NPDES permit for the City would elevate HRWA to such status.

119.    The Cartwright Creek Consent Decree and Berry's Chapel Consent Decree would not require HRWA to approve new nutrient management plans developed by such entities.

120.    Paragraph 4 of HRWA's May 5, 2014, formal demand would require the nutrient management plan, at a minimum, to meet the requirements set forth in the 2013 draft NPDES permit for the City even though such requirements have not been established.  *Id.* at 58-59.

121.    Paragraph 4 of the HRWA's May 5, 2014, formal demand would preclude the City from appealing a nutrient management plan permit condition in its permit to be issued in the future.  *Id.* at 58.

122.    Paragraph 4 of HRWA's May 6, 2014, formal demand seeks to preclude the City from pursuing its belief that the draft NPDES nutrient management plan permit condition is inappropriate.  *Id.*

123.    Paragraph 5 of the of HRWA's May 6, 2014, formal demand would require the City of Franklin to undertake in-stream monitoring set forth in the 2013 draft NPDES permit for the City even though such requirements have not been established and, even if set forth in the final NPDES permit, could be appealed.  Furthermore, Paragraph 5 would require the City to comply with a revision to in-stream monitoring recommended by USGS even though such

58

monitoring is not required by a federal or State regulatory requirement or otherwise required by the City's NPDES permit. *Id.* at 59.

124.    Paragraph 6 of HRWA's May 6, 2014, formal demand would require the City of Franklin to participate in a stakeholder group even though such participation is not required by federal or State law or otherwise required by the City's NPDES permit. *Id.*

125.    The City of Franklin does not agree with the contention of HRWA that a new TMDL should be developed for the Harpeth River. Paragraph 6 of HRWA's May 6, 2014, formal demand provides that "[t]he City will not dispute that a new Total Maximum Daily Load is needed for the Harpeth River and that TDEC and/or EPA are obligated to prepare a TMDL, an obligation which the stakeholder group does not negate." *Id.*

126.    Neither the City's existing NPDES permit (issued on or about September 30, 2010), nor the April 23, 2013, draft NPDES permit for the City would require the City to agree with HRWA's contention that a new TMDL is needed for the Harpeth River or that TDEC and/or EPA are obligated to prepare a TMDL.

127.    Paragraphs 6.B and 6.C of HRWA's May 6, 2014, formal demand would require the City to agree that HRWA shall be a member of the stakeholder group and that the City shall not unreasonably withhold approval for implementation of the plans derived by the stakeholder group. *Id.*

128.    HRWA's May 6, 2014, formal demand would require Franklin to pursue the agenda items that HRWA has been advocating for years, even though such actions are not required by Franklin's current NPDES permit issued on or about September 30, 2010.

129.     HRWA's May 6, 2014, formal demand would require Franklin to pursue the agenda items that HRWA has been unsuccessfully advocating for years to be included in the City of Franklin NPDES permit.

130.     On or about August 25, 2014, HRWA filed a Complaint for Declaratory and Injunctive Relief and for Civil Penalties against the City of Franklin in United States District Court, Middle District of Tennessee, pertaining to alleged violations of the CWA.

## FIRST COUNTERCLAIM
## COUNT I
(Abuse of Process)

131.     The foregoing paragraphs are hereby incorporated by reference and restated as if set forth in full.

132.     The United States Supreme Court stated in *Sackett v. EPA*, 132 S.C. 1367, 1374 (2012), that "there is no reason to think that the Clean Water Act was uniquely designed to enable the strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review. . . ."

133.     The EPA Environmental Appeals Board held in *In re: Borough of Ridgway Pennsylvania*, CWA Appeal No. 95-2, 6 E.A.D. 479 (May 30, 1996), that enforcement under the Clean Water Act "is not unconstrained" and remanded the case for a determination as to whether there was an "abuse" of the Clean Water Act enforcement authority and whether the enforcement action, in that case undertaken by EPA itself, "was based on impermissible considerations." *Id.* at 495-96 (Exhibit 4, at 78-79).

134.     HRWA's filing of the notice of intent to sue was followed by HRWA actions to coerce and/or extort the City into agreeing to HRWA's position even though the City was not legally obligated to agree with HRWA's positions.

60

135.     HRWA's filing of the notice of intent to sue was followed by HRWA actions to coerce and/or extort the City into agreeing to undertake actions that are not required by the City's NPDES permit.

