# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

HARPETH RIVER WATERSHED
ASSOCIATION,

        Plaintiff,

v.

THE CITY OF FRANKLIN, TENNESSEE

        Defendant.

No. 3:14-1743
Judges Sharp and Bryant

## AMICUS CURIAE BRIEF OF THE UNITED STATES OF AMERICA

DAVID RIVERA
United States Attorney
Middle District of Tennessee

MICHAEL L. RODEN
Assistant United States Attorney
110 Ninth Avenue, South, Suite A-961
Nashville, Tennessee 37203
 (615) 736-5151
B.P.R. #010595
michael.roden@usdoj.gov

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural
 Resources Division

MATTHEW R. OAKES
Law and Policy Section
Environment & Natural
 Resources Division
U.S. Department of Justice
P.O. Box 4390
Ben Franklin Station
Washington, DC 20044-4390
(202) 514-2686
(202) 514-4321 (fax)
matthew.oakes@usdoj.gov

# TABLE OF CONTENTS

INTERESTS OF THE UNITED STATES ……………………………………….. 1

INTRODUCTION …………………………………………………………… 2

BACKGROUND …………………………………………………………... 3

I.      Statutory and Regulatory Background …………………………………….. 3

II.     The City's Permit Requirements and Plaintiff's Allegations ………………… 4

ARGUMENT ………………………………………………………………… 6

I.      The Permit Requirements at Issue in Plaintiff's First Three Claims Constitute Effluent Standards or Limitations or Permit Conditions Subject to Citizen Enforcement. ……………………………………………………………….. 7

       A.      The Overflow Prohibition Is an "Effluent Standard or Limitation" Enforceable in a Citizen Suit ……………………………………… 7

       B.      Permit Provisions Mandating Nutrient Management Plans are Within the Scope of the NPDES Program. …………………………………….. 13

       C.      Plaintiff May Enforce the Permit's Monitoring Requirements……….. 16

II.     The City Relies on Inapplicable Authority …………………………………. 18

CONCLUSION …………………………………………………………….... 20

i

# TABLE OF AUTHORITIES

## Cases

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Com'n*, 389 F.3d 536 (6th Cir. 2004)... 16
*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ............................................................................ 8
*Atl. States Legal Found., Inc. v. Kodak*, 809 F. Supp. 1040 (W.D. N.Y. 1992) ......................... 19
*Citizens Coal Council v. EPA*, 447 F.3d 879 (6th Cir. 2006) ............................................. 11, 15
*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167 (2000) .............. 6
*General Motors Corp. v. EPA*, 168 F.3d 1377 (D.C. Cir. 1999) ............................................... 7
*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52-53 (1987) ........... 6
*Ky. Waterways Alliance v. Johnson,* 540 F.3d 466 (6th Cir. 2008) ........................................... 6
*Long Island Soundkeeper Fund v. New York City Dep't of Envtl. Protection*, 27 F. Supp. 2d 380
(E.D.N.Y. 1998) ................................................................................................................. 20
*NRDC v. EPA*, 822 F.2d 104 (D.C. Cir. 1986) ...................................................................... 12
*Nw. Envt'l Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995) ................................... 11
*Pub. Interest Research Group of N.J. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64 (3d Cir.
1990) ................................................................................................................................. 7
*Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton*, 506 F. Supp. 902 (W.D. Pa.
1980) ............................................................................................................................... 10
*Sierra Club v. City and County of Honolulu*, CV No. 04-00463 DAE-BMK, 2008 WL 3850495,
(D. Haw. Aug. 18, 2008) .................................................................................................... 11
*Stephens v. Koch Foods, LLC*, 667 F. Supp. 768 (E.D. Tenn. 2009) ....................................... 12
*U.S. Envtl. Prot. Agency v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200 (1976) ......... 6

## Federal Statutes

33 U.S.C. § 1251 ............................................................................................................. 3, 4
33 U.S.C. § 1311 .............................................................................................. 1, 3, 7, 9, 14
33 U.S.C. § 1318 ............................................................................................................... 16
33 U.S.C. § 1342 ........................................................................................... 1, 2, 3, 4, 8, 16
33 U.S.C. § 1362 ................................................................................................................. 1
33 U.S.C. § 1365 ......................................................................................................... 3, 4, 6, 7
33 U.S.C. § 1369 ............................................................................................................... 13

## Tennessee Code

Tenn. Code Ann. § 69-3-111 ............................................................................................... 7

## Federal Regulations

40 C.F.R. § 122.41(e) .................................................................................................. 2, 8, 13
40 C.F.R. §§ 122.41(d), (e) ................................................................... 3, 8, 10, 13, 14, 17
40 C.F.R. § 122.41(h) ..................................................................................................... 2, 17
40 C.F.R. § 122.44(i) ........................................................................................................ 17
40 C.F.R. § 122.44(k) ........................................................................................................ 14
40 C.F.R. §122.48 .......................................................................................................... 2, 17
40 C.F.R. § 123.25(a) ........................................................................................................ 17
40 C.F.R. Parts 122 through 125 .......................................................................................... 4

