## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **HARPETH RIVER WATERSHED ASSOCIATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No. 3:14-1743** |
| **THE CITY OF FRANKLIN, TENNESSEE,** | ) ) ) | **Judge Sharp** |
| **Defendant.** | ) | |

## MEMORANDUM

This is a citizen's suit under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*., brought by Plaintiff Harpeth River Watershed Association ("HWRA"), whose professed mission is to restore and preserve the Harpeth River Watershed, against Defendant City of Franklin, which owns the Franklin Sewage Treatment Plaint. The essence of Plaintiff's complaint is that, since at least 2009, Defendant has discharged pollutants, including untreated sewage, ammonia, and toxic wastewater into the Harpeth River and its tributaries in violation of National Pollutant Discharge Elimination System ("NPDES") Permit No. TN0028827 issued to the sewage plant through Tennessee's EPA approved NPDES program. The allegedly unpermitted discharges and other permit violations have, in Plaintiff's view, significantly impacted water quality and aquatic life in the Harpeth River.

The Amended Complaint spans 54 pages and is in six counts. Count 1 alleges that Defendant's spills of raw sewage from its system violate its NPDES permit; Count 2 alleges that Defendant has failed to prepare a plan to optimize its operations and reduce its nutrient discharge;

Count 3 alleges that Defendant has failed to conduct in-stream monitoring in the Harpeth River; Count 4 alleges that Defendant has violated the permit limits on the toxicity of its effluent discharge into the river; Count 5 alleges that Defendant violated the permit limits for ammonia discharges into the river; and Count 6 alleges that Defendant has operated without an accurate flow meter.

Defendant has filed a Motion to Dismiss Count 1 in part, and Counts 2 through 6 in full.[1] That Motion has been fully briefed, not only by the parties, but also, with respect to Counts 1 to 3, by the United States through an Amicus Curiae brief, to which the Defendant responded. The Court also heard oral argument on the Motion on November 4, 2015.[2]

# I. Governing Standards

Defendant's Motion to Dismiss is based upon both Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, although Defendant does not clearly differentiate between which Count (or portion of a Count) is subject to dismiss under which standard. Generally speaking, in considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient

---

[1] The Motion to Dismiss was directed at the original Complaint which included seven counts. Count 7, alleging violations of water quality standards, was eliminated from the Amended Complaint. Thus, the Court does not consider the "permit shield" defense of Section 402(k) of the CWA, 33 U.S.C. § 1342(k).

[2] Following the hearing, the Court entered an Order that concluded by "reiterat[ing] its suggestion to the parties that they engage in meaningful settlement discussions in an effort to resolve this case for the benefit of the citizens of the City of Franklin." (Docket No. 118 at 1). Accordingly, the Court intentionally delayed consideration of the present Motion in order to give the parties that opportunity. No filings have been made in this case since that Order, suggesting that the matter has not been resolved. Hopefully, this ruling will provide the parties with some idea as to how this Court presently views this case and they will redouble their efforts to settle before more taxpayer time and money is spent.

factual matter' to render the legal claim plausible, i.e., more than merely possible." Id. (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009)). Thus, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations and quotations omitted).).

As for motions under Rule 12(b)(1), the Sixth Circuit has summarized the applicable standard of review as follows:

> A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack). United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis. Id.

> A factual attack challenges the factual existence of subject matter jurisdiction. In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case. Id. Plaintiff bears the burden of establishing that subject matter jurisdiction exists. DLX, Inc. v. Commonwealth of Kentucky, 381 F.3d 511, 516 (6th Cir. 2004).

Cartwright v. Garner, 751 F.3d 752, 759-60 (6th Cir. 2014).

With these standards in mind, the Court addresses the arguments by the parties, roughly in the order presented by Defendant in its initial Memorandum.

## II. Permit Provisions Allegedly Beyond the Scope of the NPDES Program

The CWA "mandates that toxic discharges into the nation's waterways be monitored and regulated." Ailor v. City of Maynardville, 368 F.3d 587, 590 (6th Cir. 2004). "The Act is enforced through effluent limitations guidelines and NPDES permits that set technology-based discharge

limits for categories and subcategories of water pollution point sources." <u>Citizens Coal Council v. U.S. E.P.A.</u>, 447 F.3d 879, 883 (6th Cir. 2006).

"States may request permission from the U.S. EPA to administer a state-NPDES program after the U.S. EPA promulgates certain guidelines that govern monitoring, reporting, enforcement, funding, personnel, and manpower." <u>Askins v. Ohio Dep't of Agric.</u>, 809 F.3d 868, 872 (6th Cir. 2016). Indeed, "[i]n administering these programs, states are free to treat the EPA's pollution limits as a floor and impose more stringent requirements." <u>W. Va. Highlands Conservancy, Inc. v. Huffman</u>, 625 F.3d 159, 162 (4th Cir. 2010). "In other words, [u]nder this 'cooperative federalism' scheme, EPA establishes the minimum requirements that must apply to all entities regulated under the CWA, and states may adopt more stringent standards where they see fit." <u>Nw. Envtl. Advocates v. U.S. E.P.A</u>, 2006 WL 2669042, at *2 (N.D. Cal. Sept. 18, 2006).