136.     HRWA's filing of the notice of intent to sue was followed by HRWA actions to coerce and/or extort the City into agreeing to future NPDES permit conditions.

137.     HRWA's filing of the notice of intent to sue was followed by actions to coerce and/or extort the City into agreeing to undertake actions that HRWA has been unsuccessful in having included in the City's NPDES permit.

138.     HRWA's filing of the notice of intent to sue was followed by HRWA actions to coerce and/or extort the City into agreeing to a new or amended TMDL.

139.     The purpose of the CWA citizen suit provision and notice of intent to sue is not to provide an adverse party an advantage in the NPDES permitting process or to coerce and/or extort the NPDES permittee to agree with that adverse party's position.

140.     The purpose of the CWA citizen suit provision and notice of intent to sue is not to provide an adverse party an advantage in the TMDL process or to require the NPDES permittee to forego all technical, legal, and other objections it may have to a potential future TMDL or the need for such TMDL.

141.     The United States Supreme Court has stated in *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977), that the Clean Water Act is intended "to relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict."

142.     HRWA has misused the citizen suit provision of the CWA in pursuing an outcome that the enforcement provision was not designed to accomplish.

143.     HRWA has threatened and filed the CWA citizen suit against the City as a means to coerce and/or extort the City to undertake actions that the City is not otherwise required to undertake.

144.     HRWA is not satisfied with the conditions in the existing NPDES permits for Franklin STP, Berry's Chapel STP, and Cartwright Creek STP.

145.     HRWA is not satisfied with the conditions in the April 23, 2013, draft NPDES permits for Franklin STP, Berry's Chapel STP, and Cartwright Creek STP.

146.     HRWA has inappropriately misused the citizen suit provision of the CWA as a means for HRWA to pursue its objectives that it was not able to achieve through the NPDES permitting process.

147.     HRWA is not satisfied with the 2004 TMDL for the Harpeth River. HRWA would like to see such duly established TMDL revised or amended. HRWA, to date, has not been able to convince EPA or TDEC to take such action.

148.     HRWA has used the citizen suit provision of the CWA as a means to achieve or seek to achieve its objectives of revising or amending the Harpeth River TMDL and eliminating opposition from the NPDES permittees, including the City of Franklin.

WHEREFORE, Cross Plaintiff, City of Franklin, respectfully requests this Court:

1.   Dismiss the suit brought by Plaintiffs.

2.   Issue a declaratory judgment stating that:

    a.   HRWA commenced this action with an ulterior motive not contemplated by the citizen-suit process of the Clean Water Act; and

    b.   HRWA misused or misapplied a process for an end other than that which the citizen suit process of the Clean Water Act was designed to accomplish.

3. Award Counter-Plaintiff, City of Franklin, monetary damages associated with Plaintiff, Counter Defendant's abuse of process.

4. Award Counter-Plaintiff, City of Franklin, all reasonable attorney fees and costs incurred in this action

5. Enjoin Plaintiff and Counter Defendant, HRWA, from filing a CWA citizen suit under 33 U.S.C. §1365; and

6. For such other and further relief as the Court deems proper.

Dated this 19th Day of November, 2014

/s Shauna R. Billingsley
SHAUNA R. BILLINGSLEY
Tennessee Bar No. 023362
City Attorney
City of Franklin
Law Department
109 Third Avenue South
P.O. Box 305
Franklin, Tennessee 37065-0305
(615) 550-6603
shauna.billingsley@franklintn.gov

/s Gary B. Cohen
GARY B. COHEN
Hall & Associates
1620 I Street, N.W., Suite 701
Washington, DC 20005
(202) 463-1166
gcohen@hall-associates.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 19th day of November, 2014, a copy of Defendant and Counter-Plaintiff, City of Franklin, Tennessee's Answer and Counterclaim has been served via electronic mail to:

Delta Anne Davis
BPR No. 010211
Managing Attorney
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
adavis@selctn.org

Anne E. Passino
BPR No. 027456
Staff Attorney
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
apassino@selctn.org

/s Gary B. Cohen
GARY B. COHEN
Hall & Associates
1620 I St. NW, Suite #701
Washington, DC 20006-4033
(202) 463-1166
gcohen@hall-associates.com