# GLOSSARY

| | |
|---|---|
| CWA: | Clean Water Act |
| EPA: | United States Environmental Protection Agency |
| FAC: | First Amended Complaint |
| MTD: | Defendant's Motion to Dismiss |
| NPDES: | National Pollution Discharge Elimination System |
| O&M: | Operation and Maintenance |
| POTW: | Publicly-Owned Treatment Works |
| RCRA: | Resource Conservation and Recovery Act |

Harpeth River Watershed Association ("Plaintiff") has filed Clean Water Act ("CWA") citizen suit claims against the City of Franklin, Tennessee ("the City"), owner and operator of a Publicly-Owned Treatment Works ("POTW"). First Amended Complaint ("FAC") ¶¶ 2, 17. Plaintiff alleges that the City has violated the terms of a National Pollution Discharge Elimination System ("NPDES") permit issued by the State of Tennessee under a program approved by the United States Environmental Protection Agency ("EPA").

EPA administers and enforces the CWA, 33 U.S.C. § 1251 *et seq.* Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits, except as authorized by the Act, the "discharge of any pollutant," i.e., "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. §§ 1311(a), 1362(12). Section 402 establishes the NPDES discharge permit program, which is a critical element of federal water pollution control. EPA, or states under EPA-approved programs, may issue a NPDES permit for the discharge of any pollutant to navigable waters so long as the discharge meets the applicable requirements of the Act. 33 U.S.C. § 1342(a)(1). Pursuant to 33 U.S.C. § 1342 (a)(2) and (b)(1), EPA has promulgated NPDES permit regulations. These regulations include approval requirements for state NPDES programs and specific requirements that must be included in all EPA or state-issued permits. Compliance with NPDES permits by POTWs is an important component of achieving CWA objectives.

In this action Plaintiff seeks to enforce permit provisions that deal with: sewage overflows (Count 1); requirements for a nutrient management plan (Count 2); requirements to conduct instream monitoring (Count 3); specific effluent limitations (Counts 4-5); and flow monitoring (Count 6). The City argues that the permit requirements forming the basis of

1

Plaintiff's first three claims are outside the scope of the federal NPDES program, and are thus unenforceable under the CWA's citizen suit provisions. The City also argues that sewage overflows that violate the terms of a NPDES permit are not enforceable unless Plaintiff demonstrates that such overflows reach waters of the United States.

NPDES permits routinely contain both effluent limitations restricting discharges, terms and conditions relating to the operation and maintenance of permitted facilities to ensure compliance with discharge requirements, monitoring requirements, and to avoid unlawful discharges. 40 C.F.R. § 122.41(e). Such permit terms implement the Act's requirements for appropriate technology-based and water-quality based effluent limitations, and the Act's grant of authority for permits to contain terms and conditions that the Administrator determines are necessary for carrying out the provisions of the Act. In addition, permits must include required monitoring provisions to ensure compliance with permitting limits and to inform future permitting decisions. 33 U.S.C. 1342(a)(2); 40 C.F.R. §§ 122.41(h), 122.44(i), 122.48. The City has asserted that the overflow provisions, nutrient management plans, and monitoring provisions at issue in this case are "beyond the scope" of the CWA, assertions that implicate the United States' interests in the nationwide operation of the NPDES permitting system.

## INTRODUCTION

The United States submits this brief to provide the Court with its views regarding the scope of the federal NPDES program, an issue raised in the City's Motion to Dismiss with respect to Plaintiff's first three claims. Contrary to the City's argument, the permit provisions at issue in each of these claims are squarely within the scope of the federal NPDES program and

2

enforceable in a citizen suit under 33 U.S.C. § 1365(f). That section of the Act authorizes citizen

suits for an effluent limitation or other limitation under 33 U.S.C. § 1311 or a permit or permit

condition under 33 U.S.C. § 1342. 33 U.S.C. § 1365(f)(2), (f)(6). Overflow prohibitions are an

"other condition" or "other requirement" under section 33 U.S.C. § 1342 (a)(2) designed to

ensure proper operation and maintenance of the Franklin Sewage Treatment Plant, which is the

City's POTW. Permit provisions requiring a nutrient management are effluent limitations

necessary to meet state water quality standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §

122.44(d). The Permit's monitoring requirement is appropriate both to ascertain compliance

with permit terms and to ensure that the existing permitted requirements are necessary and

sufficient, and may be enforced as an "other requirement" of the permit under 33 U.S.C. §

1342(a)(2). Such Section 1342 permit requirements are effluent standards or limitations for

purposes of Section 505 of the Act, 33 U.S.C. § 1365.

The United States takes no position on the underlying merits of Plaintiff's claims against

the City.

## BACKGROUND[1]

### I.       Statutory and Regulatory Background

The CWA aims "to restore and maintain the chemical, physical, and biological integrity

of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA prohibits the discharge of

pollutants except under prescribed conditions, including a permit under section 402. 33 U.S.C. §

1311(a). The CWA affords States a significant role in protecting their own natural resources,

---

[1] Defendant has adequately recited the motion to dismiss standard, and the United States does not restate that
standard here. MTD 2.

and the federal government may approve a State to administer the NPDES program with respect to point sources located within the State so long as the proposed state program complies with the requirements prescribed at 33 U.S.C. § 1342(b). 33 U.S.C. § 1251(b). EPA regulations concerning the NPDES program and requirements for approval of state programs are set forth at 40 C.F.R. Parts 122 through 125. On December 28, 1977, EPA approved Tennessee's request for approval to administer a State NPDES permit program.