The Environmental Protection Agency ("EPA") has formulated regulations governing the procedures it "will follow in approving, revising, and withdrawing State programs and the requirements State programs must meet to be approved by the Administrator." 40 C.F.R. § 123.1. Those regulations include a provision that reads:

> (I) Nothing in this part precludes a State from:
>
> > (1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this part;
> >
> > (2) Operating a program with a greater scope of coverage than that required under this part. If an approved State program has greater scope of coverage than required by Federal law the additional coverage is not part of the Federally approved program.

<u>Id</u>. § 123.1 (I). The State of Tennessee's NPDES permit program was approved by the EPA on December 28, 1977. See, NPDES State Program Information,

http://www.epa.gov/npdes/npdes-state-program-information (all websites last visited on Feb. 27, 2016).

"Permit holders are subject to state and federal enforcement actions, as well as suits by private citizens." Ailor, 368 F.3d at 590. As a supplement to these actions, "[t]he CWA's citizen's suit provision permits any individual who has an interest which is or may be adversely affected to sue to enforce any limitation established by a NPDES permit." Id.

Noting that the regulations permit States to adopt more stringent requirements, but also provide that requirements with a greater scope of coverage are not part of the federally approved program, Defendant argues that the former requirements can be the subject of a citizen' suit under the CWA, but the latter cannot. That is, "[u]nder EPA's own regulation, requirements that have a greater scope of coverage than 'required' by federal law are BTS [beyond the scope], not part of the approved program and, therefore, not enforceable in federal courts." (Docket 50 at 16).

Defendant claims there are "three permit conditions subject to the BTS defense" id. in the Amended Complaint: (1) "overflows" that are not discharges (Count 1); (2) nutrient management plans (Count 2); and (3) in- stream monitoring and receiving stream investigations (Count 3). In this regard, and utilizing Section 123.1(i)(2) as the guidepost, Defendant posits that "[w]hether the NPDES regulations can somehow be stretched to authorize the permit condition is not the issue." (Id. at 4). Rather,

> the issue is what is required by Federal law? For instance, does the federal law *require* that non-discharging overflows be prohibited? Similarly, does the federal program *require* nutrient management plans for POTWs [publicly-owned treatment works] or ambient monitoring?

(Id., emphasis in original).

Defendant relies on the district and Second Circuit decisions in Atlantic States Legal

Foundation, Inc. v. Kodak, 809 F. Supp. 1040 (W.D. N.Y. 1992), aff'd, 12 F.3d 353 (2nd Cir. 1993), and the district court's decision in <u>Long Island Soundkeeper Fund v. New York City Department of Environmental Protection</u>, 27 F. Supp. 2d 380 (E.D.NY 1998) for the proposition that a "BTS permit condition . . . included in the State-issued permit . . . does not magically make that condition subject to a CWA citizen suit." (Docket No. 18 at 3).[3]   Save for the fact that the trial court in <u>Atlantic States</u> specifically recognized that "liability in this case must be determined in light. . .of the conditions of [defendant's] Permit," and that, unlike here, the citizen's suit was based on discharges not expressly limited by the permit, those cases support Defendant's position. Nevertheless, the Court finds the more recent Eleventh Circuit's opinion in <u>Parker v. Scrap Metal Processors, Inc.</u>, 386 F.3d 993 (11th Cir. 2004) and the district court's decision in <u>Ohio Valley Environmental Coalition, Inc. v. FOLA Coal Co.</u>, 2013 WL 6709957 (S.D. W. Va. Dec. 19, 2013) more persuasive.

    <u>Atlantic States</u> involved a New York SPDES Permit[4] that prohibited the discharge of any pollutant that was not subject to a numerical effluent limitation.  Rejecting plaintiff's position that, under state law, the discharge of any pollutant not identified and authorized by the permit constituted a violation of the permit, the district court held:

        Accepting plaintiff's view of the reach of the Act would effectively circumvent the

_____

        [3] Defendant also places heavy reliance on <u>United State v.Recticel Foam Corp.</u>, 858 F. Supp. 726 (E.D. Tenn. 1993), which it repeatedly points out is an opinion from a district court in this circuit.  While that case discussed virtually identical language to Section 123.1 found in the Resource Conversation and Recovery Act ("RCRA") on the way to finding that hazardous waste under the "Tennessee Mixture Rule" was not hazardous waste under the RCRA, it did so in the context of a federal criminal prosecution.  The analogous citizens suit provision under the RCRA simply was not in issue, and, for that reason, is not persuasive authority on the question presented here.

        [4] In New York, NPDES Permits are referred to as SPDES permits, an acronym for State Pollutant Discharge Elimination System.

permit system and expand the scope of a citizen suit under the Act; it "would change the nature of the citizens' role from interstitial to potentially intrusive." . . . I cannot agree that Congress intended such a result.

809 F. Supp. at 1048. Affirming that conclusion, the Second Circuit wrote:

> States may enact stricter standards for wastewater effluents than mandated by the CWA and federal EPA regulations. 33 U.S.C. § 1342(b). These states' standards may be enforced under the CWA by the states or the EPA, 33 U.S.C. § 1342(h), but private citizens have no standing to do so. New York chose to implement its own environmental policies through its . . . issuance of SPDES permits[.]
>
> However, state regulations, including the provisions of SPDES permits, which mandate "a greater scope of coverage than that required" by the federal CWA and its implementing regulations are not enforceable through a citizen suit under 33 U.S.C. § 1365. 40 C.F.R. § 123.1(i)(2).