The CWA citizen-suit provision authorizes any citizen to commence a civil action on his own behalf against any person who is "alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). Pursuant to CWA section 505, "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation. . . ." 33 U.S.C. § 1365(a). CWA section 505 specifically defines the term "effluent standard or limitation" to include, among other things, "(2) An effluent limitation or other limitation under section [301 or 302]; . . . (6) A permit or condition thereof issued under [section 402] which is in effect under this chapter. . . ." 33 U.S.C. § 1365(f)(2), (6).

## II.     The City's Permit Requirements and Plaintiff's Allegations

This case is a citizen suit enforcement action seeking to enforce the terms of NPDES Permit No. TN0028827, issued to the Franklin Sewage Treatment Plant through Tennessee's EPA approved NPDES program.[2] FAC ¶ 12. Plaintiff alleges that the City has violated the terms of its NPDES permit and the CWA by:

4

(1)      Allowing sewage overflows and allowing sewage to bypass its treatment plant (Count 1, FAC ¶¶ 108-156);

(2)      Failing to develop or implement a nutrient management plan (Count 2, FAC ¶¶ 157-178);

(3)      Failing to conduct continuous instream monitoring and receiving stream investigations (Count 3, FAC ¶¶ 179-196);

(4)      Discharging effluent that failed toxicity tests (Count 4, ¶¶ 197-216);

(5)      Discharging excess ammonia as nitrogen (Count 5, ¶¶ 217-226); and,

(6)      Inaccurate flow measurement and monitoring (Count 6, ¶¶ 227-243).

This amicus brief focuses on the City's challenges to Plaintiff's first, second and third claims and the argument that certain permit conditions are outside the EPA's CWA authority.

The City's currently-effective NPDES permit prohibits "overflows." Permit § 2.3.3(b). "Overflow" is defined as "any release of sewage from any portion of the collection, transmission, or treatment system other than through permitted outfalls." Permit § 2.3.3(a). As the "Overflow and Bypass Reporting" provision of the permit Rationale explains:

> For the purposes of demonstrating proper operation of the collection, transmission, and treatment system, the permit defines overflow as any release of sewage other than through permitted outfalls. This definition includes, but is not necessarily limited to, sanitary sewer overflows and dry weather overflows. . . . Any unpermitted release, however, potentially warrants permittee mitigation of human health and/or water quality impacts via direct or indirect contact and demonstrates a hydraulic problem in the system that needs permittee consideration as part of proper operation and maintenance of the system.

Permit Rationale R7.13.

The permit also requires the Franklin Sewage Treatment Plant to develop and implement a Nutrient Management Plan consistent with specific requirements, Permit § 3.8, and requires the City to "complete the receiving stream monitoring/reporting" consistent with its terms, Permit § 3.7. Discharge Monitoring Reports and Monthly Operating reports must be filed to show compliance with permit terms. Permit §§ 1.3.1, 1.3.4, 2.3.1. Any instances of non-compliance

---

[2] Franklin's current NPDES permit is attached as Exhibit 3 to Plaintiff's FAC.

must be reported in its Discharge Monitoring Reports, Permit § 2.3.2, and operation and maintenance of all facilities and systems must be sufficient "to achieve compliance with the terms and conditions of this permit," Permit § 2.1.4.

## ARGUMENT

The City discharges pollutants into waters of the United States and is prohibited from doing so except in compliance with the terms of its NPDES permit. *See Ky. Waterways Alliance v. Johnson,* 540 F.3d 466, 470 (6th Cir. 2008). Failure to comply with permit conditions subjects the permit holder to a possible enforcement action. 33 U.S.C. § 1365(a)(1); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52-53 (1987). As the Supreme Court has explained the "the permit defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations" under the CWA. *U.S. Envtl. Prot. Agency v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976). NPDES permit enforcement is therefore a fairly straightforward process. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 174 (2000) ("Noncompliance with a [NPDES] permit constitutes a violation of the Act.").

The City tries to shift the focus of this case from the terms of its permit to the scope of the CWA, but these arguments lack merit. The permit provisions at issue in Counts 1-3 of the FAC are enforceable effluent standards or limitations under the CWA's citizen-suit provision. In deciding this case, this Court need not address the larger question of whether the citizen suit provision does or does not authorize the enforcement of any and all conditions in a lawfully issued NPDES permit because the three provisions in question are indisputably enforceable in this case. A NPDES permit is a powerful enforcement tool precisely because it functions to

6

clarify a discharger's obligations.  The City's attempt to undermine that function should fail.