12 F.3d 358-59.

Long Island Soundkeeper involved an argument that plaintiffs could not enforce the alleged violation of the limits for settleable solids by a sewer plant because the permit restrictions were imposed under state, not federal law. That case adds little to the mix because the court was bound by the Second Circuit's "holding in Atlantic States" that "precludes citizens from suing to enforce permit provisions imposed under state law that are stricter than those required under federal law." 27 F. Supp. 2d at 380.

On the other side of the coin are Parker and Ohio Valley. In Parker, the Eleventh Circuit observed that "the Supreme Court apparently has incorporated state law standards under the CWA into federal environmental law for jurisdictional purposes," and held that "the plain language of the CWA and the relevant case law dealing with the CWA convince us that there is federal jurisdiction over citizen-suit claims that allege violations of a state-issued NPDES permit." 386 F.3d at 1008. In so doing, the court recognized that the Second Circuit "questioned this conclusion" in Atlantic States, but found that it read the Supreme Court's decision in United States Department of Energy

v. Ohio, 503 U.S. 607 (1992) "too broadly." Id. at 1008 n. 15.  The Eleventh Circuit then wrote:

> . . . The Supreme Court's discussion of the "arising under" language, at first glance, appears to preclude federal subject-matter jurisdiction of CWA cases brought pursuant to a state law that has received EPA approval.  That conclusion, however, is correct only if one presumes that federal courts have jurisdiction over CWA citizen suits as a result of the grant of general federal question jurisdiction contained in 28 U.S.C. § 1331. Here, however, we rely on the CWA's specific grant of jurisdiction rather than 28 U.S.C. § 1331.

> [T]he citizen-suit provision of the CWA gives federal courts an independent basis of jurisdiction.  The relevant question is whether a state standard enacted pursuant to the CWA is "an effluent standard or limitation under this chapter." 33 U.S.C. § 1365. On this question, the Supreme Court, although in dicta, has appeared to say yes, suggesting that citizens can sue under § 1365 regardless of whether the suit is based on standards promulgated by the EPA, or more stringent state standards that have received EPA approval.

Id.

Finally, Ohio Valley was a citizens suit under the CWA and the Surface Mining Control and Reclamation Act ("SMCRA"), in which it was alleged that a coal mine discharged excessive amount of selenium into the waters of West Virginia.  Relying on the Second Circuit's decision in Atlantic States, defendant argued that the CWA citizen's suit provision could not be used to enforce state water quality standards.  Noting that the Second Circuit's "holding has not been adopted in the Fourth Circuit," the district court "reject[ed] its reasoning in light of the Eleventh Circuit's conclusion" in Parker that "state law standards are incorporated into the CWA and are enforceable in citizens suits."  Ohio Valley, 2013 WL 6709957, at *18.  The court went on to note that "[a] permit condition is enforceable as an 'effluent standard or limitation under § 1365(a)," and that "[p]ursuant to the CWA, entities must follow 'any more stringent limitation, including those necessary to meet water quality standards ... established pursuant to any State law or regulations' 33 U.S.C. § 1311(b)(1)."  The court also observed:

> All NPDES permits must comply "with the applicable water quality requirements of

all affected States." 40 C.F.R. § 122.4(d). As explained by the Supreme Court, "[t]his regulation effectively incorporates into federal law those state-law standards the Agency reasonably determines to be 'applicable.' In such a situation, then, state water quality standards promulgated by the States with substantial guidance from the EPA and approved by the Agency are part of the federal law of water pollution control." <u>Arkansas v. Oklahoma</u>, 503 U.S. 91, 110, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) (footnote omitted).

Id. at *9.

Defendant is correct that this Court must give due deference to EPA regulations. Indeed, in <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-844 (1984), the Supreme Court "held that a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." <u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 586-87 (2000). But the jurisdiction providing statute is not ambiguous. It says that "any citizen may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation . . . of an effluent standard or limitation under this chapter," 33 U.S.C. § 1365(a), with "effluent standard or limitation" later being defined to include "(1) an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title;" and "(6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter," <u>id</u>. § 1365(f).[5] <u>See</u>, <u>Atchafalaya Basinkeeper v. Chustz</u>, 682 F.3d 356 (5th Cir. 2012) (Congress provided "citizen suits for § 1342 permit condition violations in the unmistakably clear language of § 1365(f)(6)"); <u>Citizens' All. for Prop. Rights v. City of Duvall</u>, 2014 WL 1379575, at *2 (W.D. Wash. Apr. 8, 2014) ("There is more than one way to violate the CWA, and more than one way for a citizen (or group of citizens) to sue for those violations. . . . The Act is explicit as to seven categories of 'effluent standard or limitation under this chapter' whose violation will satisfy the

---

[5] Section 1342 sets forth the NPDES permitting regime.

citizen suit provision," including violating "a permit or condition thereof issued under section 1342"); United States v. Metro. Water Reclamation Dist. of Greater Chicago, 2012 WL 3260427, at *4 (N.D. Ill. Aug. 7, 2012) (although "the private right of action is a right to allege violations of 'an effluent standard or limitation, . . . the statute goes on to define 'effluent standard or limitation' as including half a dozen things, among them 'a permit or condition thereof issued under section 1342 of this title[.]'").