**I.**     **The Permit Requirements at Issue in Plaintiff's First Three Claims Constitute Effluent Standards or Limitations or Permit Conditions Subject to Citizen Enforcement.**

As noted, the CWA citizen suit provision provides that citizens may bring suit against any person alleged to be in violation of "an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a).  An effluent standard or limitation is defined to include an effluent limitation or other limitation under section 301 of the CWA, 33 U.S.C. § 1311, or a NPDES permit or permit condition "which is in effect . . . under this chapter."[3]  33 U.S.C. § 1365(f).  The key question in this case is whether each permitting provision that Plaintiff alleges has been violated is an "effluent standard or limitation" in a permit in effect under the CWA for purposes of section 505.  33 U.S.C. §§ 1365(a)(1) & (f).  They clearly are.[4]

**A.**     **The Overflow Prohibition Is an "Effluent Standard or Limitation" Enforceable in a Citizen Suit**

The prohibition on overflows is an "other requirement" under section 33 U.S.C. § 1342(a)(2) designed to ensure proper operation and maintenance of the City's POTW and to

---

[3] 33 U.S.C. 1365 is part of Chapter 26, titled Water Pollution Prevention and Control.  This chapter consists of the entirety of the CWA, 33 U.S.C. §§ 1251-1387.

[4] The City's arguments can also be viewed as collateral challenges to its NPDES permit.  A NPDES permit issued by Tennessee must be challenged upon issuance directly, not collaterally.  *See* Tenn. Code Ann. § 69-3-111.  *See generally, General Motors Corp. v. EPA*, 168 F.3d 1377, 1381-83 (D.C. Cir. 1999) (rejecting challenge to state permit in federal enforcement proceeding); *Pub. Interest Research Group of N.J. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 78 (3d Cir. 1990) ("By failing to challenge a permit in an agency proceeding, [defendant] has lost forever the right to do so, even though that action might eventually result in the imposition of severe civil or criminal penalties." (internal citations omitted)).  There are good reasons for such a rule.  EPA and the States base NPDES permitting decisions on the assumption that all of the terms in a permit, including the standard operation and maintenance conditions at issue here, will be enforceable.  If one permit term is found invalid, the permitting authority may need to adjust other permit terms to compensate, and this can be done in a timely manner only if permit holders are required to utilize the statutory mechanisms for challenging permit terms.  The City's challenges here, though framed as jurisdictional challenges, amount to nothing more than a collateral attack on permitting terms.  Plaintiff's right to enforce these conditions does not depend on whether the violation of the permit condition resulted in a spill to the ground, a spill to the waters of the United States, or no spill at all, and the City's collateral attack to the permit it has now accepted, should be rejected.

7

protect human health and the environment. The CWA expressly requires all NPDES discharge permits to meet the requirements of section 301 and any additional requirements deemed appropriate. *See* 33 U.S.C. § 1342(a)(2) (the Administrator "shall prescribe conditions for such permits to assure compliance . . ., including conditions on data and information collection, reporting, ***and such other requirements as he deems appropriate***") (emphasis added). This provision has been recognized as a broad grant of power to the Administrator to impose such conditions as deemed appropriate to achieve compliance with the CWA. *See, e.g., Arkansas v. Oklahoma*, 503 U.S. 91, 105 (1992). Acting under this authority, EPA has adopted regulations that mandate inclusion of a condition in NPDES permits: (1) requiring the permittee to "take all reasonable steps to minimize or prevent any discharge . . . which has a reasonable likelihood of adversely affecting human health or the environment" and (2) requiring proper operation and maintenance ("O&M") of "all facilities and systems of treatment and control" installed to achieve compliance with the terms of the NPDES permit. 40 C.F.R. §§ 122.41(d) & (e).

The City's permit includes the required O&M condition and the duty to mitigate condition prescribed by the EPA regulations. The permit also includes a particularized O&M condition – the overflow prohibition – designed to implement the more general requirements. In addition to directly prohibiting overflows, the overflow provision requires the "permittee to operate the collection system so as to avoid overflows." Permit § 2.3.3.c. The overflow provision serves two functions. The provision prohibits immediate discharges to jurisdictional waters as well as requiring the City to operate the collection system in a manner that avoids *the creation of conditions that may result in prohibited discharges*. The overflow prohibition requires the City to protect the integrity of the POTW system as a whole and the system's ability

8

to function as designed.  Overflows are themselves indications of improper operation and maintenance of a treatment facility.

Sewage overflows at a POTW may adversely affect POTW operation in several ways. POTWs such as the Franklin Sewage Treatment Plant typically treat wastewater from residential, commercial, and industrial consumers.  The Franklin plant serves a sanitary sewer collection systems that conveys wastewater flows to the plant.  If a sanitary sewer system overflows before it reaches the POTW treatment plant, the overflow will contain the same raw sewage the POTW should be treating, exposing the community at the point of overflow to the public health hazard associated with the untreated sewage.  Rain or snow can result in significant increases in flow entering the treatment facility.  These increased flows can reduce treatment efficiencies, damage treatment units and cause unauthorized untreated discharges.  EPA has treats such overflows as CWA permit violations, and overflows that reach a water of the United States also violate the discharge prohibition of the CWA, 33 U.S.C. § 1311(a).