The question is not whether non-discharging overflows, nutrient management plans, or ambient monitoring are *required* by federal law, as Defendant would have it. Rather, the "relevant question," as the Eleventh Circuit stated, " is whether a state standard enacted pursuant to the CWA is 'an effluent standard or limitation" under the CWA. Since the CWA defines effluent standards or limitations to include violations of NPDES permits issued under Section 1342 regarding discharges of pollutants, and, more specifically, since subsection (a)(2) requires the Administrator to prescribe conditions for the issuance of permits, the Court rejects Defendant's "BTS" defense to the overflow prohibitions and the permits provisions requiring monitoring and nutrient management. The very fact that the EPA can prescribe conditions for the issuance of permits "to assure compliance . . . including conditions on data and information collection [and] reporting" undercuts the foundation on which Defendant's Motion rests, to wit, Regulation 123.1(i)(2), which provides that state programs having a greater scope of coverage than that allowed by federal law are not part of the federally approved program.


### III.  "Discharge" Provision Under the 2004 NPDES Permit

In the Amended Complaint, Plaintiff alleges:

> Defendant's NPDES permit provides that "any release of sewage from any portion of the collection, transmission, or treatment system other than through permitted outfalls" is an "overflow." Overflows are prohibited. Permit, § 2.3.3(a), (b) (2010).

(Docket No. 22, Amended Complaint ¶ 112). As Defendant points out, however, the referenced permit was not effective until November 1, 2010, and replaced a permit effective June 1, 2004. The former permit defined an "overflow" as the "discharge of wastes from any portion of the collection, transmission, or treatment system other than through permitted outfalls." (Docket No. 18-1 at 57). As a consequence, Defendant seeks dismissal of any alleged overflow violation prior to November 1, 2010, that is not a "discharge" (such as sanitary sewer overflows or "SSOs" on private property) as well as any alleged reporting violation of such discharges.

In response, Plaintiff acknowledges that the 2004 permit regarding overflows referred to the "discharge of waste" while the current permit defines overflow to mean "release of sewage." Nevertheless, Plaintiff argues that

> If Defendant is correct that the former permit only prohibited discharges that reached waters by using the word "discharge" rather than "release," it follows that any overflow Defendant reported under that permit was an overflow that reached waters. Otherwise, the spill would not have been prohibited or reportable. Defendant's argument also fails based on normal principles of interpretation, because the 2004 permit did not define "discharge" and its ordinary and natural meaning is "flowing or issuing out," not reaching a particular destination. Under the terms of both permits, each overflow constitutes an enforceable violation.

(Docket No. 32 at 18, footnote omitted).

Although Plaintiff's argument has some facial appeal, it neglects to consider that the NPDES permit was issued pursuant to state law. Under the regulations issued by the Tennessee Department of Environment and Conservation, "'discharge' or 'discharge of a pollutant' refers to the addition

of pollutants to water from a source." Tenn. Comp. R. & Reg., ch. 0400-40-05.02(29).[6]

Accordingly, alleged overflow violations prior to November 1, 2010 that are not discharges within

the meaning of the 2004 permit will be dismissed.

## IV.  Statute of Limitations

In the absence of a specific statute of limitations to the contrary, 28 U.S.C. § 2462 limits the

time in which an action may be brought to five years from the date on which the claim accrues.[7]

That section has been repeatedly found to govern claims under the CWA.  See, Catskill Mountains

Chapter of Trout Unlimited, Inc. v. City of New York, 451 F.3d 77, 88 (2nd Cir. 2006) ("the CWA

has a five-year statute of limitations, 28 U.S.C. § 2462"); U.S. E.P.A. v. City of Green Forest, Ark.,

921 F.2d 1394, 1408 (8th Cir. 1990) ("The statute of limitations for CWA violations is five years");

United States v. Sharon Steel Corp., 1989 WL 190241, at *2 (N.D. Ohio July 12, 1989) ("It is well

established that actions for civil penalties under the CWA are governed by the five-year federal

statute of limitations, 28 U.S.C. § 2462").

In this case, the Complaint was filed on August 25, 2014.  As a consequence, Defendant

seeks dismissal of any claims alleging overflows, bypass or discharge violations that occurred prior

---

[6]  Under the regulations: "'Waters' means any and all water, public or private, on or beneath the surface of the ground, which are contained within, flow through, or border upon Tennessee or any portion thereof except those bodies of water confined to and retained within the limits of private property in single ownership which do not combine or effect a junction with natural surface or underground waters." Id. 400-40-05.02(91).

[7]  The statute reads:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C.§ 2462.

to August 26, 2009.

In response, Plaintiff first cites a couple of district court cases for the proposition that no statute of limitations applies to citizen suits under the Act. The Court rejects this argument as against the weight of authority and contrary to the default limitation provision found in § 2462. This is particularly so because the Sixth Circuit has held that the five year period set forth in Section 2462 applies to actions under the Clean Air Act ("CAA"), National Parks Conservation Association v. TVA, 480 F.3d 410, 416 (6th Cir. 2007), and the citizen suit provision of the CWA was "specifically modeled on" the CAA citizen suit provision, Texans United for a Safe Economic Educational Fund v. Crown Central Petroleum Corporation, 207 F.3d 789, 795 (5th Cir. 2000).