As EPA has explained, overflows from sanitary sewer systems and POTW treatment facilities reflect poor system maintenance.  *See e.g.* U.S. Env't Prot. Agency, EPA-833-K-10-001, *NPDES Writers' Manual* § 9.1.2-9.2.4 (2010) (Attached as Ex. A); U.S. Env't Prot. Agency, EPA-832-K-96-001, *Sanitary Sewer Overflows What are they and how do we reduce them?* at 1 (Summer 1996) (Attached as Ex. B).[5]  Overflows have significant public health and welfare consequences.  *See, e.g.* U.S. Envtl. Prot. Agency, *Why Control Sanitary Sewer Overflows* (Mar. 1, 2011) (Attached as Ex. C) (EPA fact sheet explaining the impact of sanitary

---

[5] Judicial notice of EPA's CWA interpretations as set out in regulations and guidance documents is appropriate because such interpretations "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455, 465-66 (6th Cir. 2014).

9

sewer overflows on human health (as a result of drinking or swimming in contaminated water or eating contaminated fish or shellfish) as well as natural resource impacts on downstream waters.). As background on the scale of issues associated with sewage overflow, a review of reported overflows in only 18 states in the year 2000 indicates an estimated 1.2 billion gallons of sewage overflows were reported that year. Ex. C at 3. EPA has considered overflows from various points in a municipal wastewater system as subject to regulation under the CWA, and the primary tool used to control these overflows has been the NPDES program. *See* U.S. Envtl. Prot. Agency, EPA-833-R-04-001, *Report to Congress on the Impacts and Control of CSOs and SSOs*, §§ 7-1 – 7-7 (August 26, 2004) (Attached as Ex. D).

As explained above, EPA's regulation requires that NPDES permits include provisions requiring permittees to take all reasonable steps to minimize or prevent any discharge which has a reasonable likelihood of adversely affecting human health or the environment and for requiring proper operation and maintenance of "all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of this permit." 40 C.F.R. §§ 122.41(d), (e). Overflow provisions are a more specific form of these required conditions designed, in part, to ensure proper operation and maintenance of a discharging facility. EPA has recognized that proper operation and maintenance is critical to controlling overflows, and courts have entertained lawsuits seeking to enforce such conditions. *See Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton*, 506 F. Supp. 902 (W.D. Pa. 1980), *aff'd*, 644 F.2d 995 (3d Cir. 1981) (allowing citizen enforcement of sewage system maintenance terms).

In including the specialized O&M condition prohibiting overflows in the City's permit,

10

the State specifically acknowledged the potential adverse consequences of overflows. While violations of O&M conditions may not result in discharges to waters of the United States, the permit recognizes that overflows and spills indicate improper operation and maintenance and identifies the backup of raw, untreated sewage into buildings from sewage overflows as a "hydraulic problem" that requires mitigation. *See* Permit Rationale at R7.13. The NPDES program does not tolerate the use of private property as auxiliary storage of raw sewage.

The Ninth Circuit has explicitly rejected a city's argument that citizens may not enforce permit conditions prohibiting overflows that do not reach navigable waters. *Nw. Envt'l Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995). There the court rejected the argument that only numerical effluent limitations are enforceable in a citizen suit and identified other types of permit conditions that citizens may enforce under section the CWA citizen suit provision, including, for example, discharges that may never reach navigable waters. *NW Envt'l Advocates*, 56 F.3d at 988 (*citing Conn. Fund for Env't v. Raymark Indus., Inc.*, 631 F. Supp. 1283, 1285 (D. Conn. 1986) (allowing citizen enforcement of permit limitation on discharges to lagoons that may not reach navigable waters)). *See generally Citizens Coal Council v. EPA*, 447 F.3d 879, 896 (6th Cir. 2006) (recognizing that best management practices can be considered an effluent limitation); *Sierra Club v. City and County of Honolulu*, CV No. 04-00463 DAE-BMK, 2008 WL 3850495, at *10 (D. Haw. Aug. 18, 2008) ("To the extent CCH argues that it cannot be found liable for any spills because there is no evidence of the actual volume of spill that reached a receiving water, that argument lacks merit."); *Stephens v. Koch Foods, LLC,* 667 F. Supp. 768, 783 (E.D. Tenn. 2009) (citing *Honolulu* to support its holding that citizens had standing to enforce a permit violation).

11

O&M requirements play a key role in advancing the CWA's core objectives. Even if the failure to properly operate and maintain a facility does not result in a direct discharge to the waters of the United States, overflow may be evidence of defects in the operation and maintenance of the collection or treatment system that may result in a spill or create a risk of spills to such waters or untreated discharges by the system. *See e.g. NPDES Permit Writers' Manual* §§ 9.1.2; 9.2.4 (Ex. A); *Sanitary Sewer Overflows* at 1 (Ex. B). The D.C. Circuit, for example, has specifically upheld EPA's bypass regulation, which is required to be included in all NPDES permits prohibiting "bypass" of treatment systems where the bypass does not result in a violation of an end-of-pipe discharge limitation. *NRDC v. EPA*, 822 F.2d 104 123-125 (D.C. Cir. 1986). Sewage overflows may also contain viruses, pathogens and other disease causing organisms, and the CWA contains emergency powers to prevent endangerment posed through such overflows – allowing permit provisions that help to avoid such cleanups is consistent with the purpose of the CWA. 33 U.S.C. § 1364.