Plaintiff next argues that "[e]ven if Defendant is correct that there is a statute of limitations, it should be equitably tolled because the suit may not commence for at least sixty days after the required notice and should not be held to run before the public could reasonably have know of the violation. The Court disagrees in part.

Turning to the latter point first, the Supreme Court has recently rejected the notion that the limitations period governed by the default provision contains a discovery rule. In Gabelli v. SEC, the Supreme Court wrote:

> Justice Marshall used particularly forceful language in emphasizing the importance of time limits on penalty actions, stating that it "'would be utterly repugnant to the genius of our laws' if actions for penalties could 'be brought at any distance of time.'" Adams v. Woods, 2 Cranch 336, 342, 2 L.Ed. 297 (1805). Yet grafting the discovery rule onto § 2462 would raise similar concerns. It would leave defendants exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future. Repose would hinge on speculation about what the Government knew, when it knew it, and when it should have known it.

133 S.Ct. 1215, 1223-24 (2013). While Gabelli involved an action brought by the government, the

Court agrees with those court which have held that its logic applies to citizen's suit as well, including Sierra Club v. DTE Energy Co., 2014 WL 29127 (E.D. Mich. Jan. 3, 2014) and New Jersey v. RRI Energy Mid-Atlantic Power Holdings, LLC, 960 F. Supp. 2d 512, 514 (E.D. Pa. 2013). See also, United States v. Rutherford Oil Corp., 756 F. Supp. 2d 782, 788-89 (S.D. Tex. 2010) ("The fact that § 2462 includes a provision for tolling limitations if the defendant is absent from the United States . . . , but does not include any provision for tolling based on the discovery rule, . . . weighs against applying the discovery rule for CWA actions")

As for tolling during the notice period, there are plenty of cases to support Plaintiff's position. See e.g., Catskill Mountains, 451 F.3d at 88 n.14 ("the CWA has a five-year statute of limitations, 28 U.S.C. § 2462, that is tolled sixty days before the filing of a complaint"); San Francisco Baykeeper v. W. Bay Sanitary Dist., 791 F. Supp. 2d 719, 729 (N.D. Cal. 2011) ("A five year statute of limitations applies under the CWA, tolled 60 days for a 'notice of intent to sue' period"); Nw. Envt'l. Def. Ctr. v. Grabhorn, Inc., 2009 WL 3672895, at *12 (D. Or. Oct. 30, 2009) (citation omitted) ("because citizens must give 60 days notice prior to bringing suit under the CWA . . . the five-year statute of limitations period is tolled sixty days before the filing of the complaint"); Cmty. Ass'n for Restoration of Env't (CARE) v. Sid Koopman Dairy, 54 F. Supp. 2d 976, 983 (E.D. Wash. 1999) ("the general federal five-year statute of limitations governing CWA claims "includes an additional 60 days from the date of the Notice of Claim based upon the CWA's 60 day pre-suit notice requirement").

In reply, Defendant relies on the Sixth Circuit's decision National Parks which it claims "rejected" the "position that the filing of notice tolls the statute of limitations for sixty days." (Docket No. 42). Even though the Sixth Circuit there counted back five years from the date of filing

of the complaint, tolling was not an issue in the case, nor was it even mentioned. Rather, the question was whether a continuing violation theory should be recognized.

Given the authority cited, and given that the lead case on which Defendant relies for the proposition that a five year statute of applies also holds that "the statute of limitations" under the CWA is "tolled sixty days," Sierra Club v. Chevron, U.S.A. Ltd., 834 F.2d 1517, 1523 (9th Cir. 1987), the Court finds tolling for sixty days to be appropriate. Accordingly, those claims alleging violations that occurred prior to June 26, 2009 will be dismissed on statute of limitations grounds.

## V. Ammonia and Whole Effluent Toxicity Violations

As noted previously, the CWA authorizes citizen's suits against any person "alleged to be in violation of . . . an effluent standard or limitation" 40 U.S.C. 1365(a)(1). In Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 59 (1987) ("Gwaltney I"), the Supreme Court held that "citizens, unlike the Administrator, may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation." In other words, "the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." Id. at 58. .

In light of Gwaltney, Defendant seeks dismissal of Counts 4 and 5 which allege violations of effluent limits in the NPDES permit for whole effluent toxicity ("WET")[8] and ammonia, respectively. These relate to wholly past violations, Defendant insists, because the last alleged violation dates back to many months before the filing of the Motion to Dismiss.

In deciding that the CWA "does not permit citizen suit for wholly past violations," the Supreme Court in Gwaltney I observed that the "most natural reading of 'to be in violation' is a

---

[8] WET "refers to the aggregate toxic effect to aquatic organisms from all pollutants contained in a facility's wastewater (effluent)," measured by "wastewater's effects on specific test organisms' ability to survive, grow and reproduce." WHOLE EFFLUENT TOXICITY METHODS, http://www.epa.gov/cwa-methods/whole-effluent-toxicity-methods.

requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future." <u>Id</u>. at 57 & 64. The Court remanded the case to the Fourth Circuit to determine whether the "complaint contained a good-faith allegation of ongoing violation[']" <u>Id</u>. at 67.