The City's argument focuses on the fact that some overflows may not reach waters of the United States. MTD 9-11. This argument confuses what is necessary to require a NPDES permit (a discharge into waters of the United States, and here, the City has such discharges, thus requiring the City to obtain a permit) with the scope of the terms that can be implemented through that permit. NPDES permittees receive permission to discharge so long as they, in turn, undertake various obligations to prevent unpermittable discharges such as overflows and spills. The City here attempts to subvert this bargain by challenging the enforceability of its assumed obligations to properly operate and maintain its treatment system. Here, the applicable permit authorizes discharges to the Harpeth River in accordance with its terms. As described above,

12

overflow provisions are well within the scope of permissible, and enforceable, NPDES permitting provisions. Multiple CWA provisions work together to show that NPDES provisions prohibiting the overflow of sewage are part of the federal program, and are properly enforceable through a citizen suit claim.

Finally, to the extent that the City asserts that prohibitions on overflows that do not reach water of the United States not authorized under the CWA, the City is collaterally attacking the existing regulations, 40 C.F.R., §§ 122.41(d),(e), that require proper operation and maintenance of the facility and systems. *See supra* fn. 4. Any such challenge is untimely and in the wrong court. Under section 509(b)(1) of the CWA, any petition for review of this provision would have had to be filed in a U.S. Court of Appeals within 120 days of the EPA promulgation – a date that has long passed. 33 U.S.C. § 1369(b)(1).

### B. Permit Provisions Mandating Nutrient Management Plans are Within the Scope of the NPDES Program.

The City's POTW discharges into the Harpeth River, which is impaired for dissolved oxygen and phosphorus. FAC § 159. The City's discharges, if not properly controlled, contain pollutants that make this problem worse.[6] *Id.* Under the terms of its NPDES permit, the City must implement a nutrient management plan that addresses the amount of total nitrogen and phosphorus in its wastewater, thus leading to improved levels of nutrients and dissolved oxygen in the receiving waters. FAC ¶ 159, Permit § 3.8. The permit, on its face, requires the City to develop a nutrient management plan, and Plaintiff alleges that the City has failed to meet that

---

[6] The increase in nutrients in a waterbody can lead to excessive plant growth, which results in dissolved oxygen declines. Thus permit provisions targeted at reducing the discharge of nutrients such as nitrogen and phosphorus (nutrients essential for plant growth) are intended to alleviate dissolve oxygen issues. *See generally American Farm Bureau Federation v. EPA*, 984 F. Supp.2d 289, 300 fn. 5 (M.D. Pa. 2013) ("The goal of nutrient (nitrogen and phosphorus) reduction is to increase dissolved oxygen levels in Bay waters.").

13

requirement. Thus, this permit's nutrient management plan requirement is enforceable in a citizen suit.

The Act and EPA's NPDES regulations require permit conditions that include any limitations necessary to ensure that the receiving waters comply with State water quality standards. 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. § 122.44(d). In other words, the nutrient management plan at issue in the City's second claim is not only authorized but is required in order to meet state water quality standards. In addition, EPA regulations at 40 C.F.R. § 122.44(k) specifically authorize inclusion of effluent limits expressed in terms of "best management practices" (such as the nutrient management plan at issue in this case) in a variety of circumstances.[7] These include when "the practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA." *Id.* The inclusion of a nutrient management plan requirement in the Franklin NPDES permit is a reasonable measure to achieve nutrient discharge reductions and address excessive nutrient discharges from the facility that may cause or contribute to violations of water quality standards. As such, this provision satisfies CWA requirements set out in 33 U.S.C. § 1311(b)(1)(C), and its implementing regulations that require permits to contain limitations necessary to meet water quality standards. 40 C.F.R. §§122.44(d), (k).

EPA guidelines have long recognized the implementation of best management practices through NPDES permitting terms. *See* U.S. Envtl. Prot. Agency, EPA-833-B-87-203, *Training Manual for NPDES Permit Writers*, 1, 69 (May 1987), available at http://www.epa.gov/nscep/index.html; *NPDES Permit Writers' Manual*, Chapter 9, September

---

[7] Again, to the extent that the City challenges EPA's regulation authorizing a permit to require best management

2010 (Ex. A). The Sixth Circuit has similarly recognized that numerical effluent limitations are not the only effluent terms authorized by the NPDES program – EPA is given "considerable flexibility in framing the permit to achieve a desired reduction in pollutant discharges." *Citizens Coal Council*, 447 F.3d at 896 citing *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369 (D.C.Cir.1977). In the same case, the Sixth Circuit also recognized that EPA's NPDES permit regulations "reflect the EPA's longstanding interpretation of the CWA as allowing [Best Management Practices] to take the place of effluent limitations under certain circumstances," and expressly rejected Petitioners' argument that permit terms containing Best Management Practices were contrary to the CWA. *Id.* at 896 n.18, 900. In other words, EPA regulations allow for effluent limitations requiring best management practices, including nutrient management plans. The nutrient management plan also helps develop information that will inform future permitting decisions and, as discussed below related to monitoring provisions, gathering such information is necessary to the proper functioning of the NPDES program.[8]

The Sixth Circuit has recognized and enforced similar conditions, and citizen enforcement of such permit terms should be recognized by this Court. The absence of any specific regulatory requirements mandating inclusion of this type of best management practice in an NPDES permit creates no legal impediment to their inclusion as an "effluent limitation" in an NPDES permit or enforcement in a citizen suit.