The Sixth Circuit does not appear to have established a particular test to determine whether an ongoing  violation has been sufficiently pled.  However, the Fourth Circuit's subsequent treatment in <u>Gwaltney</u> is instructive.

On remand, the Fourth Circuit observed that, while the "Supreme Court held that citizen-plaintiff suits under § 505 could not be based on wholly past violations, [it] carefully distinguished an allegation of a wholly past violation from allegations of intermittent or sporadic violations." <u>Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.</u>, 844 F.2d 170, 171 (4th Cir. 1988) ("<u>Gwaltney II</u>").  The Fourth Circuit went on to conclude that the district court did not err in "find[ing] a good faith allegation of ongoing violation sufficient to avoid threshold jurisdiction to avoid threshold jurisdictional challenges," but remanded the case to the district court

> for further findings as to whether, on the merits, plaintiffs proved at trial an ongoing violation.  Citizen-plaintiffs may accomplish this either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find  a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

<u>Id</u>. at 171-72.  Once those findings were made, the case returned to the Fourth Circuit which concluded that "a 'reasonable tier of fact could find a continuing violation of a recurrence in intermittent or sporadic violations'" in light of the fact that expert testimony from both sides suggested that violations were more likely to occur in the winter and the evidence showed "recurring violations . . . were likely." <u>Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.</u>, 890 F.2d

690, 694-5 (4th Cir. 1989) ("Gwaltney III").

This case, of course, is being decided in the context of a Motion to Dismiss and the cases Defendant relies on that were decided under Rule 56 are not extremely helpful. See San Francisco Herring Ass'n v. Pac. Gas & Elec. Co., 81 F. Supp. 3d 847, 861 (N.D. Cal. 2015) ("Both parties spend much time debating whether the waste from the long-defunct MGP operations constitutes an ongoing discharge. However, I consider this dispute to be factual in nature, and improper to consider on a motion to dismiss"). Still, and as Defendant points out, when "considering a challenge to a complaint based on lack of subject-matter jurisdiction, [the Court] must take the material allegations of the [complaint] as true and construe[ ] [them] in the light most favorable to the nonmoving party,' [but] 'it is the plaintiff's burden . . . to prove that this court has jurisdiction over [its] claim, . . . and that the complaint contains sufficient factual matter to state a claim for relief that is plausible on its face." Kiser v. Reitz, 765 F.3d 601, 606 (6th Cir. 2014).

Defendant argues Plaintiff's allegations regarding continuing ammonia and WET violations are not plausible on their "face as the last alleged ammonia violation was back in June 2013 (*i.e.,* now more than 19 months ago) and last alleged WET violation was May 2014 (now more than 7 months ago)." (Docket No. 42 at 18). This focus on the time between the last violation and the present (or as of the time the Motion to Dismiss was filed) is misplaced because "the proper point from which to assess the likelihood of continuing violations is not the present, with its advantage of hindsight, but the time of the original suit" Gwaltney III, 890 F.2d at 693-94; see also Assateague Coastkeeper v. Alan & Kristin Hudson Farm, 727 F. Supp. 2d 433, 443 (D. Md. 2010) ("A CWA citizen suit may be brought only if there is an ongoing violation of the act at the time the complaint is filed"); Greenfield Mills, Inc. v. Goss, 2005 WL 1563433, at *5 (N.D. Ind. June 28, 2005) ("This

court concludes that a continuing violation exists in this case if, at the time of the filing of the complaint, Plaintiffs can demonstrate that dredged materials remained in the river").[9]  This is in keeping with the principle that, "[o]rdinarily, the subject matter jurisdiction of a court is tested as of the time the action is filed and subsequent changes will not operate to divest a court of its jurisdiction once it has been properly invoked." In re Lewis, 398 F.3d 735, 743 (6th Cir. 2005).

Turning to the specific allegations in the Amended Complaint, the Court finds that Plaintiff states a plausible claim regarding the toxicity test failures (WET violations) in Count 4, but not with respect to the ammonia violations as set forth in Count V.

With regard to WET violations, the Amended Complaint alleges that "toxicity is demonstrated if the $IC_{25}$ value is less than 100%, with $IC_{25}$ referring "to the inhibition concentration causing 25% reduction in survival, reproduction, and growth of test organisms (*i.e.* water fleas and flathead minnow) when exposed to treated wastewater."  (Docket No. 22, Amended Complaint ¶ 200).  Defendant only conducts the test four times a year, once per quarter.  Even so, the plant failed the test in the first, third and fourth quarters of 2013, in the first quarter of 2014 (after the notice letter), and again in April 2014, four months before the Complaint was filed.  There may be reason for the failures or the failures may be explained away, but these allegations are enough to suggest an intermittent, if not continuing WET problem.

The same cannot be said with respect to the allegations underlying the alleged ammonia violations.  Unlike WET tests, the presence of ammonia is tested daily.  According to the Amended Complaint, violations of permit parameters occurred on a daily, weekly and monthly basis in June

---

[9]  Theoretically, a more proper date may be 60-days before the complaint is filed because of the mandatory notice provision and the fact that the notice must set forth all of the alleged violations.