## C.     Plaintiff May Enforce the Permit's Monitoring Requirements

The CWA enforcement scheme is primarily based on self-monitoring and self-reporting

---

practices, the challenge is both not timely and not properly before this court. 33 U.S.C. § 1369(b).
[8] *See e.g.* Permit Rationale R28 (The nutrient management plan "provides a basis for the permittee to conduct additional evaluations/implement effective methods for enhanced wastewater nutrients (total nitrogen and phosphorus) removal by modifying its treatment facilities operation.").

15

rather than independent agency investigation of potential violations. In establishing this framework, Congress intended that permittees take responsibility for monitoring and ensuring their own compliance in the first instance. A failure to monitor is therefore a core violation of the statutory framework. The plaintiff may enforce the permit's monitoring requirement as an "other requirement" of the permit under 33 U.S.C. § 1342 (a)(2). Monitoring is appropriate both to ascertain compliance with permit terms and to ensure that the existing permit requirements are necessary and sufficient. Monitoring requirements, such as those Plaintiff seeks to enforce in its third claim, are federal requirements.

EPA's regulations require the permit writer to include permit conditions "on data and information collection, reporting, and other requirements as he deems appropriate." 33 U.S.C. § 1342(a)(2). EPA is also authorized, *inter alia*, to require an owner or operator of a point source, such as the City, to establish records, make reports, and use and maintain monitoring equipment in order to develop or assist in the development of any effluent limitation or to determine when any person is in violation of an effluent limitation. 33 U.S.C. § 1318(a). *See Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Com'n*, 389 F.3d 536, 539 (6th Cir. 2004) (recognizing that permit-holders can be required to monitor and report their effluent discharge). The instream monitoring requirement set out in section 3.7 and Attachment 1 of the City's permit is an appropriate condition under these provisions, and authorized State programs must be able to require monitoring to the same extent as EPA. 33 U.S.C. § 1342(b)(2)(B). NPDES regulations require a permittee to provide any information necessary to determine compliance with the permit and whether the permit should be modified. *See* 40 C.F.R. § 122.41(h), applicable to Tennessee through 40 C.F.R. § 123.25(a)(12). NPDES permits include receiving stream

monitoring requirements, and EPA has recommended a wide range of monitoring measures and methods in Chapter 8-9 of its NPDES Permit Writers' Manual.  Ex. A, E.

EPA's NPDES regulations require monitoring to assure compliance with permit limitations and authorize the permit writer to require provision of information to determine whether a permit should be modified, revoked and reissued, or terminated.  40 C.F.R. §§ 122.41(h) and 122.44(i).  In addition, the regulations require the permit writer to specify requirements concerning the proper use, installation and maintenance of monitoring equipment. 40 C.F.R. §122.48(a).  As explained above, a NPDES permits must include any more stringent effluent limitations required to comply with state water quality standards.  Determination of when to develop such a limitations requires the permit writer to evaluate the reasonable potential for any pollutant to cause or contribute to an in-stream excursion above a narrative or numeric criteria within a State water quality standard.  40 C.F.R. §122.44(d).  In-stream monitoring may be essential to this evaluation and is authorized by the regulations noted above.[9]  It is apparent then that the permit conditions requiring instream monitoring at issue in this case, including the requirements in section 3.7 and Attachment 1 of the City's permit, are consistent with EPA regulations and are properly the subject of a CWA citizen enforcement action.

The permit "Rationale" and "Addendum to Rationale" sections explain the need for particular permit terms.  These sections state that the instream monitoring provisions are necessary to inform future permitting decisions regarding appropriate effluent limits and

---

[9] In guidance, EPA has suggested that monitoring may be necessary to "establish a basis for enforcement actions, assess treatment efficiency, characterize effluents and characterize receiving waters."  Ex. E, § 8.1.1.  EPA further recommends that a NPDES permit should specify the appropriate monitoring location to both ensure compliance with permit limitations and to provide necessary data to determine the effects of an effluent on the receiving water. Ex. E, § 8.1.2.  Guidance also suggests instances in which influent and source water may appropriately be monitored through a NPDES permit.  Ex. E, § 8.1.2.1.

17

operational requirements to meet water quality standards – reasons consistent with EPA's

NPDES permit regulations.[10]  Franklin's NPDES permit also contains a narrative effluent limit.[11]

EPA's regulations require the inclusion of a requirement to monitor ambient stream conditions

to ensure compliance with this narrative limitation.  Permit § 3.7 represents an appropriate

response to the regulatory requirement and may be enforced through CWA citizen suit

provisions.