2010 and June 2013, on a weekly basis in October 2012, and on a daily basis on January 8 and 9, 2012. Nevertheless, Plaintiff concedes that 13 months passed between the last alleged violation and the filing of the Complaint, effectively nullifying its conclusory assertion that ammonia violations are "perhaps tied to seasonal considerations." (Docket No. 32 at 29). This is particularly so since there was a three year gap between the June 2010 and June 2013 alleged violations, and hundreds of samples have been taken since the last event with no reported violation of the ammonia limits.

## VI.  Article III Standing

The Court's power to adjudicate is limited to "cases and controversies" under Article III. U.S. Const., art. III, § 2, cl. 1. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The Supreme Court has defined standing generally as "the question of . . . whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975).

"To demonstrate constitutional standing, a plaintiff must satisfy the following three elements: (1) an allegation of an 'injury in fact,' which is a concrete harm suffered by the plaintiff that is actual or imminent, rather than conjectural or hypothetical; (2) a demonstration of 'causation,' which is a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and (3) a demonstration of 'redressability,' which is a likelihood that the requested relief will redress the alleged injury." Friends of Tim Fords v. Tenn. Valley Auth., 585 F.3d 955, 966 (6th Cir. 2009). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000).

For CWA claims and alleged violations of NPDES permits, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." <u>Id</u>. Even so, "[w]hile generalized harm to . . . the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 494 (2009) (citing <u>Sierra Club v. Morton</u>, 405 U.S. 727, 734-736 (1972).

Defendant acknowledges that, to the extent HRWA was harmed by the potential effects of actual discharges from the sewage facility, HRWA has Article III standing. This would include "those Counts alleging exceedance of the NPDES permit discharge limitations (i.e., Counts 4 and 5), . . . or that portion of Count 1 that addresses actual 'discharges' to waters of the U.S. – not 'overflows.'" (Docket No. 18 at 25). Defendant argues, however, that the same cannot bee said with regard to the allegations that "have absolutely no relations to the water quality of the Harpeth River and, ergo, the harm alleged by HRWA." (<u>Id</u>.).

When the Motion to Dismiss was filed, Defendant's argument had more purchase. However, the Complaint has been amended to suggest that the scope of HRWA's concern is with more than discharges of pollutants into the Harpeth River. Specifically, the Amended Complaint (with supporting declarations from HRWA members, including its Executive Director) alleges:

> The Watershed Association is a § 501(c)(3) non-profit public interest organization with its headquarters in Brentwood, Tennessee. The Watershed Association's mission is to restore and preserve the Harpeth River Watershed through education, research, discussion, and advocacy, and to encourage the public, including industry and government, to comply with

existing laws and regulations relating to water quality.  The Watershed Association and its members are concerned about contamination of the Harpeth River and about threats to wildlife  and wildlife habitat posed by the pollutants in Defendant's discharge. They live, work, fish, swim, boat, view wildlife, engage in nature study and scientific study, and participate in other forms of recreation in and around the Harpeth River. Defendant's discharges into the Harpeth River in the vicinity of these uses, impairs them.  Plaintiff is further harmed by the operational deficits at the facility, including overflows in the collection system and inaccurate monitoring.  Overflows of untreated sewage into the community where Plaintiff's [sic] live, work, and recreate cause harm within the watershed and to Plaintiff's interests.  Because part of Plaintiff's mission is dedicated to education, research, and advocacy, Defendant's monitoring and reporting violations – including the inaccurate flow monitor, failure to institute a Nutrient Management Plan, and failure to conduct continuous instream monitoring – also affected Plaintiff's efforts to study the river and take other steps to improve water quality; to research Defendant's compliance status and to report the results of that research to its members, the community, and the regulatory agency; to propose legislation; and to bring litigation to prevent violation of the discharge limitations in the permit and thereby protect the waters affected by the facility's discharge.

(Docket No. 22, Amended Complaint 15).

To be sure, "[i]t is black-letter law that standing is a claim-by-claim issue," <u>Rosen v. Tennessee Commissioner of Finance & Administration.</u>, 288 F.3d 918, 928 (6th Cir. 2002), and Plaintiff's claims about injury or harm from overflows that do not reach the Harpeth River, such as influent (as opposed to effluent) monitoring, ambient water quality monitoring, and the absence of a nutrient management plan seem a bit conclusory.  However, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  <u>Lujan</u>, 504 U.S. at 561.  Thus, the Court will not dismiss any of the claims at this time for the alleged lack of Article III standing.

## VII. <u>Jurisdictional Notice Requirements</u>

Under the implementing regulations, would-be plaintiff's must provide alleged CWA violators with notice that

shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). With regard to the sufficiency of notice, it has recently been observed:

> To provide proper notice of an alleged violation, a would-be plaintiff must "[a]t a minimum . . . provide sufficient information . . . so that the [notified parties] could identify and attempt to abate the violation." . . . A citizen " 'is not required to list every specific aspect or detail of every alleged violation. Nor is the citizen required to describe every ramification of a violation.'" . . . Rather, the analysis turns on the "overall sufficiency" of the notice. . . . A reviewing court may examine both the notice itself and the behavior of its recipients to determine whether they understood or reasonably should have understood the alleged violations.