## II.    The City Relies on Inapplicable Authority

The City argues that the three permit conditions discussed above are beyond the scope of

the CWA, and therefore not subject to citizen enforcement.  To support this argument, the City

pointed to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*

and a district court decision in an enforcement action under RCRA. MTD 6-9, Reply 6-14.  The

argument is erroneous for several reasons.  First, as EPA has shown, the three permit conditions

are clearly within the scope of EPA CWA authority and flow directly from the statute and its

implementing regulations.  Second, because the permit conditions are directly tied to the CWA,

EPA has answered the question about whether the conditions are beyond the scope of the CWA.

As result, the City's argument discussing RCRA and a district court case concerning whether

certain provisions in a state RCRA permit were federally enforceable is irrelevant.

---

[10] *See e.g.* Addendum to Rationale AD-3 (future permit modifications are based on monitoring data); AD-7 (instream monitoring necessary to identify receiving streams characteristics); AD-9 (permit requirements were included to better understand "the nature of the receiving stream's dissolved oxygen encumbrances and enhancement opportunities"); AD-10 (monitoring required "to identify actual effective measures for defining dissolved oxygen improvements); AD-11 (the impacts from the discharge can be assessed in light of the variation in upstream and downstream variation in dissolved oxygen); Rationale R-2 (additional data/instream information necessary to investigate/implement treatment plant performance enhancements), R-8 (monitoring provides empirical information to assess shortcomings and make improvements).

[11] This limit provides that "[t]he wastewater discharge shall not contain pollutants in quantities that will be hazardous or otherwise detrimental to humans, livestock, wildlife, plant life, or fish and aquatic life in the receiving stream."  Permit § 1 at page 4 of 40.

18

The essence of the City's RCRA argument is that similar regulatory language applicable to an entirely separate statutory program must, somehow, be binding on the scope of the federal NPDES program. This is flatly incorrect. The CWA and its interpreting regulations and guidelines are most relevant to determining the scope of the NPDES program, and, as shown above, those interpretative tools demonstrate that the permit provisions at issue in this case are within the scope of the CWA and therefore federally enforceable. The City's reliance on RCRA is misplaced.

In any event, the Court need not determine whether EPA's RCRA guidance is applicable here. The City's RCRA argument depends on the conclusion that state requirements are "greater in scope" than federal regulations where "no counterpart can be found in the federal requirements." MTD at 7. As discussed above, the permit terms challenged in Plaintiff's first three claims are well within, and consistent with, the CWA and its implementing regulations and guidelines, so there is no issue here of the State requirements being "greater in scope" than the federal requirements.

The City cites *Atl. States Legal Found., Inc. v. Kodak*, 809 F. Supp. 1040 (W.D. N.Y. 1992) to support its proposition that 40 C.F.R. § 123.1(i)(2) somehow compels a narrow interpretation of the scope of the CWA. MTD at 4. *Atlantic States*, however, was based on the Court's finding that the permit at issue mandated "a greater scope of coverage than that required" by the federal CWA. 12 F.3d at 359. Even assuming, *arguendo*, that *Atlantic States'* correctly concluded a court would divide a NPDES permit into State and Federal conditions, that proposition is irrelevant here because, as discussed above, each of the permit provisions challenged through Plaintiff's first three claims are squarely within the scope of the federal

19

NPDES permitting program. The City similarly relies on *Long Island Soundkeeper Fund v. New York City Dep't of Envtl. Protection*, 27 F. Supp. 2d 380 (E.D.N.Y. 1998), but that case relies on the fact that "Plaintiffs do not dispute that New York law expands the scope of current federal limits." 27 F.Supp. 2d at 385, N.3. MTD at 5. No such concession has been made (or could properly be made) here.

## CONCLUSION

For the foregoing reasons, to the extent the City relies on arguments that certain of its NPDES permit provisions are beyond the scope of the federal NPDES program, those arguments fail.

<div style="margin-left:40%">

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA
JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division

</div>

Date: February 18, 2015          /s/ Matthew R. Oakes

<div style="margin-left:40%">

MATTHEW R. OAKES
Trial Attorney
Law and Policy Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7415
Ben Franklin Station
Washington, DC 20044-7415

DAVID RIVERA
United States Attorney
Middle District of Tennessee

MICHAEL L. RODEN
Assistant United States Attorney
110 Ninth Avenue, South, Suite A-961

</div>

20

Nashville, Tennessee 37203
Telephone:  (615) 736-5151
B.P.R. #010595
Email: michael.roden@usdoj.gov

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of February, 2015, a copy the **AMICUS CURIAE BRIEF OF THE UNITED STATES OF AMERICA** has been served via electronic mail to:

Delta Anne Davis
BPR No. 010211
Managing Attorney
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
adavis@selctn.org

Anne E. Passino
BPR No. 027456
Staff Attorney
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
apassino@selctn.org

Gary B. Cohen
Hall & Associates
1620 I Street, NW, Suite 701
Washington, DC  20006
Phone:  202-463-1166
Fax:  202-463-4207
gcohen@hall-associates.com

/s/  Matthew R. Oakes
MATTHEW R. OAKES