Klamath-Siskiyou Wildlands Ctr. v. MacWhorter, 797 F.3d 645, 650 (9th Cir. 2015) (internal citations omitted).

Unfortunately for Plaintiff, MacWhorter, being a Ninth Circuit case, is not controlling and the Sixth Circuit appears to have taken a more restrictive view of the notice requirement. In Atlantic States Legal Foundation v. United Musical Instruments, U.S.A., Inc., 61 F.3d 473 (6th Cir.1995), the Sixth Circuit addressed the analogous 60-day notice provision of the Emergency Planning and Community Right to Know Act. The notice provided defendant mentioned violations occurring in 1987-1990, as well as other violations "not yet known," yet the complaint also include a violation occurring in 1991. In holding that jurisdiction did not exist over the alleged 1991 violation, the Sixth Circuit wrote:

> In the RCRA context, the Supreme Court held that "the notice and 60-day delay requirements are mandatory conditions precedent to commencing suit under the ... citizen suit provision; a district court may not disregard these requirements at its discretion." Hallstrom v. Tillamook County, 493 U.S. [20,] 31 [1989]. Accordingly, when a citizen plaintiff fails to provide the required notice, "the district court must dismiss the action as barred by the terms of the statute." Id. at 33[.]

> As the structure of EPCRA's notice provision is substantively identical to the analogous provision of RCRA, it follows that sufficient notice is also a mandatory prerequisite to filing an enforcement action under EPCRA. [Plaintiff] does not dispute this obvious implication of <u>Hallstrom</u> but contends the notice of its intention to hold [defendant] liable for "violations not yet known" was sufficient to create jurisdiction over the alleged 1991 violation. We disagree. One of the important purposes of the notice requirement under environmental statutes is to facilitate "dispute resolution by EPA negotiation [and thereby] reduce the volume of costly litigation." <u>Walls v. Waste Resource Corp.</u>, 761 F.2d 311, 317 (6th Cir.1985). Here, [plaintiff's] failure to include the 1991 violation in its notice may have contributed to the EPA's decision not to act. Moreover, the vague warning of possible other claims failed to inform UMI of the year of the additional alleged violation or even the specific EPCRA reporting requirement involved. For these reasons, the notice of the alleged 1991 violation was inadequate.

<u>Id</u>. at 478.

<u>United Musical</u> has been repeatedly read by district courts in this circuit as requiring more than "overall sufficiency." <u>See</u> e.g., <u>Stephens v. Koch Foods, LLC</u>, 667 F. Supp. 2d 768, 787 (E.D. Tenn. 2009) (while plaintiffs argued that they were "entitled to prove additional violations of the same type on summary judgment or at trial without having to include them in additional 60 day notice letters as the violations recur or are discovered," court noted that "[w]hile this is indeed the rule in the Third Circuit, it is not the law of the Sixth Circuit"); <u>City of Ashtabula v. Norfolk S. Corp.</u>, 633 F. Supp. 2d 519, 524 (N.D. Ohio 2009) (in light of <u>United Musical</u>, failure to adhere to each of the requirements of 40 C.F.R. § 135.3(a) necessitates dismissal); <u>Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n</u>, 2009 WL 8520576, at *11-12 (E.D. Ky. Feb. 27, 2009) (stating that "[b]ecause the citizen suit provision in the EPCRA is indistinguishable from the citizen suit provision in the CWA, this Court is bound by <u>United Musical Instruments</u>" and holding that "there must be strict and specific compliance with the notice requirement," and that plaintiffs could "only pursue claims that are based on violations that were specifically identified in their notice letter"); <u>Frilling v. Village of Anna</u>, 924 F. Supp. 821, 833 (S.D. Ohio 1996) (holding that <u>United</u>

Musical requires that "plaintiffs bringing suit under 33 U.S.C. § 1365 must provide notice of the specific limitations, standards, or orders alleged to be violated").

The rationale for strict and specific notice compliance not only facilitates dispute resolution by the EPA as the Sixth Circuit in United Musical observed, it also "allow[s] the recipient an opportunity to cure the violations before suit is brought, which may obviate the need for a costly lawsuit." Frilling, 924 F. Supp. at 834; see also, Ctr for Biological Diversity v. Marina Point Dev. Co., 566 F.3d 794, 801 (9th Cir.2009) ("the notice is not just an annoying piece of paper intended as a stumbling block for people who want to sue; it is purposive in nature and the purpose is to accomplish corrections where needed without the necessity of a citizen action"). In light of United Musical and the way it has been interpreted in this circuit, the Court will dismiss those allegations that were not contained in the Section 135.3(a) Notice to Defendant.

## VIII.  Conclusion

On the basis of the foregoing, Defendant's Motion to Dismiss will be granted in part and denied in part. The Motion will be granted with respect to alleged violations arising from overflows that were not discharges within the meaning of the 2004 permit; violations that occurred prior to June 26, 2009; violations of ammonia limits; and any claims or allegations that were not specifically mentioned in the Notice. In all other respects, the Motion to Dismiss will be denied.

An appropriate Order will enter.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE